## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**NETCHOICE**                                                          **PLAINTIFF**

**vs.**                                 **CASE NO. 5:25-cv-05140-TLB**

**TIM GRIFFIN, in his official capacity
as Attorney General of Arkansas; TODD MURRAY;
SONIA FONTICIELLA HAGOOD; DEVON HOLDER;
BRANDON CARTER; JEFF PHILLIPS; WILL JONES;
TERESA HOWELL; BEN HALE; CONNIE MITCHELL;
DAN TURNER; JANA BRADFORD; FRANK SPAIN;
TIM BLAIR; S. KYLE HUNTER; DANIEL SHUE;
JEFFREY ROGERS; DAVID ETHREDGE;
TOM TATUM, II; DREW SMITH; REBECCA REED MCCOY;
MICHELLE C. LAWRENCE; DEBRA BUSCHMAN;
ROBERT T. (TONY) ROGERS; BRYAN SEXTON;
CAROL CREWS; KEVIN HOLMES; CHRIS WALTON;
and CHUCK GRAHAM, each in his or her official capacity
as a prosecuting attorney for the State of Arkansas**          **DEFENDANTS**

---

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIFE

---

Plaintiff, NetChoice, by and through its attorneys, and for their Complaint against Defendants Tim Griffin, in his official capacity as Attorney General of Arkansas; Todd Murray; Sonia Fonticiella Hagood; Devon Holder; Brandon Carter; Jeff Phillips; Will Jones; Teresa Howell; Ben Hale; Connie Mitchell; Dan Turner; Jana Bradford; Frank Spain; Tim Blair; S. Kyle Hunter; Daniel Shue; Jeffrey Rogers; David Ethredge; Tom Tatum, II; Drew Smith; Rebecca Reed McCoy; Michelle C. Lawrence; Debra Buschman; Robert T. (Tony) Rogers; Bryan Sexton; Carol Crews; Kevin Holmes; Chris Walton; and Chuck Graham, each in his or her official capacity as a prosecuting attorney for the State of Arkansas, states as follows:

## PRELIMINARY STATEMENT

1.      Two years ago, Arkansas enacted Act 689, dubbed the "Social Media Safety Act," which required a handful of the most popular websites—including Facebook, Instagram, and Twitter (now X)—to verify the age of each individual seeking to create a new account and to prevent minors from accessing the website without parental consent.  Earlier this year, this Court permanently enjoined the state from enforcing the Act, concluding that it violates the First Amendment "in all conceivable applications" because it "erects barriers to accessing entire social media platforms," hindering minors and adults alike who seek to access "the vast democratic forums of the internet."  *NetChoice, LLC v. Griffin*, 2025 WL 978607, at \*13-14 (W.D. Ark. Mar. 31, 2025); *see id.* at \*7-17.  That decision accords with the conclusions of numerous courts across the country that have enjoined states from enforcing similar laws because they violate the First Amendment.  *See, e.g.*, Order at 49-50, *NetChoice v. Carr*, 1:25-cv-2422 (N.D. Ga. June 26, 2025), Dkt.34; *NetChoice, LLC v. Fitch*, 2025 WL 1709668, at \*9-13 (S.D. Miss. June 18, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at \*15-19 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Bonta*, 770 F.Supp.3d 1164 (N.D. Cal. 2025); *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105 (D. Utah 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011 (W.D. Tex. 2024).

2.      Despite the overwhelming consensus that laws like the Social Media Safety Act are unconstitutional, Arkansas elected to respond to this Court's decision not by repealing the provisions that it held unconstitutional but by instead doubling down on its overreach.  Less than two weeks after this Court permanently enjoined the state from enforcing the Act, the Arkansas legislature passed and the Governor signed Acts 900 and 901, which not only leave the

permanently enjoined provisions intact but impose even *more* restrictions and draconian sanctions on "social media platforms."  *See* Ex.1 (Act 900 of 2025); Ex.2 (Act 901 of 2025).

3.       While the Social Media Safety Act limited its application to a relatively small universe of websites like Facebook, Instagram, and Twitter (now X), Act 900 expands the statute's coverage to sweep in a much broader range of online services.  And instead of repealing the (still enjoined) age-verification and parental-consent requirements, Act 900 leaves the substantive obligations untouched, dramatically ratchets up the penalties for violating them, and heaps on a requirement that covered websites "implement technological measures to prevent circumvention of age verification protocols."  Ex.1 §5.

4.       Fortunately, the state will not be able to enforce those amendments so long as the age-verification and parental-consent requirements remain enjoined.  But Act 900 also adds a new provision (§2) that imposes a distinct requirement.  Section 2 prohibits "social media platform[s]" from "engag[ing] in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human."  Ex.1 §2.  Act 901 similarly forbids "social media platform[s]" from "us[ing] a design, algorithm, or feature" that "causes" any "user"—whether minor or adult—to "[d]evelop or sustain an addiction to the social media platform."  Ex.2 §1502(a)(4).[1]

5.       Those vague mandates directly target expressive activity and abjectly fail any form of heightened scrutiny.  At the outset, defining a prohibition in terms of the potential impact on users creates an insurmountable vagueness problem, as it leaves services guessing what designs,

---

[1] All citations to Act 901 reference the location in Title 4, Chapter 88 of the Arkansas Code Annotated at which the relevant provision is to be codified.

algorithms, or features may subject them to liability. Moreover, while the precise contours of these new mandates are anything but clear, they clearly restrict substantial constitutionally protected expression on "social media platforms"—while permitting the exact same speech in other settings. Although the state is free to voice concerns about how much time its citizens spend online, the First Amendment does not countenance "[b]road prophylactic rules in the area of free expression." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

6.    Act 901 also prohibits a "social media platform" from "us[ing] a design, algorithm, or feature" that it "knows, or should have known through the exercise of reasonable care, causes a user to: (1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; [or] (3) [c]ommit or attempt to commit suicide." Ex.2 §1502(a). Lest there be any doubt that these prohibitions are focused on content, Act 901 provides an additional cause of action arising out of "exposure to online content promoting, or otherwise advancing, self-harm or suicide." Ex.2 §1503(b)(1).

7.    To be clear, NetChoice members strongly oppose speech that promotes or glorifies illicit drug use, eating disorders, or self-harm, and they already enforce their own prohibitions against such content. But Act 901 is not confined to those categories—or to any discernable category of speech. By banning speech based on what *impact* it ultimately has on any user of the online service, the law sweeps in all manner of constitutionally protected expression that NetChoice members currently disseminate. To give just a few examples: Act 901 would seem to forbid Nextdoor from carrying ads for allergy medication since they may cause users to "purchase a controlled substance" under Arkansas' broad definition of that term. It could expose Meta to liability for Facebook posts celebrating the achievement of a weight-loss goal or photos on a supermodel's Instagram account if they were linked to a user's eating disorder. And it could expose

YouTube to liability for providing access to popular music containing themes relating to depression or suicide.

8. Even setting aside the vagueness problems, the law is not remotely tailored to the state's legitimate interests. To take just one example, Arkansas law broadly defines "controlled substance" to include all sorts of common prescription and over-the-counter drugs—medicines that it has no legitimate interest in trying to prevent its residents from purchasing.

9. On top of their constitutional flaws, Act 900 and Act 901 are preempted in whole or in part by §230 of the Communications Decency Act ("CDA"), which bars state-law claims seeking to hold the provider of an online service "liable for information originating with a third-party user of the service." *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *see* 47 U.S.C. §230(c)(1). Section 230 was enacted to prohibit states from subjecting online services to liability for failing to remove third-party content—which is precisely what these laws would do.

10. In sum, Arkansas continues to "take[] a hatchet to adults' and minors' protected speech," ignoring this Court's admonition that "the Constitution demands it use a scalpel." *NetChoice*, 2025 WL 978607, at *17. This Court should declare all operative provisions of Act 900 and Act 901 unconstitutional and enjoin Defendants from enforcing both Acts.

## THE PARTIES

11. Plaintiff NetChoice is a nonprofit based in the District of Columbia. It is a trade association for Internet companies. NetChoice's members include (among others) Meta Platforms, Inc., which owns and operates Facebook and Instagram; Nextdoor Holdings, Inc.; Discord, Inc.; Pinterest, Inc.; Reddit Inc.; Snap Inc.; X Corp.; and Google, Inc, which owns YouTube. A full list of NetChoice's members is located here: https://netchoice.org/about. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and

useful. NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that Acts 900 and 901 undermine. NetChoice brings this action on its members' behalf to vindicate their First Amendment rights as well as those of their users, and to prevent the economic and other injuries that the Acts will cause NetChoice members absent judicial relief.

12.     Defendant Tim Griffin is the Attorney General of Arkansas. As the state's chief law-enforcement officer, he is charged with enforcing Acts 900 and 901. *See* Ark. Code §§25-16-702, 4-88-103, 4-88-104; Ex.1 §§3, 6. Attorney General Griffin is a resident of Arkansas. NetChoice sues Attorney General Griffin for declaratory and injunctive relief in his official capacity as the Attorney General of Arkansas.

13.     Defendants Todd Murray, Sonia Fonticiella Hagood, Devon Holder, Brandon Carter, Jeff Phillips, Will Jones, Teresa Howell, Ben Hale, Connie Mitchell, Dan Turner, Jana Bradford, Frank Spain, Tim Blair, S. Kyle Hunter, Daniel Shue, Jeffrey Rogers, David Ethredge, Tom Tatum II, Drew Smith, Rebecca Reed McCoy, Michelle C. Lawrence, Debra Buschman, Robert T. Rogers, Bryan Sexton, Carol Crews, Kevin Holmes, Chris Walton, and Chuck Graham are the state of Arkansas' 28 elected local prosecuting attorneys. Like Attorney General Griffin, local prosecutors have authority to enforce Acts 900 and 901. *See* Ark. Code §§16-21-114(b), (d), 4-88-103, 4-88-1403(b)(1). Each of these individuals resides in Arkansas. NetChoice sues each of them for declaratory and injunctive relief in their official capacity as prosecutors.

## JURISDICTION AND VENUE

14.     NetChoice's causes of action arise under 42 U.S.C. §§1983 and 1988 and the United States Constitution. The Court therefore has jurisdiction under 28 U.S.C. §1331. This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S.

123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a), 2202.

15.     Venue is proper in this District under 28 U.S.C. §1391 because multiple defendants perform their official duties in the Western District of Arkansas and are therefore considered to reside in this District as a matter of law, and because the injuries giving rise to this action are being inflicted on NetChoice and its members in this District.

16.     Many NetChoice members, including Meta Platforms, Nextdoor, Discord, Google, Pinterest, Reddit, Snapchat, and X Corp., operate services that are directly regulated by Acts 900 and 901. Each law imposes substantial compliance costs and threat of liability on these companies. Because these members "would have standing to sue in their own right," NetChoice has associational standing to sue on their behalf. *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31, 2023) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

17.     In addition, the interests this lawsuit seeks to protect are germane to NetChoice's organizational purpose of promoting online commerce and speech and increasing consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful. *Accord id.* at *10 (holding that challenging the Social Media Safety Act was "central to [NetChoice's] organizational purpose").

18.     Finally, the claims asserted and relief requested do not require individual members to participate as parties. Just as in NetChoice's prior challenge to the Social Media Safety Act, "NetChoice's 'claims can be proven by evidence from representative injured members, without fact-intensive-individual inquiry,' and, under these circumstances, 'the participation of certain individual members does not thwart associational standing.'" *Id.* (brackets omitted).

## BACKGROUND

**I.    Legal Background**

19.    While online services are a relatively new innovation, concerns that novel forms of communication could be harmful to minors are anything but new.  The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

20.    In the 1800s, for example, "penny dreadful[]" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike.  *See* James B. Twitchell, *Preposterous Violence:  Fables of Aggression in Modern Culture* 168-69 (1989).  Decades later, comic books were derided as "particularly injurious to the ethical development of children." *Juvenile Delinquency (Comic Books):  Hearings Before the Subcomm. to Investigate Juv. Delinq. of the S. Comm. on the Judiciary*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham).  Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952).  Television too.  *See, e.g.*, Surgeon Gen.'s Sci. Advisory Comm. on Television & Soc. Behav., *Television and Growing Up:  The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcomm. to Investigate Juv. Delinq. of the S. Comm. on the Judiciary*, 83d Cong., 2d Sess. (1954).  In the 1980s, "partly clad, long-haired rockers who s[a]ng about sex, sado-masochism, suicide, murder and other things" were the problem.  *See* Irvin Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 20, 1985), https://tinyurl.com/yrknwwf8.  A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet.  *See* H.R. Rep. No. 105-775, at 7 (1998).  Concerns about violent video games followed soon after.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011).

21.     As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors.  Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature.  *See* Alvin Powell, *Fight Over Huck Finn Continues:  Ed School Professor Wages Battle for Twain Classic*, Harv. Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb.  Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons.  *See Graphic 'Private Ryan' Not for Kids*, Chi. Trib. (Aug. 6, 1998), https://tinyurl.com/44tf6jfr.  Some think that video games are unduly violent.  *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh.  Others say that smartphones are addictive.  *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction?*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum.  Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Facebook, Instagram, Discord, and YouTube.

22.     There are certainly legitimate concerns underlying both sides of these debates, and the government may certainly use its considerable resources to participate in the debate.  But when the government has crossed the line into restricting which constitutionally protected speech minors may access, courts have not hesitated to invalidate such efforts as inconsistent with the First Amendment.  *See, e.g.*, *Brown*, 564 U.S. at 794-95, 805 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14, 217-18 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters).  After all, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar

public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212-13 (citation omitted). In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict access should they choose to do so.

23.    Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programming on television).

24.    As for laws that cover adults and minors alike, the Supreme Court has "emphatically rejected" the "'startling and dangerous' proposition" that the legislature may "create new categories of unprotected speech by applying a 'simple balancing test' that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test." *Brown*, 564 U.S. at 792; *see United States v. Stevens*, 559 U.S. 460, 468-70 (2010) (striking down federal ban on for-profit depictions of animal cruelty).

25.    These longstanding principles apply to online speech. "'Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (brackets omitted) (quoting *Brown*, 564 U.S. at 790).

## II.    Factual Background

### A.    Adults and Minors Alike Use NetChoice Members' Online Services to Engage in a Wide Array of Protected First Amendment Activity.

26.    NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, Nextdoor, Discord, Pinterest, Reddit, Snapchat, X, and YouTube. Those services "allow[] users to gain access to information and communicate with one

another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105. That is why the Supreme Court has held that these are precisely the kinds of "social media" websites that people have a right to "access," free from governmental restraint. *Id.* at 108. On Facebook, Reddit, and X, for example, discussions run the gamut from direct engagement with elected representatives and debates about religion or politics to tips about home maintenance and auto repair. On Instagram, users can share photos of everyday moments and express themselves with short, fun videos. Nextdoor helps users connect with their neighbors; it facilitates everything from sharing local news and promoting local businesses to finding a babysitter and borrowing tools. Discord is a voice, video, and chat app that offers invitation-only spaces for groups of friends and communities to stay in touch and spend time together, as well as larger, more open communities that are generally centered around popular video games such as Minecraft and Fortnite. Pinterest enables users to discover ideas for recipes, style, home decor, and more. On Snapchat, users can communicate with friends and family in fun and casual ways. And YouTube allows users to upload, share, and watch videos on practically any topic that comes to mind.

27.    As the Supreme Court has explained, many of these online services—including Facebook, Instagram, and YouTube—present users with personalized content, "most often based on a user's expressed interests and past activities." *Moody*, 603 U.S. at 734-35. They are aided in that endeavor by "the use of algorithms," which they design to sift through "the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list" and "prioritiz[e] … content" that is likely to be of interest. *Id.* at 734. Like newspaper editors and booksellers, "the major social-media platforms are in the business, when

curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Id.* at 738. Those are "expressive choices" that "receive First Amendment protection." *Id.* at 740.

28.     While NetChoice members often take users' interests into account when curating and disseminating content, they do not "respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736 n.5. NetChoice members instead have carefully crafted policies about what speech they will permit on their services and by whom it may be seen, which they enforce using algorithms, automated editing tools, and human review.

29.     NetChoice members' online services are widely used by teens and adults. Surveys indicate that more than 90% of American teens have used one or more online services offered by NetChoice members. Many teens, in Arkansas and elsewhere, maintain a user profile and use Facebook, Instagram, Discord, and/or YouTube.

30.     Like adults, minors use these websites to engage in all manner of protected First Amendment activity on all manner of topics. For example, they use online services to read the news, connect with friends, explore new interests, practice their faith, and much more. Some use online services to showcase their creative talents, including their artwork, photography, writing, or other forms of creative expression. Others use them to raise awareness about social causes and participate in public discussion on the hottest topics of the day. Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for teens who feel isolated or are seeking support from others who understand their experiences.

###### B.    Parents Have Many Ways to Restrict Their Children's Access to Online Services and to Keep Their Children Safe on Such Services.

31.    Parents who wish to limit their children's access to online services or to control the websites and content to which their children are exposed have numerous options at their disposal.

32.    For starters, parents can decide whether and when to let their children use computers, tablets, and smartphones in the first place.  They can also determine whether, when, and how their children access the Internet by deciding to purchase a personal phone plan for their child or Internet service for their household.  Cell carriers and broadband providers provide parents with tools to block certain apps and sites from their kids' devices, ensure that they are texting and chatting with trusted contacts only, and restrict access to screen time during certain hours of the day.  *See, e.g.*, Verizon, *Verizon Family*, https://tinyurl.com/3brvv69b (last visited June 27, 2025); Tamar Levin, *Guide to Parental Controls for Your Kid's Phone or Tablet*, AT&T, https://tinyurl.com/2mbnsfn5 (last visited June 27, 2025); T-Mobile, *Make Digital Parenting Control Easier with FamilyMode®*, https://tinyurl.com/mpwr4tdd (last visited June 27, 2025); Xfinity, *Set Up Parental Controls for the Internet*, https://tinyurl.com/5acdsnat (last visited June 27, 2025).

33.    On top of that, most wireless routers (the devices that provide wireless Internet connectivity throughout a home) offer parental control settings.  *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 28, 2025), https://tinyurl.com/ymsctasa.  Parents can use these settings to block certain websites or online services that they deem inappropriate, set individualized content filters for their children, and monitor the websites their children visit and the services they use.  *See* NETGEAR, *NETGEAR Smart Parental Controls*, https://tinyurl.com/yjvsmjy6 (last visited June 27, 2025).  Parents can also use router settings to turn off their home Internet at particular times of day, pause Internet

access for a particular device or user, or limit the amount of time that a child can spend on a particular website or online service.  *See id.*

34.    Additional parental controls are available at the device level.  For example, iPhones and iPads empower parents to limit the amount of time their children can spend on the device, choose which applications (*e.g.*, YouTube, Facebook, Snapchat, or Instagram) their children can use, set age-related content restrictions for those applications, filter online content, and control privacy settings.  *See* Apple, *Use Parental Controls on Your Child's iPhone or iPad* (May 5, 2025), https://tinyurl.com/2wpjvjwh.  Google and Microsoft similarly offer parental controls for their devices.  *See* Google:  Safety Center, *Parental Controls*, https://tinyurl.com/43eks8uj (last visited June 27, 2025); Microsoft, *Microsoft Family Safety*, https://tinyurl.com/bp9s4yrf (last visited June 27, 2025).  In addition, numerous third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See* Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://tinyurl.com/43537k92.  And helpfully, there are resources that collect multiple parental-control tools in one place.  *See, e.g.*, Internet Matters, Parental Control Guides, https://tinyurl.com/58knyafv.

### C.    NetChoice Members Offer Numerous Parental Controls and Tools to Keep Minors Safe Online.

35.    On top of all that, NetChoice members provide parents with many tools to decide for themselves what minors can see and do on their services, and have devoted extensive resources to developing policies and practices to protect minors and adults who use their services.

36.    For starters, most services operated by NetChoice members—including Facebook, Instagram, Nextdoor, Discord, Pinterest, Snapchat, Reddit, X, and YouTube—require users in the United States to be at least 13 years old before they can create an account.  Some members also offer separate experiences geared at users under 13.  For example, YouTube offers two services—

YouTube Kids and a "Supervised Experience" on YouTube—designed for minors under 13. *See* YouTube for Families Help, *Important Info for Parents About YouTube Kids*, https://tinyurl.com/2z6cw92p (last visited June 27, 2025); YouTube Help, *What Is a Pre-Teen Supervised Experience on YouTube*, https://tinyurl.com/2uat3j5r (last visited June 27, 2025). These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

37.     NetChoice members also provide users with tools to curate the content they wish to see. Users can generally choose whom to follow. Users can generally block or mute other users and control who may see and interact with their own content. Some members provide users with tools to exclude specific categories of content they wish to avoid. Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether). Instagram users can select a "not interested" button to filter out content they do not wish to see. They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

38.     NetChoice members empower parents with supervision tools and features to monitor teens' online activities. For example, Facebook offers supervision tools that parents and guardians can use. Parents can see how much time their teens have spent on the Facebook app. They can set scheduled breaks for their teens and see their Facebook friends. Parents can also review some of their teens' privacy settings and content preferences and see the people and pages they have blocked. *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited June 27, 2025).

39.     Instagram's supervision tools similarly enable parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and

monitor accounts followed by their teens and the accounts that follow them.  Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings.  *See, e.g.*, Instagram:  Help Center, *About Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited June 27, 2025).

40.     As announced in September 2024, Meta began placing teens on Instagram in the United States into Teen Accounts, which have built-in protections limiting who can contact them and the content they see.  Teens under 16 need a parent's permission to change any of these settings to be less strict.  In April 2025, Meta announced the expansion of Teen Accounts to Facebook and Messenger.  Meta, *We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger* (Apr. 8, 2025) ("*New Built-In Restrictions*"), https://tinyurl.com/32xdne63;  *see, e.g.*, Instagram, *Instagram Teen Accounts*, https://tinyurl.com/ya6aknx4 (last visited June 27, 2025).   Teen Accounts have enhanced protections, like automatically being placed into private accounts and the strictest setting of available content controls.  They also have notifications turned off overnight and reminders to leave the app after 60 minutes, and they can only be messaged by people they follow or are already connected to.  Meta, *New Built-In Restrictions*, *supra*, https://tinyurl.com/32xdne63.  Teen Accounts also include additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing.

41.     YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (i) to receive email notifications when a teen uploads a video or starts a livestream; (ii) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (iii) to choose whether to link accounts between a parent and teen.  YouTube, *Exploration Starts Here*, https://tinyurl.com/2dpetf76 (last

16

visited June 27, 2025). YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed. *Id.*

42.    NetChoice members also restrict communications between adults and teens on their services—if they allow such communications at all. *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan. 25, 2024), https://tinyurl.com/2ucma8sv; Snap Inc., *Snapchat Safeguards for Teens*, https://tinyurl.com/mvas8784 (last visited June 27, 2025). For example, Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

43.    Some NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult. Other NetChoice members, such as YouTube, do not offer private messaging between users at all.

**D.    NetChoice Members Have Adopted Detailed Policies Prohibiting Harmful Content and Spend Massive Amounts of Resources Enforcing Them.**

44.    In addition to providing parental-control and other tools that can be employed to tailor a user's experience, NetChoice members expend significant resources curating the content on their services to ensure that it is appropriate for adults and teens alike. Members have developed detailed policies restricting the publication of harmful content, including (among other things)

violent and sexual content; content that promotes the sale or use of illicit or recreational drugs; bullying and harassment; and content that encourages suicide, self-injury, or eating disorders.

45.    For example, Facebook and Instagram's Community Standards prohibit content that "speaks positively about, encourages the use of, or provides instructions to use or make" illicit drugs, as well as advertisements that promote their sale or use.  *See* Meta:  Transparency Ctr., *Restricted Goods and Services*, https://tinyurl.com/367xzu9c (last visited June 27, 2025); Meta: Transparency Ctr., *Drugs and Pharmaceuticals*, https://tinyurl.com/mrxnejhp (last visited June 27, 2025).  YouTube similarly prohibits content showing illicit drug use, explaining how to make drugs, encouraging or promoting drug abuse, or facilitating the sale of illicit drugs.  *See* YouTube Help, *Illegal or Regulated Goods or Services Policies*, https://tinyurl.com/y4hbf2ey (last visited June 27, 2025).  Discord likewise prohibits content related to creating or selling illegal drugs or other regulated substances.  *See* Discord, *Dangerous and Regulated Goods Policy Explainer* (March 15, 2024), https://tinyurl.com/47vxjwyx.

46.    NetChoice members also prohibit certain content related to suicide, self-injury, and eating disorders.  Facebook and Instagram "do not allow people to intentionally or unintentionally celebrate or promote suicide, self-injury or eating disorders."  Meta:  Transparency Ctr., *Community Standards:  Suicide, Self-Injury, and Eating Disorders*, https://tinyurl.com/5b6vhy52 (last visited June 27, 2025).  Accordingly, both services strive to "remove any content that encourages suicide, self-injury or eating disorders," including "content that contains instructions for extreme weight loss behaviour" and "content that mocks victims or survivors of suicide, self-injury or eating disorders, as well as real time depictions of suicide or self-injury."  *Id.*  They also impose restrictions on advertisements that touch on these sensitive subjects.  *See* Meta: Transparency Ctr., *Advertising Standards:  Suicide, Self-Injury, and Eating Disorders*,

https://tinyurl.com/ms7vaebr (last visited June 27, 2025).  YouTube likewise prohibits "[c]ontent promoting or glorifying suicide, self-harm, or eating disorders," including "[i]nstructions on how to die by suicide, engage in self-harm, or engage in eating disorders (including how to conceal them)."  YouTube Help, *Suicide, Self-Harm, and Eating Disorders Policy*, https://tinyurl.com/8aeeeamk (last visited June 27, 2025).  "Using Discord to glorify or promote suicide or self-harm," including "disordered eating patterns," "is not allowed under any circumstance."  Discord, *Suicide and Self-Harm Policy Explainer* (March 15, 2024), https://tinyurl.com/j83dmkw5.  And Nextdoor offers resources for combating suicide and self-harm.  *See* Nextdoor Help Ctr., *Suicide & Self-Harm Prevention*, https://tinyurl.com/2ekmfm5u (last visited June 27, 2025).

47.    NetChoice members further protect minors in particular by "age gating" some content, which prevents minors from seeing content visible to adults, or younger teens from seeing content visible to older teens.  For example, Meta restricts minors (but not adults) from viewing sensitive content depicting recovery from self-injury, such as healed cuts or images of the physical effects of eating disorders.  *See* Meta, *Community Standards*, *supra*.  YouTube restricts various types of sensitive content—e.g., sexually suggestive content, violent or graphic content, vulgar language, and depictions of dangerous activities—to users who are 18 or older.  *See* YouTube Help, *Age-Restricted Content*, https://tinyurl.com/2dnk3vud (last visited June 27, 2025).  Discord does the same.  *See* Discord, *Age-Restricted Content on Discord* (May 12, 2022), https://tinyurl.com/4hn5sddu.

48.    NetChoice members expend considerable resources developing their content-moderation policies and enforcing them using algorithms, automated editing tools, and human review.  Meta alone spends billions of dollars every year on safety and security, much of which

19

goes toward removing harmful content. *See* Nick Clegg, *Meta Launches New Content Moderation Tool as It Takes Chair of Counter-Terrorism NGO* (Dec. 13, 2022), https://tinyurl.com/55jbbshs. Google likewise spends huge sums on content moderation, removing tens of millions of YouTube videos and terminating millions of YouTube channels each year because of policy violations. *See* Google Transparency Rep., *YouTube Community Guidelines Enforcement*, https://tinyurl.com/anpjre3v (last visited June 27, 2025).

### III.    The Challenged Statutes

#### A.    In 2023, Arkansas Enacted the "Social Media Safety Act," Which This Court Declared Unconstitutional and Permanently Enjoined.

49.    Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Arkansas has taken it upon itself to decree what is appropriate for minors on the Internet. In April 2023, it enacted the Social Media Safety Act, which was designed to dramatically restrict minors' access to "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on several of the most popular online fora.

50.    The Act prohibits minors (defined as individuals under 18) from holding accounts on and accessing "social media platform[s]" without first obtaining parental consent and requires "social media compan[ies]" to verify the age of every individual who attempts to sign up to use their services. Ark. Code §4-88-1402(a)-(c). It also forbids any "commercial entity" from "retain[ing] any identifying information of an individual after access to the social media platform has been granted." *Id.* §1404(a); *see also id.* §1401(3)(A) (defining "[c]ommercial entity"). The Act imposes both civil and criminal liability on companies that fail to comply with these restrictions. *See id.* §1403(b)-(c).

20

51.    In June 2023, NetChoice sued to challenge the constitutionality of the Social Media Safety Act on behalf of its members. *See Griffin*, 2025 WL 978607, at *1-2, *6. This Court preliminarily enjoined enforcement of the Act shortly before its September 1, 2023 effective date, *id.* at *1, and ultimately awarded NetChoice a declaratory judgment and a permanent injunction against enforcement of the Act on March 31, 2025, *id.* at *17. In doing so, the Court held that the Act violates the First Amendment "in all conceivable applications." *Id.* at *14.

52.    As the Court explained, the Act burdens vast amounts of expressive activity by "all Arkansans—both adults and minors whose parents would allow them to use social media"—thus triggering "intermediate scrutiny at a minimum." *Id.* at *8. And because the Act's definitions of "social media company" and "social media platform" include "both content-based and speaker-based distinctions," the law triggers "strict scrutiny." *Id.* at *10.

53.    The Court concluded that the Act could not survive strict scrutiny because it "is not narrowly tailored to address" the state's asserted interest in protecting minor children. *Id.* at *11; *see also Griffin*, 2023 WL 5660155, at *16-21 (conducting intermediate-scrutiny analysis at preliminary-injunction stage). To the contrary, the Act is "seriously overinclusive": "Rather than targeting content that is harmful to minors, [it] simply impedes access to content writ large." *Griffin*, 2025 WL 978607, at *13. At the same time, the Act is grossly underinclusive, as it (1) lets minors have unfettered access to these supposedly dangerous online services "so long as one parent says it's OK," *id.* (ellipsis omitted) (quoting *Brown*, 564 U.S. at 802), and (2) covers a handful of large online services that the state apparently dislikes, while arbitrarily exempting many others, including "at least some … that adult sexual predators commonly use to communicate with children," *id.* at *11.

54.     This Court also held that the Social Media Safety Act is unconstitutionally vague. *Id.* at *14-17. A law is void for vagueness "if it 'forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* at *15 (brackets omitted) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). And, as the Court explained, the Act "must meet" a particularly "stringent vagueness test because it both contains criminal penalties … and interferes with the right of free speech." *Id.* (quotation marks omitted). It failed that test because its definitions of "social media company" and "social media platform" do not make clear which companies are regulated. Indeed, the state's litigation counsel took the position that the Act does not cover Snapchat (a NetChoice member), while "a co-sponsor of the Act as well as the State's own expert witness contend[ed] that Snapchat *is* regulated." *Id.* at *17. This vagueness "risk[s] chilling effects" by forcing arguably regulated entities "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked.'" *Id.* at *15 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). It also "invit[es] arbitrary enforcement" by giving the state *carte blanche* to bring actions against disfavored online services but not other similar services. *Id.* at *15-16.

**B.      In April 2025, Arkansas Passed Two Additional Laws Taking Aim at "Social Media Platforms."**

55.     In January 2025, while the Social Media Safety Act was preliminarily enjoined and NetChoice's motion for summary judgment was pending, the Governor urged the state legislature to "update the Social Media Safety Act so that it's no longer held up in court and can begin to be enforced." Off. of Governor of Ark., *Governor Sanders Delivers State of the State Address* (Jan. 14, 2025), https://tinyurl.com/2zvwytz3. The full video of the Governor's speech is available on the Governor's official Facebook page, https://tinyurl.com/ms7d6uy, and the Governor's official YouTube channel, https://tinyurl.com/5n8s7dp4.

56.     On April 2, 2025—just two days after this Court granted NetChoice's motion for summary judgment, declaring Act 689 "unconstitutional in all conceivable applications," *Griffin*, 2025 WL 978607, at \*14—the Governor announced the introduction of two new pieces of legislation, now known as Act 900 and Act 901.  *See* Off. of Governor of Ark., *Sanders Announces New Social Media Protections* (Apr. 2, 2025), https://tinyurl.com/uvam4jns.

57.     The Governor acknowledged that the Social Media Safety Act was (and still is) "currently enjoined," but asserted that the proposed amendments in Act 900 (then known as S.B. 611) would "remedy" its legal defects and "allow it to go into effect."  *Id.*  The Governor also asserted that Act 901 (then known as S.B. 612) would "protect kids" from being "subjected to toxic material" on covered online services.  *Id.*; *see also* Sonny Albarado, *Bills Would Amend Arkansas Social Media Law, Create Right for Parents to Sue Platforms*, Ark. Advoc., https://tinyurl.com/ykj85nnh (Apr. 3, 2025) (noting that S.B. 612 "would create a right for parents to sue social media platforms … because of content the child was exposed to").

58.     This new legislation passed through the House of Representatives and the Senate in just two weeks.  On April 21, 2025, the Governor signed Act 900 and Act 901 into law.  Off. of Governor of Ark., *Bills Signed* (Apr. 21, 2025), https://tinyurl.com/3x54tc68https://tinyurl.com/uvam4jns.

59.     Sections 2 and 5 of Act 900 do not take effect until April 21, 2026.  *See* Ex.1 §5 (adding new §1405(b)); Ex.1 §8.  The rest of Act 900 and all of Act 901 is slated to take effect on August 3, 2025, which is 90 days after the Arkansas legislature ended its regular session for 2025.  *See Miller v. Witcher*, 254 S.W. 1063, 1063-64 (Ark. 1923) (construing Article 5, §1 of the Arkansas Constitution).

### 1.    Much of Act 900 is unenforceable because of the existing injunction.

60.    Most of Act 900 is dead on arrival.  In *Griffin*, this Court correctly held that the Social Media Safety Act's age-verification and parental-consent requirements are "unconstitutional in all conceivable applications" and enjoined the state from enforcing them.  *See* 2025 WL 978607, at *14, 17.  Notably, Act 900 does not repeal or amend in any way the substantive provisions requiring "social media companies" to perform age verification and obtain parental consent before letting minors access their platforms.  *Compare* Act 900, *with* Ark. Code §§4-88-1402, 1403(a).  Accordingly, the state is still enjoined from enforcing those provisions, and NetChoice need not challenge them anew in this lawsuit.  To the extent Arkansas wishes to argue that Act 900 fixes the constitutional problems with the Social Media Safety Act's age-verification and parental-consent requirements (which Act 900 plainly does not), the onus is on the state to persuade this Court (or the Eighth Circuit) to lift or modify the injunction.[2]  Unless and until that happens, the state cannot enforce the bulk of Act 900 against NetChoice members.

61.    Section 1 of Act 900 amends various definitions, in an apparent effort to broaden the universe of online services that must conduct age verification and demand parental consent.  But those definitional amendments are ineffectual so long as enforcement of the unchanged substantive obligations—§4-88-1402 and §1403(a)-(c)—remains enjoined.  For example, Act 900 changes the definition of "minor" from a person under the age of 18 to a person under the age of 16, Ex.1 §1 (amending §1401(9)), but this Court already enjoined enforcement of the age-verification and parental consent requirements with respect to *all* minors.  As another example, while Act 900 deletes Act 689's exception-riddled definition of "social media company," Ex.1 §1

---

[2] If, for whatever reason, the amended Social Media Safety Act's age-verification and parental-consent requirements were to become enforceable, NetChoice reserves the right to amend this complaint to challenge those provisions.

24

(striking prior version of §1401(7) in its entirety), that does not somehow permit the state to begin requiring "[a] social media company" to "verify the age of an account holder," §1402(b)(1), or to block teens from accessing its "social media platform" without "the express consent of a parent or legal guardian," §1402(a). Indeed, the state apparently recognizes as much, as it recently filed a post-trial motion in the Act 689 case asking the Court to narrow the injunction so that it could begin enforcing the amended statute. *See* Defendant's Brief in Support of Motion to Alter or Amend Judgment at 9-10, *Griffin*, No. 5:23-cv-5105, Dkt.83.

62.    For similar reasons, §3 of Act 900 is largely inoperative. Section 3 authorizes "[a] parent or guardian" to sue a "social media platform that is in violation of §4-88-1402" (emphasis omitted). But this Court already held that §1402's age-verification and parental-consent requirements are "unconstitutional in all conceivable applications," *Griffin*, 2025 WL 978607, at *14, and Act 900 does not amend those substantive obligations. They remain unconstitutional, despite §3's effort to impose "strict liability" on anyone who violates them.

63.    Section 4 fares no better. It dramatically increases the penalties that an individual may obtain from "[a] covered social media platform" that "permits a minor to access [it] in violation of this subchapter," raising the maximum civil penalty from $2,500 to $10,000 per violation and providing that "[e]ach day" of unsanctioned access, in violation of §1403, "constitutes a separate violation." Ex.1 §4 (amending §1403(c)(1) and adding (c)(2)). Because the substantive obligations of §1403(a) remain unchanged, however, these sanctions cannot constitutionally be imposed on anyone.

64.    Section 5 is a nullity, too. Its command that online services "prevent circumvention of age verification protocols," Ex.1 §5, is entirely dependent on the existence of §1402's age-verification protocols. Because NetChoice members need not adopt the Act's age-verification

protocols in the first place, thanks to the existing injunction, there is nothing for them to prevent minors from circumventing.[3]

### 2. Act 900's lone operative section imposes several new content- and speaker-based restrictions on online speech.

65.    Not content with trying to beef up enforcement measures for the age-verification and parental-consent provisions this Court had just permanently enjoined, the state also imposed entirely new and burdensome obligations on "social media platform[s]"—a term that Act 900 defines extremely broadly—via §2 of Act 900.

66.    As this Court will recall, Act 689's definition of "social media platform" was so riddled with exceptions and qualifications that the statute covered only a handful of very large companies such as "Meta, Twitter [now X], and TikTok," *Griffin*, 2025 WL 978607 at *16 (brackets in original).  Act 900 jettisons much of the old definition, and redefines a "[s]ocial media platform" as "a business entity or organization that operates an online platform, application, or service that:"

(i)     Is designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication;

(ii)    Assigns, utilizes, or relies on a unique identifier, username, profile name, or image that is associated with a specific user account;

(iii)   Provides mechanisms for a user to create an online profile comprised of *personally identifiable information* or professional information, including without limitation a user's name, username, address, date of birth, educational pedigree, professional details, interests, activities, or connections;

(iv)    Employs features that allow a user to connect, follow, or establish a relationship with other users and creates a network of interactions either in

---

[3] Sections 6 through 8 of the Act are not at issue, either, as they do not purport to impose any obligations on NetChoice members.

real time or asynchronously, including without limitation virtual likes and dislikes;

(v)     Generates revenue primarily through user engagement, including without limitation through advertising, user data monetization, or premium content; and

(vi)    Is accessed by Arkansas users.

Ex.1 §1 (adding §1401(11)(A)).

67.    That expansive definition covers many websites and apps that are not commonly referred to as "social media platforms."  For example, the *New York Times* app and the ESPN app (1) "facilitate user-to-user" and "user-to-public interaction, expression, or communication"; (2) allow users to "create an online profile" with a unique "username" or "profile name"; (3) allow users to "connect … with other users"—e.g., by letting users comment on and/or "like" content such as articles and videos; and (4) "[g]enerate[] revenue primarily … through advertising" and "premium content" available only to users who pay a subscription fee.  *Cf.* Ex.1 §1 (adding §1401(11)(A)).  And the only things Act 900 exempts from that definition are "an email service provider, a not-for-profit organization, a public or private school, business-to-business software, a common carrier, or a broadband internet service."  *Id.*

68.    Section 2 of Act 900 proceeds to impose several onerous requirements on this newly defined universe of "social media platforms."  First, it decrees that each "platform" must "ensure that [it] does not engage in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human." Ex.1 §2 (adding new §1402(d)(1)).  The law does not define either "addiction or compulsive behaviors" or "practices to evoke" them; it instead just directs platforms to implement its vague

commands "[c]onsistent with contemporary understanding of addiction, compulsory behavior, and child cognitive development" (terms it likewise does not define). *Id.*

69.    Second, every "social media platform" must "[e]nsure that, by default:

(A)    Notifications to an Arkansas user who is a minor, other than safety or privacy-related alerts, are ceased between the hours of 10:00 p.m. central standard time (CST) and 6:00 a.m. central standard time (CST) and allow a parent or guardian to modify this setting; and

(B)    Privacy and safety settings for an Arkansas user who is a minor on a covered social media platform provides the most protective level of control for privacy and safety offered by the covered social media platform[.]"

Ex.1 §2 (emphasis omitted) (adding new §1402(d)(2)).

70.    Third, every "social media platform" must "[c]onduct an audit at least one (1) time per quarter to ensure that the social media platform's software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior." Ex.1 §2 (adding new §1402(d)(3)).

71.    Fourth, every "social media platform" must "[d]evelop an easily accessible online dashboard to allow a parent of a minor user to view and understand his or her child's use habits on the covered social media platform" and "provide tools for a parent to restrict his or her minor child's access to the covered social media platform, or logical portions of the covered social media platform." Ex. 1 §2 (adding new §1402(d)(4)).

### 3.    Act 901 saddles "social media platforms" with even more content-based restrictions, along with liability for content generated entirely by third parties.

72.    Act 901 imposes yet another new set of onerous obligations on "social media platform[s]," using the same broad definition of "social media platform" as Act 900, but without the carveouts for "an email service provider, a not-for-profit organization, a public or private

28

school, business-to-business software, a common carrier, or a broadband internet service." *Compare* Ex.1 §1 (adding new §1401(11)), *with* Ex.2 §1501(a)(5).

73.     Act 901 creates a new §1502, which provides:  "A social media platform shall not use a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user to:

(1)     Purchase a controlled substance;

(2)     Develop an eating disorder;

(3)     Commit or attempt to commit suicide; or

(4)     Develop or sustain an addiction to the social media platform."

Ex.2 §1502(a).

74.     Notably, neither these obligations nor the "users" who must be taken into account in determining their scope are limited to minors; a social media platform cannot use any "design, algorithm, or feature" that might "cause" *any* user to engage in the covered conduct *at all*, even as to its adult users.  The Attorney General is authorized to enforce these obligations by bringing a civil-enforcement action seeking restitution and injunctive relief.  *See* Ark. Code §4-88-104.

75.     Act 901 also creates a new §1503, which prohibits a "social media platform" from "host[ing], promot[ing], shar[ing], or otherwise facilitat[ing]" access by a minor child to "online content promoting, or otherwise advancing, self-harm or suicide."  Ex.2 §1503(b)(1).

76.     "[K]nowing and willful[]" violations of §1503 may be punished by "[a] civil penalty not to exceed ten thousand dollars," plus "litigation costs and reasonable attorney's fees."  Ex.2 §1503(a).  Again, the Attorney General has enforcement authority.  *See* Ark. Code §4-88-104.

77.    Section 1503 also includes a private right of action for "[a] parent or guardian whose minor child or legal dependent commits suicide or attempts to commit suicide ... following exposure to online content promoting, or otherwise advancing, self-harm or suicide."  Ex.2 §1503(b)(1).   A court may award "[a]ffirmative relief from the effects of the content," "[d]amages," "[c]osts of medical treatment," "[f]uneral expenses and related costs," "[p]unitive damages," "[l]itigation costs," and "reasonable attorney's fees," which "shall be no less than the lesser of the... [t]otal cost of the defendant's legal fees for the lawsuit" or "[r]easonable legal fees for the defense, had the defendant prevailed."  Ex.2 §1503(b)(2)-(3).

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment - Act 900
### Facial & As-Applied Challenge
### (42 U.S.C. §1983, *Ex parte Young*)

78.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

79.    Count One claims that §§2 and 5 of Act 900 violate the First Amendment, both on their face and as applied to NetChoice members' curation and dissemination of collections of third-party and their own speech on their online services.[4]

80.    This Court's decision in *Griffin* effectively disposes of §5.  The Court held that age-verification requirements burden core First Amendment activity, triggering "intermediate scrutiny at a minimum."  *Griffin*, 2025 WL 978607, at *8.  Those requirements cannot survive any form of heightened scrutiny, as they are not narrowly tailored to serve an important state interest.  *Id.* at

---

[4] The remaining provisions of Act 900 are also invalid, but NetChoice need not challenge them at this time because they are already rendered unenforceable by this Court's permanent injunction in *NetChoice v. Griffin*, No. 5:23-cv-5105.  *See supra* ¶¶60-63.

*10-14; *see Griffin*, 2023 WL 5660155, at *16-21.  Because §5's anti-circumvention regime is merely an adjunct to age-verification, it burdens protected speech and fails narrow tailoring for the same reasons.  Simply put, the state cannot require NetChoice members to prevent circumvention of an unconstitutional (and permanently enjoined) age-verification regime.

81.    Section 2 is distinct from the age-verification regime.  And it is even more of an affront to the First Amendment.  Section 2 prohibits covered services from engaging in "practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human."  Ex.1 §2 (adding new §1402(d)(1)).  The statute does not even attempt to limit its reach to any "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."  *Stevens*, 559 U.S. at 468-69.  Instead, it prohibits *any* speech on *any* topic, or any other type of "practice" that the state (or a jury) happens to think "evoke[s] any addiction or compulsive behaviors" in Arkansas' minors.

82.    It is not at all clear how a covered website is supposed to know which of its "practices" "evoke addiction and compulsive behavior."  It is not even clear what Arkansas means by "addiction" or "compulsive behavior."  Is it "compulsive" for a user to check her Instagram feed twice a day?  What about four times a day?  Is it "addictive" to spend 30 minutes a day searching for odd jobs on Nextdoor?  What about spending an hour reading articles on NYTimes.com, or logging on every morning to complete the daily crossword or Wordle over a cup of coffee?  What is "addictive" to one user, moreover, may not be "addictive" to others.  Some users may check an online service often because they want to see how many other users have "liked" or commented on one of their posts.  Others may not care.  Some users may spend more

time on Facebook because they find user-generated speech particularly engaging or informative. Others do not. How a website is supposed to determine which "practices" violate the Act's prohibitions, the law does not explain. When it comes to restrictions on speech, laws must speak "with narrow specificity" so the citizenry have fair notice about what is prohibited. *NAACP v. Button*, 371 U.S. 415, 433 (1963). Vague prohibitions like §2 risk chilling would-be speakers by forcing them to "steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372. As explained in greater detail in Count II, §2 runs afoul of that requirement multiple times over.

83.    Whatever "practices" §2 ultimately prohibits, however, there is no question that it infringes on First Amendment rights. To the extent §2 restricts features such as "notifications" and "recommended content," that is a direct prohibition on the website's own speech. It also burdens minors' First Amendment rights to receive speech. Likewise, by prohibiting features that evoke in users an "artificial sense of accomplishment," and "online bots that appear human," the law appears to target all manner of features that make websites more engaging and useful to minors, including comments, likes, streaks, and artificial intelligence. That also restricts websites' own speech. And by preventing minors from engaging in all manner of expression on those websites, it burdens the First Amendment rights of minors too.

84.    Section 2's second operative paragraph likewise burdens First Amendment activity. It prohibits covered websites from sending push notifications to minors during certain times of the day and requires them to default minors to the strictest privacy and safety settings. Ex.1 §2 (adding §1402(d)(2)). Again, that burdens both the First Amendment rights of covered websites to disseminate content to their users and the First Amendment rights of minors to receive that content.

And §2 triggers First Amendment scrutiny yet again by compelling speech; it requires covered websites to provide a "dashboard" for parents to view their child's "use habits."

85.    Because §2 directly burdens First Amendment activity, it "is subject to intermediate scrutiny at a minimum." *Griffin*, 2025 WL 978607 at \*8; *see, e.g.*, *Packingham*, 582 U.S. at 105-06. But because the law discriminates on the basis of content and speaker, it triggers strict scrutiny too.

86.    "The most basic" principle of First Amendment law is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. Accordingly, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling state interest[]." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). In addition, "[the Supreme] Court's precedents are deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (second brackets in original) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)).

87.    In its prior opinion, this Court correctly held that the original version of the Social Media Safety Act triggered strict judicial scrutiny because it regulated protected speech on the basis of content and speaker. *See Griffin*, 2025 WL 978607, at \*7-10. While Act 900 eliminates some of the content- and speaker-based distinctions previously codified in §1401(7) and (8), the amended Social Media Safety Act still discriminates based on content and speaker. Indeed, the new substantive obligations imposed by Act 900 §2 trigger strict scrutiny several times over.

88.     As the Supreme Court has explained, some content-based restrictions target "particular subject matter," while others "defin[e] regulated speech by its function" or end result. *Reed*, 576 U.S. at 163.  Section 2 does both.  First, it broadly restricts covered entities' speech, including their "notifications," "recommended content," and interactions with users, based on whether that speech may "evoke any addiction or compulsive behaviors" by a minor.  Ex.1 §2 (adding new §1402(d)(1), (3)).  That is a content-based restriction:  Whether speech is permissible depends on what effect it may have on its audience.

89.     Proving the point, §2 is infected by some of the same content-based distinctions that doomed the Social Media Safety Act.  As this Court previously explained, "news" is a "certain type[] of content."  *Griffin*, 2025 WL 978607 at *9.  Yet Act 900 does not repeal parts of the Social Media Safety Act that discriminate in favor of "news," expressly exempting "news-gathering organization[s]" and any "news … broadcast, website video, report, or event" from liability.  Ark. Code §4-88-1403(d).  Accordingly, the new obligations created by §2 are subject to those content-based carveouts as well as those created by Act 900 itself.  Section 2 thus requires covered entities to ensure that their "notifications" and "recommended content" are not causing minors "to engage in compulsory or addiction-driven behavior"—unless they are disseminating "news or public interest" or "business-to-business" content.  *Id.*; Ex.1 §1 (amending §1401(11)(B)).  And while the law restricts "notifications" to Arkansas minors, it does not restrict notifications about a "news or public interest … event," Ark. Code §4-88-1403(d), or "safety or privacy-related alerts," Ex.1 §2 (adding new §1402(d)(2)(A).

90.     Like the rest of the Social Media Safety Act, §2 discriminates among speakers, too.  It singles out entities that "facilitate" expressive activity—specifically, "user-to-user, user-to-group, or user-to-public interaction, expression, or communication"—for special burdens.  *See*

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983).  Even amongst websites that facilitate "user-to-user" communications, §2 draws distinctions; "email service provider[s]," for example, are exempt.  *See* Ex.1 §1 (adding §1401(11)(A), (B)).  And while Act 900 §2 imposes obligations on a broad array of for-profit entities, it excludes any "not-for-profit organization, a public or private school, business-to-business software, a common carrier, or a broadband internet service."  Ex.1 §1 (adding §1401(11)(B)); *see also* Ark. Code §4-88-1403(d) (additional exemptions).

91.     Section 2 draws other content- and speaker-based distinctions as well.   The amended statute expressly restricts speech on services that facilitate "*user*-to user, *user*-to-group, and *user*-to-public … expression," as well as "one-on-one or one-on-group messages," but it does not cover *institutional or corporate* expression even if the substance is identical.  Ex.1 §1 (emphases added) (adding §1401(8), (11)(A)(i)).  Act 900 thus privileges speech by "institutional content creators" (e.g., "movie and TV studios, mainstream media outlets, and traditional journalists") "over the speech of users of online services" (e.g., "the Soundcloud artist, the TikTok chef, and the citizen journalist").  *Cf. Griffin*, 2025 WL 978607, at *9.  Services like Facebook, Instagram, and Nextdoor must eschew and suppress expressive speech that the state may think "evoke[s] any addiction or compulsive behaviors" in their users, but services like Disney+, Hulu, and HBO Max have no such obligation.  Such "elevation" of "provider-generated content over user-generated content is a content-based regulation."  *Paxton*, 747 F.Supp.3d at 1032; *accord Fitch*, 2025 WL 1709668, at *8; *Reyes*, 748 F.Supp.3d at 1122-23.

92.     "Courts 'apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.'" *Griffin*, 2025 WL 978607, at *7 (quoting *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 642 (1994)).  To satisfy

strict scrutiny, Arkansas must demonstrate that Act 900 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Even intermediate scrutiny would require Arkansas to demonstrate that Act 900 is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Arkansas cannot make either showing.

93.     Section 2 comes nowhere close to satisfying narrow tailoring. To begin, its vague restrictions on "practices" that supposedly "evoke" or "caus[e]" minors to engage in "addiction-driven" or "compulsive behavior" are wildly overinclusive. As noted above, §2 does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors. It instead aims broadly at core aspects of how services disseminate both third-parties' and their own protected speech—including specifically targeting their algorithms, which are "[t]he key" to culling through "billions of posts or videos" to present users with curated content. *Moody*, 603 U.S. at 734; *see* Ex.1 §2 (targeting "recommended content"). Indeed, the Arkansas Attorney General has already taken the position that the algorithm-based recommendations used by Facebook, Instagram, and YouTube are "addictive."[5]

94.     In essence, §2 prohibits online services from displaying protected speech to millions of users—ironically including content and resources that help users *combat* various types of addiction and compulsion—if a subset of minor users might find the presentation or the speech especially appealing. And because it is impossible to know, *ex ante*, what "practices" may cause any individual minor to engage in arguably "addiction-driven" or "compulsive" behavior,

---

[5] *See, e.g.*, Am. Compl. ¶¶6-7, 32, 121-22, 130, 140, 171, 173, 208, 240-41, *State ex rel. Griffin v. Meta Platforms, Inc.*, No. 57CV-23-47 (Ark. Cir. Ct. Oct. 30, 2023); Compl. ¶¶6, 70, 74, 95, 100, 149, *State ex rel. Griffin v. Alphabet Inc.*, No. 54CV-24-258 (Ark. Cir. Ct. Sept. 30, 2024).

regulated services can avoid crippling sanctions only by dramatically restricting *all minors'* access to speech and effective tools to present and organize it.  That is breathtakingly overbroad measured against any interest the state could assert.

95.    Conversely, §2 is seriously underinclusive because it excludes countless forms of expression that could be equally "addict[ive]" to minors.  The law does not restrict purportedly addictive practices (including notifications and content recommendations) by services like Disney+, Hulu, and Max, despite the potential for minors to spend too much time "binging" their favorite movies or TV shows.  It likewise does not cover many video games, despite suggestions that video-game addiction affects up to 10% of the U.S. population.[6]

96.    Section 2's ban on sending certain notifications to minors between 10:00pm CT and 6:00am CT appears motivated by "a concern that notifications will … interrupt their sleep."  *Cf. NetChoice v. Bonta*, 761 F.Supp.3d 1202, 1227 (N.D. Cal. 2024) (analyzing similar provision of California law).  "But if that is the case, why not prohibit all notifications during those hours?"  *Id.* It makes scant sense to permit an after-hours "news" alert (e.g., a notification that the minor's favorite college team just won a national title) or a notification by an unregulated application (e.g., a university or other "non-profit") while barring the exact same notification if it comes from Facebook.  *See id.*

97.    At bottom, §2 of Act 900 appears to be animated by Arkansas' concern that minors are spending what the state views as "too much" time on "social media platforms."  But it is highly doubtful that the state has a legitimate interest in restricting minors' ability to access and interact on some of "the most important places … for the exchange of views," *Packingham*, 582 U.S. at

---

[6] Cleveland Clinic, *Video Game Addiction* (May 27, 2022), https://tinyurl.com/yukf4pva.

104, just because the state thinks some minors spend too much time doing so. *See O'Brien*, 391 U.S. at 377 (state's interest must be "unrelated to the suppression of free expression"). Singling out forms of speech that have proven particularly popular imposes a particularly significant First Amendment burden, as that distinctly burdens the content that people find most valuable. The "fear that speech might persuade provides no lawful basis for quieting it." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011). Some minors undoubtedly spend several hours per day reading graphic novels, playing video games, listening to podcasts or music, watching movies, or binging television series. That hardly empowers Arkansas to insert itself into homes throughout the state and second-guess the parenting choices of its residents about what content, in what quantity, is appropriate for their minor children.

98.    Even assuming that is an important state interest, the Act gives no indication that Arkansas has considered less-speech-restrictive alternatives to the imposition of draconian sanctions on "social media platforms"—let alone concluded that such alternatives are insufficient. When the government finds speech problematic, "[t]he preferred First Amendment remedy" is "more speech, not enforced silence." *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). If the state believes that teens are spending too much time on "social media platforms," then it is free to share its concerns with the public and urge parents, teachers, and young people to avail themselves of the numerous parental controls and other tools that are already available and to impose healthy limits on "social media" usage. After all, it is manifestly less restrictive to educate the public about what tools are available and how to use them, and "a court should not presume parents, given full information, will fail to act." *Playboy*, 529 U.S. at 824.

99.    Indeed, §2 is so poorly tailored when judged against any *legitimate* interest the state may have that it seems Arkansas' real concern is that not all parents share its views about the propriety of "social media platforms" for minors.  But to the extent that is the concern that the provision is designed to address, then the law's "effect is only in support of what the State thinks parents *ought* to want," which, again, is not a permissible ground for government interference with First Amendment rights.  *Brown*, 564 U.S. at 804.

100.    Those deficiencies render §§2 and 5 of Act 900 facially unconstitutional.  Those sections are facially invalid because *all* their applications are unconstitutional—or, at minimum, a substantial number of their applications are unconstitutional judged in relation to any plainly legitimate sweep the law may have.  Section 5 is unconstitutional in all its applications because its provisions are an adjunct to the age-verification regime already struck down as unconstitutional.  Section 2 is also unconstitutional in all its applications because each of the new onerous requirements it places on "social media platform[s]" unconstitutionally interferes with how those "platforms" curate and disseminate collections of third-party and their own speech, implicating the First Amendment rights of NetChoice members and their users.  Even if there are some conceivable applications of §2 that would *not* implicate the First Amendment, those applications are far outweighed by the "substantial amount of protected speech" that their heartland applications restrict.  *Moody*, 603 U.S. at 723.  In short, because the core, if not sole, applications of §§2 and 5 of Act 900 impermissibly abridge speech in violation of the First Amendment, those provisions in the Act are facially invalid.

101.    Sections 2 and 5 of Act 900 are also unconstitutional as applied to NetChoice's members insofar as the law burdens their constitutionally protected expressive activity.  Even if the statute is not unlawful on its face, it cannot be applied to NetChoice members when they are

engaged in expressive activity such as curating and disseminating collections of third-party or their own speech. *See Moody*, 603 U.S. at 740. The Court should thus hold that §§2 and 5 of Act 900 violate the First Amendment as applied to NetChoice members when they are engaged in that activity.

## COUNT TWO
### Unconstitutional Vagueness – Act 900
### (42 U.S.C. §1983, *Ex parte Young*)

102.    NetChoice re-alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set out herein.

103.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at, 372. For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP*, 371 U.S. at 433.

104.    The new substantive prohibitions of Act 900 §2 are unconstitutionally vague. How is a "social media platform" supposed to determine what the "contemporary understanding of addiction, compulsory behavior, and child cognitive development" is, given the robust academic debate on these topics? Is that "contemporary" understanding fixed at the time of the statute, or

40

does it evolve over time?  What if experts on both sides of the debate disagree?  Whose "understanding" should control under the statute?

105.    What is more, how is an online service supposed to predict whether its "practices" may "evoke any addiction or compulsive behaviors" in a minor?  What is "addictive" to some minors may not be addictive to others.  Does allowing teens to share photos with each other evoke addiction?  What if the videos disappear after a set amount of time?  What about prioritizing content that matches a user's interests?  Promoting content that has lots of views or likes?  Providing live play-by-play updates of sports games that encourage people to keep hitting "refresh"?  Setting up discussion groups on video games in which people are intensely interested, like Fortnite and Minecraft?  And what if a handful of minors find a particular practice "addictive," but the majority of minors do not?  Does that trigger liability under §2?  The Act does not say.

106.    In short, covered websites have no way of knowing what "practices" will trigger liability under §2.  The Act does not provide even minimum guidelines about how to interpret its nebulous mandate, leaving covered websites to choose between risking unpredictable and arbitrary enforcement (backed by significant penalties) or eliminating (or at least restricting to adults) core various features of their services.  When it comes to First Amendment protected speech, the state may not hinge liability on a provision so ambiguous in nature.

107.    The Act's definition of "social media platform" remains unconstitutionally vague as well.  This Court held that the original version of the Social Media Safety Act "[wa]s unconstitutionally vague because it fail[ed] to adequately define which entities are subject to its requirements, risking chilling effects and inviting arbitrary enforcement."  *Griffin*, 2025 WL 978607, at *15.  In particular, the statutory definitions of "social media company" and "social

41

media platform" were so vague that companies were left "to guess whether their online services [we]re covered." *Id.* at *15-16.

108.    While Act 900 considerably broadens the definition of "social media platform," it does not solve the vagueness problem.  What does it mean for an online service to "[g]enerate revenue primarily through user engagement"?  That term would seem to encompass any advertisement-driven website, from an online news service to a recipe blog, even though such websites are not typically thought of as "social media."  And what about websites that facilitate travel, such as Kayak.com?  Perhaps Act 900 intends to sweep in all such websites under the rubric of "social media," but it is far from clear.

109.    Moreover, because Act 900's definition of "social media platform" is so much broader than Act 689's definition of that term, the statutory carveouts take on even greater importance.  The statute's liability-creating provisions "do[] not … [a]pply to a public interest broadcast, website video, report, or event," Ark. Code §4-88-1403(d)(1), but it makes no effort to define the "public interest."  And it is anyone's guess how to harmonize §1403(a)(1), which continues to impose liability on companies that "*knowingly* violate [the Act]," with the new §1403(b)(2)(C), which purports to make any "violation" of the Social Media Safety Act "a *strict liability* civil offense" (emphases added).

110.    To make matters worse, Act 900 §2 inexplicably uses the terms "covered social media platform" and "social media platform" interchangeably, even though the former has a much broader statutory definition.  *See* Ex.1 §2 (using "social media platform" in §1402(d), (d)(1), and (d)(3), but "covered social media platform" in §1402(d)(2)(B), (4)(A)-(B)).  That leaves a "messaging service" or "other online platform" in the dark as to whether it must comply with §2.

*See* Ex.1 §1 (amending §1401(5)(A) to include not only a "social media platform" but also a "messaging service" or "other online platform").

111.    For any and all of these reasons, Act 900 §2 is unconstitutionally vague.

**COUNT THREE**
**Supremacy Clause, CDA §230 Preemption – Act 900**
**(42 U.S.C. §1983, *Ex parte Young*)**

112.    In addition to its constitutional defects, Act 900 §2 is preempted in whole or in part by federal law—specifically, §230 of the Communications Decency Act.  Congress enacted §230 "to encourage the unfettered and unregulated development of free speech on the Internet," while "keep[ing] government interference in the medium to a minimum." *Batzel v. Smith,* 333 F.3d 1018, 1027 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766-67 (9th Cir. 2017).  As pertinent here, §230(c)(1) declares that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1). Section 230 also contains an express-preemption clause:  "[N]o liability may be imposed under any State or local law that is inconsistent with this section." *Id.* §230(e)(3).

113.    Like "[t]he majority of federal circuits," the Eighth Circuit has interpreted §230 "to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (quoting *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir. 2006)).  Simply put, §230 preempts any state law that seeks to "hold[] [online services] legally responsible for information that third parties created and developed." *Id.* at 791.

114.    That is precisely what §2 of Act 900 does.  Section 2 subjects online services to liability if their curated presentation of third parties' speech "evoke[s] any addiction or compulsive behaviors in an Arkansas user who is a minor."  Ex.1 §2 (adding §1402(d)(1)).  To avoid liability,

43

an online service would necessarily have to monitor third-party posts and take down any that might lead to that result. But "to impose liability on the basis of" failing to remove third-party content "necessarily involves treating the liable party as a publisher of the content it failed to remove," thus triggering §230 immunity. *Est. of Bride ex rel. Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1177 (9th Cir. 2024); *see, e.g.*, *Johnson*, 614 F.3d at 792 (interpreting §230 to forbid imposing liability against a defendant "for material originating with a third party"). Indeed, a federal court recently held that §230 barred state-law claims that Facebook, Instagram, Snapchat, TikTok, and YouTube allegedly use "algorithms" "in a way that promotes addiction" because such claims "directly target defendants' roles as publishers of third-party content." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.Supp.3d 809, 830-31 (N.D. Cal. 2023). That reasoning equally applies to §2 of Act 900.

## COUNT FOUR
### First Amendment – Act 901
### Facial & As-Applied Challenge
### (42 U.S.C. §1983, *Ex parte Young*)

115.    NetChoice re-alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set out herein.

116.    Count Four claims that Act 901 violates the First Amendment, both on its face and as applied to NetChoice members' curation and dissemination of collections of third-party and their own speech on their online services.

117.    Act 901 triggers First Amendment scrutiny. It restricts the use of "a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user"—including an adult—to: "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." Ex.2 §1502(a); *see id.* §1503(b)(1).

Here, too, the statute does not even attempt to limit its reach to any "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Stevens*, 559 U.S. at 468-69.  It prohibits *any* speech on *any* topic that the state (or a jury) happens to think the website "should have known" "cause[s] a user" to "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform."

118.    Of course, NetChoice members already strive to remove all manner of content that may harm users, including content that promotes or glorifies suicide and eating disorders.  *See supra* ¶¶44-48.  But it is another thing for a government to effectively mandate the removal of protected speech, and Act 901 sweeps broadly—punishing websites for disseminating any content that the state (or a jury) happens to think the website "should have known" may cause a user to purchase a controlled substance, develop an eating disorder, commit suicide, or develop an addiction to its services, even if that content does not promote or glorify any of that conduct.  And here, too, it is not at all clear what Act 901 prohibits.  Does it require YouTube to take down clips of the movie "Pineapple Express"?  What about the music video for Afroman's "Because I Got High," or Johnny Cash's "Hurt"?  Must Facebook remove posts promoting workout trends?  What about healthy recipes?  Can NYTimes.com promote engaging games like Wordle?  What if the game includes access to years' worth of past puzzles and features that allow players to interact with each other or play against an AI-powered bot?  Act 901 provides no clarity as to any of that.  Again, when it comes to restrictions on speech, laws must speak "with narrow specificity" so the citizenry can know what is prohibited.  *NAACP*, 371 U.S. at 433.  As explained in Count V, Act 901 runs afoul of that requirement.

119.    Whatever Act 901 ultimately prohibits, there is no question that it likewise infringes on First Amendment rights.  To the extent Act 901 restricts websites from offering designs, algorithms, and features that may facilitate a user's view of, for example, clips of Pineapple Express, that is unquestionably a restriction on the website's speech.  It is likewise a burden on the First Amendment rights of users who wish to receive that speech.

120.    Act 901 triggers strict judicial scrutiny because it imposes content-based restrictions on speech.  It is well established that the First Amendment generally prevents the government from "singl[ing] out specific subject matter for differential treatment," including by using the "function" or end result of speech as a proxy for its content.  *Reed*, 576 U.S. at 163, 169; *see City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 74 (2022) ("[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result.").  That describes Act 901 to a T:  It expressly restricts speech that could "cause[] a user"—including an adult—to: "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." Ex.2 §1502(a); *see id.* §1503(b)(1) (prohibiting hosting or sharing "online content promoting, or otherwise advancing, self-harm or suicide").  Each of those provisions is clearly content based, *see Paxton*, 747 F.Supp.3d at 1036 (concluding that similar provisions of Texas law are "as content based as it gets"), even if the state purports to regulate only the effects of the speech it targets, *see Boos v. Barry*, 485 U.S. 312, 321 (1988).

121.    Because Act 901 imposes content-based restrictions on protected speech, it is subject to strict judicial scrutiny.  It cannot survive that demanding standard.  Indeed, it could not even pass intermediate scrutiny.  For starters, the prohibition on speech that could cause someone

46

to "[p]urchase a controlled substance" sweeps far more broadly than is necessary to further the state's legitimate interest in preventing illicit drug use. After all, purchasing "a controlled substance" is not necessarily illegal or even harmful; Arkansas law defines numerous common medicines (e.g., Sudafed) as "controlled substance[s]." *See* Ark. Code §5-64-201 to -215. The plain text of Act 901 thus appears to broadly prohibit online services from carrying advertisements or even informal recommendations for prescription drugs (and even some over-the-counter medications). *Cf.* Meta: Transparency Ctr., *Prescription Drugs*, https://tinyurl.com/m6nds8en (last visited June 27, 2025) (permitting advertisements for prescription drugs under certain circumstances); Nextdoor, *Nextdoor Ads & Policy Guidelines*, https://tinyurl.com/psyytwxn (last visited June 27, 2025) (same).

122.    The law also necessitates that "social media platforms" censor considerable quantities of political and ideological speech. For example, while Facebook and Instagram prohibit content that promotes using illegal drugs, they currently permit content "[d]ebating or advocating for the legality or discussing scientific or medical merits of" illegal drugs.[7] But Act 901 could expose them to liability for that constitutionally protected speech if it ends up causing a user to purchase a "controlled substance."

123.    Act 901's prohibitions on expression that could cause any user to "[d]evelop an eating disorder" or "[c]ommit or attempt to commit suicide" are similarly wildly overinclusive. NetChoice members like Facebook already remove content that "celebrate[s]," "promote[s]," or "encourages suicide, self-injury or eating disorders," including "instructions for extreme weight loss behaviour" and "real time depictions of suicide or self-injury."[8] But Act 901 would force

---

[7] Meta, *Restricted Goods and Services*, *supra*.

[8] Meta, *Community Standards*, *supra*.

them to restrict content far more broadly, as it is impossible to know, *ex ante*, what effect a given statement, image, or video could have on an unidentified recipient.  To avoid the risk of crippling liability, an online service would need to restrict large amounts of speech that enjoys First Amendment protection and is not harmful to the bulk of its users—from photos on a supermodel's Instagram account to Facebook posts that celebrate hitting a weight-loss goal or a physical-fitness milestone to virulent criticism of an ex-spouse on YouTube—out of fear that, with the benefit of hindsight, it could be linked to an eating disorder or act of self-harm.

124.    Finally, Act 901's prohibition on "use [of] a design, algorithm, or feature" that "causes a user" to "[d]evelop or sustain an addiction to [a] social media platform," Ex.2 §1502(a), is overinclusive for the same reasons as Act 900's similar prohibition on "practices [that] evoke any addiction or compulsive behaviors in an Arkansas user who is a minor," Ex.1 §2 (adding new §1402(d)(1)).  *See supra* ¶¶93-94.  If anything, Act 901 is even worse than Act 900 in this respect, as it imposes liability on a "social media platform" for expressive activity that an *adult* spends too much time viewing.

125.    In addition, Act 901's content-based restrictions on online speech are wildly underinclusive, as they do not apply to identical content that is communicated through other media—including books, magazines, television, movies, and the spoken word.  For example, Hulu cannot be held liable if someone decides to buy marijuana after viewing "Pineapple Express."  Nor can a fashion magazine be held liable if its portrayals of very thin body types and promotion of diet culture cause a reader to develop an eating disorder.

126.    The state has many other ways to promote the interests ostensibly served by Act 901 while restricting little, if any, speech.  For one thing, the state can penalize primary conduct instead of related speech.  Indeed, Arkansas law already has criminal prohibitions on illicit sales

of controlled substances, *see, e.g.*, Ark. Code §§5-64-420 to -422, -426, -430, -438, and on "encouraging the suicide of another person," *id.* §5-10-107.  These prohibitions are far more direct and effective means of preventing drug abuse and peer-induced self-harm than penalizing "social media platforms" for third-party speech.  Moreover, as explained, Arkansas is free to educate its citizens about how to cultivate a healthy body image and encourage them to set reasonable limits on screen time—two efforts toward which NetChoice members already devote considerable resources.  *See supra* ¶¶44-48.  This is not the exceedingly rare case in which content-based restrictions on protected speech can pass constitutional muster.

127.    Those deficiencies render Act 901 unconstitutional on its face.  The Act is facially invalid because *all* of its applications are unconstitutional—or, at minimum, a substantial number of its applications are unconstitutional judged in relation to any plainly legitimate sweep it may have.  Every one of 901's applications regulates how "social media platform[s]" curate and disseminate speech on their online services. Ex.2 §1502(a).  And for the reasons already explained, all those applications burden First Amendment rights of NetChoice members and their users and are unconstitutional under heightened scrutiny.  Even if there are some conceivable applications of Act 901 that would *not* implicate the First Amendment, those applications are far outweighed by the "substantial amount of protected speech" that the Act's heartland applications restrict. *Moody*, 603 at 723.  In short, because the core, if not sole, applications of Act 901 impermissibly abridge speech in violation of the First Amendment, the Act is facially invalid.

128.    Act 901 is also unconstitutional as applied to NetChoice and its members insofar as the law burdens their constitutionally protected expressive activity.  The Act regulates "design[s], algorithm[s], or feature[s]" that "causes a user to" engage in certain conduct.  Ex. 2 §1502(a).  Even if Act 901 is not unlawful on its face, it cannot be applied to NetChoice members

when they are engaged in expressive activity such as curating and disseminating collections of third-party or their own speech. *See Moody*, 603 U.S. at 740. The Court should thus hold that Act 901 violates the First Amendment as applied to NetChoice members when they are engaged in that activity.

**COUNT FIVE**
**Unconstitutional Vagueness – Act 901**
**(42 U.S.C. §1983, *Ex parte Young*)**

129.    NetChoice re-alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set out herein.

130.    Like §2 of Act 900, Act 901 is unconstitutionally vague. It restricts the use of "a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user"—including an adult—to: "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." The Act contains no explanation for how a website is supposed to know ex ante what sorts of designs, algorithms, and features violate that provision. That nebulous prohibition would chill any number of decisions about what content to feature via the website's design, algorithms, or features. For example, would the law prohibit a website from using algorithms to share a music video of Afroman's "Because I Got High?" What about the "search" feature in YouTube that might lead to Johnny Cash's "Hurt" or Blink-182's "Adam's Song"? May Instagram recommend videos that feature workout content? Could Facebook display videos promoting healthy recipes? And what if a user stumbles upon that content via Instagram's or Facebook's search function? Likewise, how is the *New York Times* supposed to determine whether Wordle or Crossword may lead to "addiction," whatever that is supposed to mean? Act 901 does not provide any guidance as to any of those questions.

50

131.    Here, too, the Act leaves covered websites to choose between risking unpredictable and arbitrary enforcement (backed by serious penalties) or declining to engage in speech.  When it comes to speech, the state cannot hinge liability on a provision that is so ambiguous in nature. *Cf. Paxton*, 747 F.Supp.3d at 1040-42 (holding that ban on speech "that 'promotes,' 'glorifies,' or 'facilitates' 'suicide, self-harm,' 'eating disorders,' [or] 'substance abuse'" was unconstitutionally vague (brackets omitted)).

## COUNT SIX
### Supremacy Clause, CDA §230 Preemption – Act 901
### (42 U.S.C. §1983, *Ex parte Young*)

132.    NetChoice re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

133.    In addition to its First Amendment defects, Act 901 is preempted in whole or in part by federal law—specifically, §230 of the Communications Decency Act.  Congress enacted §230 "to encourage the unfettered and unregulated development of free speech on the Internet," while "keep[ing] government interference in the medium to a minimum."  *Batzel,* 333 F.3d at 1027.  As pertinent here, §230(c)(1) declares that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  Section 230 also contains an express-preemption clause:  "[N]o liability may be imposed under any State or local law that is inconsistent with this section."  *Id.* §230(e)(3).

134.    Like "[t]he majority of federal circuits," the Eighth Circuit has interpreted §230 "to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Johnson*, 614 F.3d at 791 (quoting *Almeida,* 456 F.3d at 1321).  Simply put, §230 preempts any state law that seeks to "hold[]

[online services] legally responsible for information that third parties created and developed." *Id.* at 791.

135.    That is precisely what Act 901 does.  Under §1502(a)(1), online services can be held liable if one user's speech "causes" another user to, for example, "[p]urchase a controlled substance."  Ex.2.  To avoid liability, an online service would necessarily have to monitor third-party posts and take down any that might lead to such a transaction.  But "to impose liability on the basis of" failing to remove harmful content "necessarily involves treating the liable party as a publisher of the content it failed to remove," thus triggering §230 immunity.  *Est. of Bride*, 112 F.4th at 1177; *see, e.g.*, *Johnson*, 614 F.3d at 792 (interpreting §230 to forbid imposing liability against a defendant "for material originating with a third party").  In *Dyroff v. Ultimate Software Group, Inc.*, for example, the Ninth Circuit held that §230 barred a claim that a website's "features and functions, including algorithms" "facilitated [an] illegal drug sale[]," leading to a user's tragic death from fentanyl-laced heroin.  934 F.3d 1093, 1095, 1098 (9th Cir. 2019).

136.    All of Act 901's liability-creating provisions share this defect.  It does not matter whether the prohibition is framed as prohibiting a "design, algorithm, or feature" that organizes, displays, and disseminates particular types of third-party content, Ex.2 §1502(a), or a ban on "host[ing], promot[ing], shar[ing], or otherwise facilitat[ing]" access to third-party content, Ex.2 §1503(b)(1).  Either way, Act 901 impermissibly makes online services "liable for information originating with third-party users of the service." *Johnson*, 614 F.3d at 792.  Indeed, just last year, a court held that §230 preempts a Texas law requiring online services to filter content "that promotes, glorifies, or facilitates … 'suicide, self-harm, or eating disorders.'" *Paxton*, 747 F.Supp.3d at 1023, 1042-43.  There is no reason for a different outcome here.

### PRAYER FOR RELIEF

NetChoice prays for the following relief from the Court:

1.      A declaration, pursuant to 28 U.S.C. §2202, that §§2 and 5 of Act 900 on their face violate the United States Constitution and are therefore void and unenforceable, or, in the alternative, that they are unconstitutional as applied to NetChoice members.

2.      A preliminary injunction enjoining all Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice members under §2 or §5 of Act 900.

3.      A permanent injunction enjoining all Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice members under §2 or §5 of Act 900.

4.      A declaration, pursuant to 28 U.S.C. §2202, that Act 901 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to NetChoice members.

5.      A preliminary injunction enjoining all Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice members under Act 901.

6.      A permanent injunction enjoining all Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing or otherwise bringing suit against NetChoice members under Act 901.

7.      Such costs and reasonable attorneys' fees to which NetChoice may be entitled by law, including under 42 U.S.C. §1988.

8.      Any further relief Court deems just and proper.

Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR  72758
Office: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

Paul D. Clement*
Erin E. Murphy*
James Y. Xi*
Joseph J. DeMott*
Philip Hammersley*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
Phone: (202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
philip.hammersley@clementmurphy.com

*pro hac vice application forthcoming