**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

NETCHOICE,

        *Plaintiff,*

        v.

TIM GRIFFIN, in his official capacity as
Attorney General of Arkansas, et al.,

        *Defendants*.

Civil Action No. 5:25-cv-05140-TLB

**MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................4

       A.     Adults and Minors Alike Use NetChoice Members' Online Services to Engage in a Wide Array of Protected First Amendment Activity..........................4

       B.     NetChoice Members Have Adopted Detailed Policies Prohibiting Harmful Content and Spend Massive Amounts of Resources Enforcing Them ..........................................................................................................6

       C.     Arkansas Enacts the "Social Media Safety Act" of 2023, and This Court Holds It Facially Unconstitutional.........................................................7

       D.     Arkansas Enacts Act 901 of 2025 .........................................................9

ARGUMENT.....................................................................................................................11

I.      NetChoice Has A High Likelihood Of Success On The Merits......................................11

       A.     NetChoice Is Likely to Succeed on Its First Amendment Claim..........................12

            1.     Act 901 triggers strict scrutiny several times over.................................12

            2.     Act 901 cannot survive any level of heightened scrutiny........................15

            3.     Act 901 is unconstitutional on its face and as applied to NetChoice members..............................................................................20

       B.     NetChoice Is Likely to Succeed on Its Vagueness Claim.....................................21

       C.     NetChoice Is Likely to Succeed on Its CDA §230 Preemption Claim. ................23

II.     NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief.............25

       A.     NetChoice Members Will Suffer Irreparable Harm Absent Preliminary Relief..........................................................................................................25

       B.     The Balance of Equities and Public Interest Strongly Favor an Injunction.....................................................................................................27

CONCLUSION..................................................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Almeida v. Amazon.com, Inc.,*
456 F.3d 1316 (11th Cir. 2006) ................................................................................. 24

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) .................................................................................................. 20

*Baggett v. Bullitt,*
377 U.S. 360 (1964) .................................................................................. 3, 9, 17, 21

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) .................................................................................. 23

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ........................................................................................ 8, 13, 15

*City of Austin v. Reagan Nat'l Advert. of Aus., LLC,*
596 U.S. 61 (2022) .................................................................................................... 13

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
747 F.Supp.3d 1011 (W.D. Tex. 2024) ....................................................... 14, 22, 25

*Dyroff v. Ultimate Software Group, Inc.,*
934 F.3d 1093 (9th Cir. 2019) .................................................................................. 24

*E. Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) .................................................................................... 26

*Elrod v. Burns,*
427 U.S. 347 (1976) .................................................................................................. 25

*Entergy, Ark., Inc. v. Nebraska,*
210 F.3d 887 (8th Cir. 2000) .............................................................................. 26, 27

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) .................................................................................................... 8

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.,*
112 F.4th 1168 (9th Cir. 2024) ................................................................................. 24

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) .................................................................................................. 21

*Hisp. Int. Coal. of Ala. v. Governor of Ala.,*
691 F.3d 1236 (11th Cir. 2012) ................................................................................ 27

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010).................................................................................................. 14

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022) ............................................................................. 27

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    702 F.Supp.3d 809 (N.D. Cal. 2023) ................................................................... 25

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ...............................................................3, 11, 24, 25

*Johnson v. Minneapolis Park & Recreation Bd.*,
    729 F.3d 1094 (8th Cir. 2013)...............................................................................11

*Little Rock Fam. Plan. Servs. v. Rutledge*,
    397 F.Supp.3d 1213 (E.D. Ark. 2019) ................................................................. 27

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
    540 F.3d 752 (8th Cir. 2008)................................................................................. 25

*Miller v. Witcher*,
    254 S.W. 1063 (Ark. 1923) .................................................................................... 9

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)............................................................................................... 14

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)......................................................................................*passim*

*NAACP v. Button*,
    371 U.S. 415 (1963)............................................................................................... 21

*NetChoice v. Carr*,
    2025 WL 1768621 (N.D. Ga. June 26, 2025) ...................................................... 25

*NetChoice, LLC v. Fitch*,
    --- F.Supp.3d ----, 2025 WL 1709668 (S.D. Miss. June 18, 2025) ...................... 14

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................................................. 9, 26

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ...............................................*passim*

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................... 27

iii

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)...........................................................................................*passim*

*Percoco v. United States*,
  598 U.S. 319 (2023)..................................................................................... 23

*Phelps-Roper v. Nixon*,
  509 F.3d 480 (8th Cir. 2007)................................................................. 25, 27

*Platt v. Moore*,
  15 F.4th 895 (9th Cir. 2021)......................................................................... 26

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)..................................................................................... 13

*Reno v. ACLU*,
  521 U.S. 844 (1997)....................................................................................... 4

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988)..................................................................................... 17

*United States v. O'Brien*,
  391 U.S. 367 (1968)..................................................................................... 15

*United States v. Stevens*,
  559 U.S. 460 (2010)..................................................................................... 12

*United States v. Williams*,
  553 U.S. 285 (2008)..................................................................................... 21

**Statutes**

47 U.S.C. §230(c)(1).................................................................................. 3, 23

47 U.S.C. §230(e)(3)..................................................................................... 24

Ark. Code §§5-64-201 to -215....................................................................... 15

Ark. Code §4-88-103 ............................................................................... 10, 26

Ark. Code §4-88-104 ............................................................................... 10, 26

Ark. Code §4-88-1401 *et seq.* ......................................................................... 1

Ark. Code §4-88-1402(a)-(c)............................................................................ 8

Ark. Code §4-88-1403(b)-(c)............................................................................ 8

Ark. Code §5-10-107 ..................................................................................... 19

Ark. Code §5-64-420 .................................................................................................... 19

Ark. Code §5-64-421 .................................................................................................... 19

Ark. Code §5-64-422 .................................................................................................... 19

Ark. Code §5-64-426 .................................................................................................... 19

Ark. Code §5-64-430 .................................................................................................... 19

Ark. Code §5-64-438 .................................................................................................... 19

**Other Authorities**

Am. Compl., *State ex rel. Griffin v. Meta Platforms, Inc.*, No. 57CV-23-47
(Ark. Cir. Ct. Oct. 30, 2023) ................................................................................... 18

Compl., *State ex rel. Griffin v. Alphabet Inc.*, No. 54CV-24-258
(Ark. Cir. Ct. Sept. 30, 2024)................................................................................. 18

## INTRODUCTION

NetChoice respectfully seeks preliminary relief from a recently enacted Arkansas law that restricts vast quantities of expressive activity across a broad array of online services, including Facebook, Instagram, Nextdoor, Discord, Pinterest, Reddit, Snapchat, Tumblr, X (formerly Twitter), and YouTube. This Court recently held that the state's first effort to restrict access to protected speech on "social media" (the so-called "Social Media Safety Act," Ark. Code §4-88-1401 *et seq.*) violates the First Amendment "in all conceivable applications" and is unconstitutionally vague to boot. *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *14, *17 (W.D. Ark. Mar. 31, 2025). But instead of heeding the Court's admonition that the Constitution obliges states to "use a scalpel," rather than "a hatchet," when regulating "adults' and minors' protected speech," *id.* at *17, Arkansas responded by enacting two more laws targeting "social media" that are even broader and vaguer than the original one. While this lawsuit challenges both those laws—Acts 900 and 901 of 2025—this motion seeks preliminary relief from only Act 901, given its fast-approaching effective date of August 3, 2025.[1]

Act 901 is blatantly unconstitutional. The Act's main operative provision prohibits a "social media platform" (very broadly defined) from "us[ing] a design, algorithm, or feature" that it "knows, or should have known through the exercise of reasonable care, causes a user to: (1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide"; or (4) "[d]evelop or sustain an addiction to the social media platform." Act 901,

---

[1] As detailed in the complaint, much of Act 900 is unenforceable, as it merely expands the coverage of (and potential penalties for violating) the Social Media Safety Act's existing age-verification and parental-consent regime, which the Attorney General remains permanently enjoined from enforcing. *See* Compl.¶¶55-64. To the extent Act 900 imposes new obligations on "social media platforms," they do not take effect until April 21, 2026, so NetChoice will endeavor to work with the state to fully litigate its challenges to those provisions before then. That said, NetChoice reserves the right to seek preliminary relief as to Act 900 if need be.

§1502(a).[2]  To be clear, NetChoice members strongly oppose speech that promotes or glorifies illicit drug use, eating disorders, or self-harm, and they already enforce their own prohibitions against such speech.  But Act 901 is not confined to those categories—or to any discernable (let alone unprotected) category of speech.  While it is not at all clear what exactly its amorphous commands are meant to prohibit, Act 901 would seemingly bar "social media" websites from disseminating *any* third-party speech that the state (or a jury) thinks it "should have known" would cause *any* user—minor or adult—to purchase drugs, develop an eating disorder, etc.  By banning speech based on what *impact* it ultimately has on a user of the online service, the law sweeps in all manner of constitutionally protected expression that NetChoice members currently disseminate.  Google could be liable for disseminating clips of "Pineapple Express" on YouTube, Meta could be liable for recommending motivational exercise videos on Instagram, and Nextdoor could be liable for publishing advertisements for allergy medication.  That is a breathtakingly sweeping restriction on protected First Amendment activity, and on the basis of content to boot.

Act 901 flunks any form of heightened scrutiny, as its nebulous prohibitions are not tailored to any legitimate state interest.  The Act is radically overinclusive:  It burdens any speech that could have an enumerated harmful effect on any single recipient ("a user"), even if the speech is not harmful (and is even highly valuable) to other recipients.  And its effects-based prohibitions will force online services to broadly restrict anything that might lead to one of the listed effects.  Could the New York Times cause a user to develop an "addiction" by providing a virtually limitless archive of "engaging word and logic games"—including features that let users interact with

---

[2] A copy of Act 901 can be found at Dkt.2-2.  This brief cites provisions of Act 901 based on the locations in Title 4, Chapter 88 of the Arkansas Code Annotated at which they are to be codified.

friends—and encouraging "everyone" to "enjoy playing every day"?  Ex.1; Ex.2.[3]  It is anyone's

guess.  At the same time, the Act is radically underinclusive, as it restricts only online services that

disseminate user-generated speech and allows the exact same types of content in other settings.

For example, it does not regulate purveyors of movies, television, or video games—even if they

are disseminating the same exact content—so long as they offer only provider-generated content

and do not "facilitate user … interaction, expression, or communication."  Act 901, §1501(5).  In

other words, Act 901 leaves the Hulu app free to offer "Pineapple Express," the HBO Max app

free to stream advertisements for allergy medications, and www.MTV.com free to play Nirvana

music videos while seemingly prohibiting Instagram and YouTube from doing the same.

Act 901 is also hopelessly vague.  A person of ordinary intelligence cannot know, *ex ante*,

whether a particular "feature" will cause some unidentified user to purchase a controlled substance,

develop an eating disorder, engage in self-harm, or become "addicted" to the online service.  That

glaring due-process problem amplifies the First Amendment concerns, as the vagueness of Act

901's commands inevitably will force covered websites "to 'steer far wider of'" any universe of

speech that it might be constitutional for Arkansas to restrict than they would "if the boundaries of

the forbidden areas were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

On top of its constitutional flaws, Act 901 is preempted by §230 of the Communications

Decency Act ("CDA"), which bars state-law claims seeking to hold the provider of an online

service "liable for information originating with a third-party user of the service." *Johnson v. Arden*,

614 F.3d 785, 791 (8th Cir. 2010); *see* 47 U.S.C. §230(c)(1).  Section 230 prohibits states from

subjecting online services to liability for disseminating allegedly harmful third-party content—

which is precisely what Act 901 attempts to do.  And all equitable factors cut strongly in favor of

---

[3] Numbered exhibits are attached to the Declaration of Katherine C. Campbell, filed herewith.

protecting constitutional rights.  NetChoice therefore respectfully asks the Court to preliminarily enjoin Defendants from enforcing Act 901 before August 3, 2025.

## BACKGROUND

### A.    Adults and Minors Alike Use NetChoice Members' Online Services to Engage in a Wide Array of Protected First Amendment Activity.

NetChoice is an Internet trade association whose members operate many online services, including Facebook, Instagram, Nextdoor, Discord, Pinterest, Reddit, Snapchat, Tumblr, X, and YouTube.  Cleland Decl. ¶4.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).  "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)).  On Facebook, Reddit, and X, for example, discussions run the gamut from direct engagement with elected representatives and debates about religion and politics to tips about home maintenance and auto repair.  Cleland Decl. ¶¶5-6.  On Instagram, users can share photos of everyday moments and express themselves with short, fun videos. *Id.* Nextdoor helps users connect with their neighbors, facilitating everything from sharing local news and promoting local businesses to finding a babysitter and borrowing tools.  Baird Decl. ¶¶3-4.  Discord is a voice, video, and chat app that offers invitation-only spaces for groups of friends and communities to stay in touch and spend time together, as well as larger, more open communities that are generally centered around popular video games such as Minecraft and Fortnite.  Cleland Decl. ¶6.  Pinterest enables users to discover ideas for recipes, style, home decor, and more. *Id.* Snapchat enables users to communicate with friends and family in fun and casual ways. *Id.* And YouTube enables users to upload, share, and watch videos on practically any topic that comes to mind. *Id.*

As the Supreme Court has explained, most of these online services—including Facebook, Instagram, and YouTube—present users with personalized content, "often based on a user's expressed interests and past activities." *Moody v. NetChoice, LLC*, 603 U.S. 707, 734-35 (2024). They are aided in that endeavor by "the use of algorithms," which they design to sift through "the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list" and "prioritiz[e]… content" that is likely to be of interest. *Id.* at 734; *accord* Cleland Decl. ¶15. Like newspaper editors and booksellers, "the major social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 738. Those are "expressive choices" that "receive[] First Amendment protection." *Id.* at 740. And the Constitution protects Arkansans' right to use online services to speak and receive speech, too. *Packingham*, 582 U.S. at 104.

NetChoice members' online services are widely used by teens and adults. Many individuals, in Arkansas and elsewhere, maintain a user profile and use online services such as Facebook, Instagram, Nextdoor, Discord, Pinterest, Reddit, Snapchat, Tumblr, X, and/or YouTube. Cleland Decl. ¶¶12, 13(f), 14(f); Baird Decl. ¶¶3, 5-6. Arkansans use NetChoice members' online services to engage in all manner of protected First Amendment activity on all manner of topics— to read the news, connect with friends, explore new interests, practice their faith, and much more. *See* Cleland Decl. ¶¶5-6. Some use online services to showcase their creative talents, including their artwork, photography, writing, or other forms of creative expression. *Id.* Others use them to raise awareness about social causes and participate in public discussion on the hottest topics of the day. *Id.* Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for teens who feel isolated or are seeking support from others who understand their experiences. *Id.*

**B.      NetChoice Members Have Adopted Detailed Policies Prohibiting Harmful Content and Spend Massive Amounts of Resources Enforcing Them.**

NetChoice members expend significant resources curating the content on their services to ensure that it is appropriate for adults and teens alike.  Members have developed detailed policies restricting the publication of harmful content, including (among other things) violent and sexual content; content that promotes the sale or use of illicit or recreational drugs; bullying and harassment; and content that encourages suicide, self-injury, or eating disorders.  *See* Cleland Decl. ¶¶8-10 (listing policies); Davis Decl. ¶¶40-49; Baird Decl. ¶9.  For example, Facebook and Instagram prohibit content that "speaks positively about, encourages the use of, or provides instructions to use or make" illicit drugs, as well as advertisements that promote their sale or use. *See* Ex.3; Ex.4.  YouTube similarly prohibits content showing illicit drug use, explaining how to make drugs, encouraging or promoting drug abuse, or facilitating the sale of illicit drugs.  *See* Ex.5. Discord likewise prohibits content related to creating or selling illegal drugs or other regulated substances.  *See* Ex.6.

NetChoice members also prohibit certain content related to suicide, self-injury, and eating disorders.  Facebook and Instagram "do not allow people to intentionally or unintentionally celebrate or promote suicide, self-injury or eating disorders."  Ex.7.  Accordingly, both services "remove any content that encourages suicide, self-injury or eating disorders," including "content that contains instructions for extreme weight loss behaviour" and "content that mocks victims or survivors of suicide, self-injury or eating disorders, as well as real time depictions of suicide or self-injury."  *Id.*  They also impose restrictions on advertisements that touch on these sensitive subjects.  *See* Ex.8.  YouTube likewise prohibits "[c]ontent promoting or glorifying suicide, self-harm, or eating disorders," including "[i]nstructions on how to die by suicide, engage in self-harm, or engage in eating disorders (including how to conceal them)."  Ex.9.  "Using Discord to glorify

6

or promote suicide or self-harm," including "disordered eating patterns," "is not allowed under any circumstance." Ex.10. And Nextdoor offers resources for combating suicide and self-harm. *See* Ex.11.

NetChoice members further protect minors in particular by "age gating" some content, which prevents minors from seeing content visible to adults, or younger teens from seeing content visible to older teens. For example, Meta prevents minors (but not adults) from viewing sensitive content depicting recovery from self-injury, such as healed cuts or images of the physical effects of eating disorders. *See* Ex.7. YouTube restricts various types of sensitive content—e.g., sexually suggestive content, violent or graphic content, vulgar language, and depictions of dangerous activities—to users who are 18 or older. *See* Ex.12. Discord does the same. *See* Ex.13.

NetChoice members expend considerable resources developing their content-moderation policies and enforcing them using algorithms, automated editing tools, and human review. Meta alone spends billions of dollars per year on safety and security, much of which goes toward removing harmful content. *See* Ex.14; Davis Decl. ¶¶32, 40-53. Google likewise spends huge sums on content moderation, removing tens of millions of YouTube videos and terminating millions of YouTube channels each year because of policy violations. *See* Ex.15.

### C. Arkansas Enacts the "Social Media Safety Act" of 2023, and This Court Holds It Facially Unconstitutional.

"'Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733 (brackets omitted). And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet," including "social media" websites. *Id.* The Supreme Court has therefore held that the First Amendment limits the government's power to restrict access

7

to those websites. *Id.* at 106-08. That rule applies with full force to efforts to restrict minors' access to such websites. While "a State possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011). Courts thus routinely invalidate government efforts to protect minors from the purportedly harmful effects of constitutionally protected speech on new forms of media. *Id.* at 804-05; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217-18 (1975).

Notwithstanding the long line of cases striking down government restrictions on speech—including those that limit what protected speech minors may access—Arkansas enacted the Social Media Safety Act of 2023, which broadly restricts minors' access to some of the most popular online services. Among other things, that law prohibits minors from holding accounts on and accessing certain "social media platform[s]" without first obtaining parental consent and requires covered "social media company[ies]" to verify the age of every individual who attempts to sign up to use their services. Ark. Code §4-88-1402(a)-(c). The Act imposes both civil and criminal liability on companies that fail to comply with these restrictions. *See id.* §1403(b)-(c).

In June 2023, NetChoice sued to challenge the constitutionality of the Social Media Safety Act on behalf of its members. *See Griffin*, 2025 WL 978607, at *1-2, *6. This Court preliminarily enjoined enforcement of the Act shortly before its September 1, 2023 effective date, *id.* at *1, and ultimately awarded NetChoice a declaratory judgment and a permanent injunction against enforcement of the Act on March 31, 2025, *id.* at *17. As the Court explained, the Social Media Safety Act imposes content- and speaker-based burdens that trigger strict First Amendment scrutiny, which the Act plainly fails because it "is not narrowly tailored to address" the state's asserted interest in protecting minor children. *Id.* at *11; *see also NetChoice, LLC v. Griffin*, 2023

8

WL 5660155, at *16-21 (W.D. Ark. Aug. 31, 2023) (conducting intermediate-scrutiny analysis at preliminary-injunction stage). This Court also held that the Act is unconstitutionally vague, as it does not make clear which companies it covers or specify what it requires of them. *Griffin*, 2025 WL 978607, at *14-17. This vagueness "risk[s] chilling effects" by forcing arguably regulated entities "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked.'" *Id.* at *15 (quoting *Baggett*, 377 U.S. at 372). It also "invit[es] arbitrary enforcement" by giving the state *carte blanche* to bring actions against disfavored online services but not other similar services. *Id.* at *15-16.

### D.    Arkansas Enacts Act 901 of 2025.

On April 2, 2025—just two days after this Court granted NetChoice's motion for summary judgment and declared the "Social Media Safety Act" "unconstitutional in all conceivable applications," *id.* at *14—the Governor of Arkansas announced the introduction of two new pieces of legislation, now known as Acts 900 and 901. *See* Ex.16.[4] The Governor asserted that Act 901 (then known as S.B. 612) would "protect kids" from being "subjected to toxic material" on covered online services. *Id.*; *see also* Ex.17 (noting that S.B. 612 "would create a right for parents to sue social media platforms … because of the content the child was exposed to"). This new legislation passed through the House of Representatives and the Senate in just two weeks, and, on April 21, 2025, the Governor signed Act 901 into law. Ex.18; Ex.19. Act 901 is slated to take effect on August 3, 2025, which is 90 days after the Arkansas legislature ended its regular session for 2025. *See Miller v. Witcher*, 254 S.W. 1063, 1063-64 (Ark. 1923).

Act 901 adds a new subchapter to Arkansas' consumer-protection statutes. Its central operative provision states that "[a] social media platform shall not use a design, algorithm, or

---

[4] Copies of these acts can be found at Dkt.2-1 and Dkt.2-2.

9

feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user to:

> (1)    Purchase a controlled substance;
>
> (2)    Develop an eating disorder;
>
> (3)    Commit or attempt to commit suicide; or
>
> (4)    Develop or sustain an addiction to the social media platform."

Act 901, §4-88-1502(a).   Notably, neither these obligations nor the "users" who must be taken into account in determining their scope are limited to minors; a social media platform cannot use any "design, algorithm, or feature" that might "cause" *any* user to engage in the covered conduct *at all*, even adult users.  The Attorney General is authorized to bring civil enforcement actions for any violation of these provisions, and state prosecutors may criminally prosecute knowing and willful violations.  *See* Ark. Code §§4-88-103, -104.

Act 901 also creates a new §1503, which prohibits a "social media platform" from "host[ing], promot[ing], shar[ing], or otherwise facilitat[ing]" access by a minor child to "online content promoting, or otherwise advancing, self-harm or suicide."   Act 901, §1503(b)(1). "[K]nowing[] and willful[]" violations of §1503 may be punished by "[a] civil penalty not to exceed ten thousand dollars," plus "litigation costs and reasonable attorney's fees."  Act 901, §1503(a).  Again, Defendants have enforcement authority.  *See* Ark. Code §§4-88-103, -104.  In addition to enforcement by state officials, §1503 includes a private right of action for "[a] parent or guardian whose minor child or legal dependent commits suicide or attempts to commit suicide … following exposure to online content promoting, or otherwise advancing, self-harm or suicide." Act 901, §1503(b)(1).  A court may award "[a]ffirmative relief from the effects of the content," "[d]amages," "[c]osts of medical treatment," "[f]uneral expenses and related costs," "[p]unitive

damages," "[l]itigation costs," and "reasonable attorney's fees," which "shall be no less than the lesser of the… [t]otal cost of the defendant's legal fees for the lawsuit" or "[r]easonable legal fees for the defense, had the defendant prevailed." *Id.* §1503(b)(2)-(3).

## ARGUMENT

NetChoice is entitled to a preliminary injunction if it shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief is in the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013). NetChoice readily satisfies each factor.

## I.     NetChoice Has A High Likelihood Of Success On The Merits.

NetChoice's complaint challenges Act 901 on three separate grounds: the First Amendment, unconstitutional vagueness, and preemption by CDA §230. *See* Compl. ¶¶115-36. A likelihood of success on any of these claims would justify preliminary injunctive relief, and NetChoice has a high likelihood of success on all three. Like the (permanently enjoined) Social Media Safety Act, Act 901 triggers strict scrutiny under the First Amendment because it prohibits speech on the basis of both content and speaker. And Act 901 fails any form of heightened scrutiny, as its nebulous prohibitions on facilitating speech through "design[s], algorithm[s], or feature[s]" that lead to particular outcomes are not remotely tailored to achieve any legitimate state interest. Act 901 is also unconstitutionally vague, as it provides no way for regulated entities to know *ex ante* which speech or speech-facilitating designs, algorithms, or features are prohibited. On top of that, Act 901 runs headlong into §230 preemption, as it attempts to "hold[] [online services] legally responsible for information that third parties created and developed." *Arden*, 614 F.3d at 791. For any and all of these reasons, NetChoice is highly likely to succeed on the merits of its challenge to Act 901.

11

**A.      NetChoice Is Likely to Succeed on Its First Amendment Claim.**

**1.      Act 901 triggers strict scrutiny several times over.**

Act 901 triggers First Amendment scrutiny.  It restricts the use of "a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user"—including an adult—to: "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." Ex.2 §1502(a); *see id.* §1503(b)(1).  And the statute does not even attempt to limit its reach to any "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."  *United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Of course, as explained, NetChoice members already strive to remove all manner of content that may harm users, including content that promotes or glorifies suicide and eating disorders. *See supra* pp.6-7.  But it is another thing for the state to effectively mandate the removal of protected speech, and Act 901 sweeps broadly—punishing websites for disseminating *any* content that the state (or a jury) happens to think the website "should have known" may cause a user to purchase a controlled substance, develop an eating disorder, commit suicide, or develop an addiction to its services, even if that content does not promote or glorify any of that conduct.  Making matters worse, it is not at all clear what Act 901 prohibits.  Does it require YouTube to take down clips of the movie "Pineapple Express"?  What about the music video for Afroman's "Because I Got High," or Johnny Cash's "Hurt"?  Must Facebook remove posts promoting workout trends?  What about healthy recipes?  Can NYTimes.com promote engaging games like Wordle?  What if the game includes access to years' worth of past puzzles and features that allow players to interact with each other or play against an AI-powered bot?  Act 901 provides no clarity as to any of that.

Whatever Act 901 ultimately prohibits, there is no question that it infringes on First Amendment rights. By prohibiting websites from offering designs, algorithms, and features that facilitate a user's view of speech, that law unquestionably restricts the website's speech. It likewise burdens the First Amendment rights of users who wish to receive that speech.

Because Act 901 implicates the First Amendment, this Court must decide what level of scrutiny to apply. The "most basic … principle[]" of First Amendment law is that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve [a] compelling interest[]." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Act 901 triggers strict judicial scrutiny because it imposes content-based restrictions on speech. It is well established that the First Amendment generally bars the government from "singl[ing] out specific subject matter for differential treatment," including by using the "function" or end result of speech as a proxy for its content. *Id.* at 163, 169; *see City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 74 (2022) ("[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result."). That describes Act 901 to a T: It expressly restricts speech that could "cause[] a user"—including an adult—to: "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." Act 901, §1502(a); *see id.* §1503(b)(1) (prohibiting hosting or sharing "online content promoting, or otherwise advancing, self-harm or suicide"). Each of those provisions is clearly content based, *see Comput. &*

13

*Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1036 (W.D. Tex. 2024) (concluding that similar provisions of Texas law are "as content based as it gets"), and was motivated by the content-driven desire to "protect kids" from being "subjected to toxic material" on covered online services. Ex.16; *see also* Ex.17 (noting that Act 901, then known as S.B. 612, "would create a right for parents to sue social media platforms … because of content the child was exposed to").

Like the Social Media Safety Act, Act 901 discriminates among speakers, too. *Cf. Griffin*, 2025 WL 978607, at *9. It singles out entities that "facilitate" expressive activity—specifically, "user-to-user, user-to-group, or user-to-public interaction, expression, or communication," Act 901, §1501(a)(5)—for special burdens. *Cf. Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) (applying heightened scrutiny where "the conduct triggering coverage under the statute consists of communicating a message"); *see also, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Moreover, the statute restricts *user*-generated expression but does not cover *institutional or corporate* expression, even if the substance is identical. Act 901, §1501(a)(5). It thus privileges speech by "institutional content creators" (e.g., "movie and TV studios, mainstream media outlets, and traditional journalists") over "the speech of users of online services" (e.g., "the Soundcloud artist, the TikTok chef, and the citizen journalist"). *Cf. Griffin*, 2025 WL 978607, at *9. Services like Facebook, Instagram, Nextdoor, Discord, Pinterest, Reddit, Snapchat, Tumblr, X, and YouTube must eschew and suppress any expression that the state asserts might lead to "addiction," but services like Disney+, Hulu, and HBO Max have no such obligation. Such "elevation" of "provider-generated content over user-generated content is a content-based regulation." *Paxton*, 747 F.Supp.3d at 1032; *accord NetChoice, LLC v. Fitch*, --- F.Supp.3d ----, 2025 WL 1709668, at *8 (S.D. Miss. June 18, 2025).

14

Even without that content- and speaker-based discrimination, Act 901 would still be subject to intermediate scrutiny because it directly burdens First Amendment activity. *See, e.g.*, *Packingham*, 582 U.S. at 104-05; *Griffin*, 2025 WL 978607, at *8. Under that standard, Arkansas would still have the burden to demonstrate that Act 901 is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The state cannot make either showing.

### 2.    Act 901 cannot survive any level of heightened scrutiny.

Act 901 abjectly fails both strict and intermediate scrutiny. At the outset, Act 901 provides NetChoice members with no way of knowing beforehand what designs, algorithms, or features will cause a user to purchase a controlled substance, develop an eating disorder, or attempt suicide, which is itself both a First Amendment and Due Process Clause problem. *See infra* pp.21-23. But regardless of exactly how far it sweeps, Act 901 plainly restricts a broad range of constitutionally protected expression, rendering it "seriously overinclusive" as to any legitimate interest the state might assert—and it manages to be "seriously underinclusive" to boot. *Brown*, 564 U.S. at 805.

Overinclusiveness infects each of the Act's operative provisions. *First*, the statute prohibits any speech that could cause someone—minor or adult—to "[p]urchase a controlled substance." Act 901, §1502(a)(1). That sweeps far more broadly than is necessary to further Arkansas' legitimate interest in preventing illicit drug use. After all, purchasing "a controlled substance" is not necessarily illegal or even harmful; Arkansas law defines numerous common medicines that may be lawfully purchased (e.g., Sudafed) as "controlled substance[s]." *See* Ark. Code §§5-64-201 to -215. Act 901 thus appears to prohibit online services from carrying advertisements or informal recommendations for prescription drugs (and even some over-the-counter medications). For instance, Nextdoor permits advertisements for certain medications that are considered

15

"controlled substances" under Arkansas law. Baird Decl. ¶19. And a Nextdoor user could post a message asking neighbors for recommendations about how to treat various maladies (e.g., seasonal allergies). *Id.* Act 901 could expose Nextdoor to liability for that protected speech if it causes any user to purchase a "controlled substance" (which is of course part of the point of such content). That sweeping command would also force "social media platforms" to censor political and ideological speech. For example, while Facebook and Instagram prohibit content that promotes using illegal drugs, they permit content "[d]ebating or advocating for the legality or discussing scientific or medical merits of" illegal drugs. Ex.3. That core political speech may have to go too since it could conceivably lead someone to try one of those substances.

*Second*, Act 901 prohibits expression that could cause any user to "[d]evelop an eating disorder" or "[c]ommit or attempt to commit suicide." Act 901, §1502(a); *see id.* §1503(b)(1). Those prohibitions—which, again, apply to adult and minor users alike—are also seriously overinclusive. As explained, NetChoice members take user health and safety very seriously, which is why services like Facebook, Instagram, Discord, and YouTube already remove content that "celebrate[s]," "promote[s]," or "encourages suicide, self-injury or eating disorders," including "instructions for extreme weight loss behaviour" and "real time depictions of suicide or self-injury." Ex.7; *see* Davis Decl. ¶¶40-50; Ex.9.; Ex.10. But Act 901 would force these online services to restrict content far more broadly, because the law's vague provisions make it impossible to know, *ex ante*, what effect a given statement, image, or video could have on an unidentified recipient. To avoid the risk of liability, an online service would need to restrict large amounts of speech that enjoys First Amendment protection and is not harmful to the bulk of its users—from photos on a supermodel's Instagram account to Facebook posts celebrating hitting a weight-loss goal or a physical-fitness milestone to songs containing themes about depression and suicide—out

16

of fear that, with the benefit of hindsight, it could be linked to an eating disorder or act of self-harm.

*Third*, Act 901 prohibits covered entities from using "a design, algorithm, or feature" that "causes a user" to "[d]evelop or sustain an addiction to [a] social media platform." Act 901, §1502(a). That provision is also overinclusive. At the outset, it is not clear what Arkansas means by "addiction." Is it an "addiction" if a user checks her Instagram feed twice a day? What about four times a day? Is it an "addiction" to spend 30 minutes a day searching for odd jobs on Nextdoor? What about spending an hour reading articles on NYTimes.com? What seems like an "addiction" to one user, moreover, may not be an "addiction" to others. Some users may check an online service more often because they want to see how many other users have "liked" or commented on one of their posts. Others may not care. Some users may spend more time on Instagram because they find user-generated speech particularly engaging or informative. Others do not. Still other users might spend time looking for antique furniture daily on Facebook Marketplace. Others may not *ever* browse Marketplace. How a website must determine which "design[s], algorithm[s], or feature[s]" violate the Act's nebulous prohibitions, the law does not explain. Act 901 will thus have a massive chilling effect by forcing online services to "steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372. That is the antithesis of the "[p]recision of regulation" that the First Amendment demands. *Cf. Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).

What is more, Act 901's ban on features that could cause "addiction" is dramatically overbroad because it is not aimed at any particular speech (let alone any *unprotected* speech) that might pose special risks. It instead aims broadly at core aspects of how services disseminate both

17

third parties' and their own protected speech—including their algorithms, which are "the [k]ey" to culling through "billions of posts or videos" to present users with curated content. *Moody*, 603 U.S. at 734; *see* Act 901, §1502(a). Indeed, the Arkansas Attorney General has already taken the position that the algorithm-based recommendations used by Facebook, Instagram, and YouTube are "addictive" writ large.[5] Act 901 thus appears to prohibit online services from disseminating content in precisely the ways that have made them so useful and popular, which directly interferes with their constitutionally protected curatorial and editorial judgments regarding how to prioritize and recommend third-party content. *See Moody*, 603 U.S. at 734-40. Making matters worse, Act 901 forces covered services to restrict as to *all* users—minor or adult—anything that could have a forbidden effect on *any* users—again, minor or adult. The law thus could force online services to fundamentally reshape their services, eliminating everything from customized feeds to push notifications to infinite scrolling and more. *See* Davis Decl. ¶¶57-62.

At bottom, Act 901 prohibits online services from displaying protected speech to millions of users—ironically including content and resources that help users *combat* various types of addiction and compulsion—if a subset of users might find the presentation or the speech especially appealing. And because it is impossible to know, *ex ante*, what "practices" may arguably cause any individual user to "develop or sustain" a pattern of "social media" use that an expert witness or jury might view as "addiction," regulated services can avoid the risk of crippling sanctions only by dramatically restricting *all users'* access to speech and effective tools to present and organize it. A law that effectively compels "social media platforms" to stop disseminating large quantities

---

[5] *See, e.g.*, Am. Compl. ¶¶6-7, 32, 121-22, 130, 140, 171, 173, 208, 240-41, *State ex rel. Griffin v. Meta Platforms, Inc.*, No. 57CV-23-47 (Ark. Cir. Ct. Oct. 30, 2023); Compl. ¶¶6, 70, 74, 95, 100, 149, *State ex rel. Griffin v. Alphabet Inc.*, No. 54CV-24-258 (Ark. Cir. Ct. Sept. 30, 2024).

of protected speech to adults and minors alike—or stop disseminating it as effectively—is breathtakingly overbroad measured against any interest the state could assert.

Act 901 also fails narrow tailoring because it is seriously underinclusive. *Cf. Griffin*, 2025 WL 978607, at *11-13. The Act's regulations do not apply to identical content that is communicated through other media—including books, magazines, television, movies, and the spoken word. For example, Hulu cannot be held liable if someone decides to buy marijuana after watching the film "Pineapple Express." A fashion magazine cannot be held liable if its portrayals of thin body types and promotion of diet culture cause a reader to develop an eating disorder. Apple cannot be held liable if a high schooler uses iMessage or FaceTime to bully a classmate, leading to a tragic instance of self-injury. Hulu, Disney+, and HBO Max need not worry that their algorithm-driven content recommendations will cause Arkansans to develop or sustain an "addiction" to watching movies, gambling on sports, or "binging" all ten seasons of Friends. Nor do video game sellers or purveyors of on-demand pornography face liability if their users become hooked—so long as they refrain from offering *user-generated* content. In sum, Act 901 draws vague and arbitrary restrictions in an area that requires careful tailoring.

On top of everything else, Arkansas has many other ways to promote the interests ostensibly served by Act 901 while restricting little, if any, speech. For one thing, the state can penalize primary conduct instead of constitutionally protected speech. Indeed, Arkansas law already has criminal prohibitions on illicit sales of controlled substances, *see, e.g.*, Ark. Code §§5-64-420 to 422, -426, -430, -438, and on "encouraging the suicide of another person," *id.* §5-10-107. These prohibitions are far more direct and effective means of preventing drug abuse and peer-induced self-harm than penalizing "social media platforms" for third-party speech or their own expressive choices about how to disseminate it. Moreover, Arkansas may educate its citizens about

how to cultivate a healthy body image and set reasonable limits on screen time—two efforts toward which NetChoice members already devote considerable resources. *See supra* pp.6-7. This is not the exceedingly rare case in which government restrictions on constitutionally protected speech (let alone content- and speaker-based restrictions) can survive heightened scrutiny.

> **3.  Act 901 is unconstitutional on its face and as applied to NetChoice members.**

Those deficiencies render Act 901 unconstitutional on its face. The Act is facially invalid because *all* of its applications are unconstitutional—or, at minimum, "a substantial number of [the law's] applications are unconstitutional, judged in relation to" any "plainly legitimate sweep" it may have. *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). Every one of Act 901's applications regulates how "social media platform[s]" curate and disseminate speech on their online services. Act 901, §1502(a). And for the reasons already explained, *see supra* pp.12-20, all those applications burden the First Amendment rights of NetChoice members and their users and flunk heightened scrutiny. Even if there were some conceivable applications of Act 901 that would *not* implicate the First Amendment, those applications are far outweighed by the "substantial amount of protected speech" that the Act's heartland applications restrict. *Moody*, 603 U.S. at 723. In short, because the core, if not sole, application of Act 901 is to regulate the editorial judgments of websites when they are curating and disseminating third-party speech posted on their services, and engaging in their own constitutionally protected expression, the Act is facially invalid.

At a minimum, Act 901 is unconstitutional as applied to NetChoice members' constitutionally protected expressive activity of curating and disseminating speech. The Act regulates "design[s], algorithm[s], or feature[s]" that "cause[] a user to" engage in certain conduct. Act 901, §1502(a). Even if there were enough *other* applications to save Act 901 from facial

invalidation, it still could not be applied to NetChoice members when they are engaged in expressive activity such as curating and disseminating collections of third-party speech or their own speech. *See Moody*, 603 U.S. at 740. Accordingly, while the Court should hold Act 901 unconstitutional on its face, at the very least it should enjoin its application to NetChoice members when they are engaged in that constitutionally protected activity.

### B.    NetChoice Is Likely to Succeed on Its Vagueness Claim.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. As explained, vague laws risk chilling would-be speakers by forcing them "to steer far wider of the unlawful zone" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372. For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Act 901 is unconstitutionally vague because it fails to provide a person of ordinary intelligence with fair notice of what is prohibited. It is anyone's guess what types of "design[s], algorithm[s], or feature[s]" could cause one or more unidentified users—including adults—to "(1) [p]urchase a controlled substance; (2) [d]evelop an eating disorder; (3) [c]ommit or attempt to commit suicide; or (4) [d]evelop or sustain an addiction to [a] social media platform." Act 901, §1502(a). The Act provides zero guidance to help an online service figure out, *ex ante*, what sorts of designs, algorithms, and features violate that provision. And the Act's capacious and vague

21

language makes it all too easy for an expert witness to assert (or a jury to conclude), with the benefit of hindsight, that a regulated company "should have known" that some aspect of its online service could play a role in one of these unfortunate outcomes.

Act 901's nebulous prohibitions would chill any number of decisions about what content to feature via the website's design, algorithms, or features.  For example, would the law prohibit a website from using algorithms to share a music video of Afroman's "Because I Got High"?  What about the "search" feature in YouTube?  After all, that feature could lead a user to the song "Hurt," sung by Johnny Cash, which discusses self-harm, or "Adam's Song," by Blink-182, which has been linked to at least one teen's suicide.  *Compare* Ex.21, *with* Act 901, §1503(b)(1).  May Instagram recommend videos that feature workout content?  Can Facebook display videos promoting healthy recipes?  And what if a user stumbles upon that content via Instagram's or Facebook's search function?  Act 901 does not provide any guidance as to those vital questions about the law's scope, leaving "people 'of common intelligence'" to "guess at its application." *Cf. Paxton*, 747 F.Supp.3d at 1040-42 (holding that ban on speech that "'promotes,' 'glorifies,' or 'facilitates' 'suicide, self-harm, eating disorders, [or] substance abuse'" was unconstitutionally vague (brackets omitted)).

If anything, the vagueness issues are even more acute with respect to Act 901's prohibition on "features" that develop or sustain an "addiction."  How is an online service supposed to predict whether any of its features could contribute to one or more Arkansans' unspecified addiction?  After all, what is "addictive" to some users may not be addictive to others.  Does allowing teens to share photos with each other evoke addiction?  What about allowing the same activity by retirees?  What about sharing videos?  What if the videos disappear after a set amount of time?  What about prioritizing content that matches a user's interests?  Promoting content that has lots of

22

views or likes?  Providing live play-by-play updates of sports games that encourage people to keep hitting "refresh"?  Setting up discussion groups on video games in which people are intensely interested, like Fortnite and Minecraft?  Allowing users to play a virtually unlimited supply of games, ranging from chess to Wordle to a crossword puzzle?  What if there is a "feature" that allows the user to play against an online bot?  And what if some users find a particular practice "addictive," but many do not—does that trigger liability?  The Act does not say.

In sum, the Act leaves covered NetChoice members to choose between risking unpredictable and arbitrary enforcement (backed by serious penalties) or declining to engage in speech.  When it comes to speech, the state cannot hinge liability on such an ambiguous provision.  As this Court aptly put it in holding the Social Media Safety Act unconstitutionally vague, "Arkansas 'cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David'" while leaving Arkansans and the businesses that serve them to bear constitutional deprivation in the meantime.  *Griffin*, 2025 WL 978607, at \*17 (quoting *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring in the judgment)).

### C.    NetChoice Is Likely to Succeed on Its CDA §230 Preemption Claim.

In addition to its constitutional defects, Act 901 is preempted by federal law—specifically, §230 of the CDA.  Congress enacted §230 "to encourage the unfettered and unregulated development of free speech on the Internet," while "keep[ing] government interference in the medium to a minimum."  *Batzel v. Smith,* 333 F.3d 1018, 1027 (9th Cir. 2003) *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766-67 (9th Cir. 2017).  As pertinent here, §230(c)(1) declares that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  Section 230 also contains an express-

preemption clause: "[N]o liability may be imposed under any State or local law that is inconsistent with this section." *Id.* §230(e)(3).

Like "[t]he majority of federal circuits," the Eighth Circuit has interpreted §230 "to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Arden*, 614 F.3d at 791 (quoting *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir. 2006)).  Simply put, §230 preempts any state law that seeks to "hold[] [online services] legally responsible for information that third parties created and developed." *Id.* at 791.

That is precisely what Act 901 does.  Under §1502(a)(1), online services can be held liable if one user's speech "causes" another user to "[p]urchase a controlled substance."  To avoid liability, an online service would necessarily have to monitor third-party posts and take down any that might lead to such a transaction.  But "to impose liability on the basis of" failing to remove harmful content "necessarily involves treating the liable party as a publisher of the content it failed to remove," thus triggering §230 immunity.  *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 (9th Cir. 2024); *see, e.g.*, *Arden*, 614 F.3d at 792 (interpreting §230 to forbid imposing liability against a defendant "for material originating with a third party").  In *Dyroff v. Ultimate Software Group, Inc.*, for example, the court held that §230 barred a claim that a website's "features and functions, including algorithms" "facilitated [an] illegal drug sale[]," leading to a user's tragic death from fentanyl-laced heroin.  934 F.3d 1093, 1095, 1098 (9th Cir. 2019).

All of Act 901's liability-creating provisions share this defect.  It does not matter whether the prohibition is framed as prohibiting a "design, algorithm, or feature" that displays particular types of third-party content, Act 901, §1502(a), or a ban on "host[ing], promot[ing], shar[ing], or otherwise facilitat[ing]" access to third-party content, Act 901, §1503(b)(1).  Either way, Act 901

impermissibly makes online services "liable for information originating with third-party users of the service." *Arden*, 614 F.3d at 792. Indeed, just last year, a court held that §230 preempts a Texas law requiring online services to filter content "that promotes, glorifies, or facilitates … suicide, self-harm, or eating disorders." *Paxton*, 747 F.Supp.3d at 1036, 1042-43. And another court recently held that §230 barred state-law claims alleging that Facebook, Instagram, Snapchat, TikTok, and YouTube use "algorithms" "in a way that promotes addiction" because such claims "directly target defendants' roles as publishers of third-party content." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.Supp.3d 809, 830-31 (N.D. Cal. 2023). There is no reason for a different outcome here.

## II.    NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief.

"In a First Amendment case … the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007). But all the other preliminary-injunction factors favor maintaining the status quo as well.

### A.    NetChoice Members Will Suffer Irreparable Harm Absent Preliminary Relief.

If permitted to take effect, Act 901 will inflict at least two distinct forms of irreparable harm on NetChoice members. First, it is well established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (brackets omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also NetChoice v. Carr*, 2025 WL 1768621, at *20-21 & n.18 (N.D. Ga. June 26, 2025). Last time around, this Court held that a loss of First Amendment rights was enough to show that "NetChoice members and their users will suffer irreparable harm if the [Social Media Safety] Act goes into effect." *Griffin*, 2025

25

WL 978607, at *17 (granting motion for permanent injunction); *accord Griffin*, 2023 WL 5660155, at *21 (granting motion for preliminary injunction). The analysis as to Act 901 is exactly the same.

Second, Act 901 will inflict irreparable harm by putting NetChoice members that are covered by the Act to a perilous choice between exposing themselves to massive liability for their own expressive content and that of their users or taking costly and burdensome steps that will drastically curtail access to their online services, all before a court decides the merits of their claims.  Cleland Decl. ¶¶22-25; Baird Decl. ¶¶16-21; Davis Decl. ¶¶60-62.  That concern is especially acute because the Act imposes severe sanctions for violations of its vague and sweeping provisions.  Unintentional violations could give rise to significant civil liability, *see* Ark. Code §4-88-104; Act 901, §§1502(a), 1503(b), and knowing and willful violations could give rise to even steeper civil penalties, *see* Act 901, §1503(a), as well as criminal sanctions, *see* Ark. Code §4-88-103.  If forced to try to comply with Act 901, NetChoice members would have to spend large amounts of resources attempting to (1) figure out what Act 901 actually requires; (2) review their existing "design[s]," "algorithm[s]," and "feature[s]" to determine whether any of them could run afoul of Act 901; and (3) either attempt to comply with Act 901 in Arkansas or cease operating in Arkansas altogether.  *See* Cleland Decl. ¶¶24-25; Baird Decl. ¶¶18, 20; Davis Decl. ¶¶60-62.  To the extent that is even feasible, it would be extremely costly, and there is likely no way to recover those costs if the Court ultimately determines that Act 901 is invalid.  *See Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021) ("[S]tate sovereign immunity protects state officer defendants sued in federal court in their official capacities from liability in damages[.]"); *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) (similar).  Those unrecoverable compliance costs are classic irreparable injury.  *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury …

26

economic harm can be considered irreparable."); *Entergy*, 210 F.3d at 899 (similar); *In re NTE Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022) (similar).

**B.    The Balance of Equities and Public Interest Strongly Favor an Injunction.**

"When the government opposes the issuance of an injunction, the final two factors—the balance of the equities and the public interest—merge." *Griffin*, 2025 WL 978607, at *17 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Those factors, too, decidedly favor NetChoice. "The balance of the equities … generally favors the constitutionally-protected freedom of expression," and "it is always in the public interest to protect constitutional rights." *Phelps-Roper*, 509 F.3d at 485. The "State has no interest in enforcing laws that are unconstitutional ... [and] an injunction preventing the State from enforcing [a challenged statute] does not irreparably harm the State." *Little Rock Fam. Plan. Servs. v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019) (citing *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012)); *Brandt v. Rutledge*, 551 F.Supp.3d 882, 892 (E.D. Ark. 2021), *aff'd sub nom. Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022). Maintaining the status quo until the glaring constitutional problems with Act 901 can be fully adjudicated will cause little if any harm to the state. Like the Social Media Safety Act, Act 901 "is a content-based restriction on speech," and it is yet another example of Arkansas "tak[ing] a hatchet to adults' and minors' protected speech alike though the Constitution demands it use a scalpel." *Griffin*, 2025 WL 978607, at *17.

## CONCLUSION

NetChoice's motion for preliminary injunction should be granted.

27

Respectfully submitted,

Paul D. Clement*                    Marshall S. Ney, Ark. Bar No. 91108
Erin E. Murphy*                     Katherine C. Campbell, Ark. Bar No. 2013241
James Y. Xi*                        FRIDAY, ELDREDGE & CLARK, LLP
Joseph J. DeMott*                   3350 South Pinnacle Hills Pkwy., Suite 301
Philip Hammersley*                  Rogers, AR 72758
CLEMENT & MURPHY, PLLC              (479) 695-6049
706 Duke Street                     mney@fridayfirm.com
Alexandria, VA 22314               kcampbell@fridayfirm.com
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com      BY: *s/ Erin E. Murphy*
james.xi@clementmurphy.com
joseph.demott@clementmurphy.com
philip.hammersley@clementmurphy.com

*admitted pro hac vice*

*Counsel for Plaintiff*

July 3, 2025

28