# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

NETCHOICE,

         *Plaintiff,*

V.

TIM GRIFFIN, in his official capacity as
Attorney General of Arkansas; TODD MURRAY;
SONIA FONTICIELLA HAGOOD; DEVON HOLDER;
BRANDON CARTER; JEFF PHILLIPS; WILL JONES;
TERESA HOWELL; BEN HALE; CONNIE
MITCHELL; DAN TURNER; JANA BRADFORD;
FRANK SPAIN; TIM BLAIR; S. KYLE HUNTER;
DANIEL SHUE; JEFFREY ROGERS; DAVID
ETHREDGE; TOM TATUM, II; DREW SMITH;
REBECCA REED MCCOY; MICHELLE C.
LAWRENCE; DEBRA BUSCHMAN; ROBERT T.
(TONY) ROGERS; BRYAN SEXTON; CAROL CREWS;
KEVIN HOLMES; CHRIS WALTON; and CHUCK
GRAHAM, each in his or her official capacity as
a prosecuting attorney for the State of
Arkansas,

         *Defendants.*

CASE NO. 5:25-CV-05140-TLB

# DEFENDANTS' RESPONSE IN OPPOSITION TO
# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authories.................................................................................................ii

Introduction ..................................................................................................... 1

Background ....................................................................................................... 4

Legal Standard ................................................................................................. 7

Argument .......................................................................................................... 8

I.  NetChoice Has Not Shown Likelihood of Success
    on the Merits. ............................................................................................. 8

   A. Because Act 901 does not impose liability for third-party
    content, NetChoice cannot show it will likely succeed on
    its preemption claim under §230. ......................................................... 8

   B. Because NetChoice has not shown that Act 901 regulated
    protected speech or that Act 901 would fail any form of
    scrutiny, it cannot show that it will likely succeed on its
    First Amendment claim. ...................................................................... 12

      1.  NetChoice has not satisfied the daunting standard for
        a facial challenge or shown that it will likely succeed
        on its as-applied claim ................................................................. 12

      2.  Act 901 is not subject to strict scrutiny ...................................... 16

      3.  Whatever level of scrutiny applies, Act 901 satisfies it ............................. 21

   C. Because NetChoice has not shown that Act 901 fails to provide
    fair notice of what is prohibited or is standardless, it has not
    shown that it is likely to succeed on its due process claim. .......................... 23

IV. Alternatively, Even if NetChoice Had Shown Extraordinary
    Injunctive Relief is  Warranted, The Scope of Relief Must
    Be Narrowly Tailored. ..................................................................... 31

Conclusion ................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A. O. Smith Corp. v. FTC,*
530 F.2d 515 (3d Cir. 1976) ...................................................................... 28

*Abbott v. Perez,*
585 U.S. 579 (2018) .................................................................................. 29

*Able v. United States,*
44 F.3d 128 (2d Cir. 1995) ......................................................................... 8

*Am. Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980) .................................................................. 28

*Anderson v. TikTok, Inc.,*
116 F.4th 180 (3d Cir. 2024) ........................................................ 9, 10, 19

*Bio Gen LLC v. Sanders,*
142 F.4th 591 (8th Cir. 2025) ................................................................ 7, 8

*Bush v. State,*
338 Ark. 772, 2 S.W.3d 761 (1999) .......................................................... 25

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................. 31

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984) .................................................................................. 18

*Doran v. Salem Inn, Inc.,*
422 U.S. 922 (1975) .................................................................................... 8

*Eggers v. Evnen,*
48 F.4th 561 (8th Cir. 2022) ....................................................... 7, 29, 30

*Elrod v. Burns,*
427 U.S. 347 (1976) .................................................................................. 27

*Freedom Holdings, Inc. v. Spitzer,*
408 F.3d 112 (2d Cir. 2005) ..................................................................... 28

*Gill v. Whitford,*
585 U.S. 48 (2018) .................................................................................... 31

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .................................................................................... 24

*Gundy v. United States,*
  588 U.S. 128 (2019) .................................................................................... 11

*Hill v. Colorado,*
  530 U.S. 703 (2000) .................................................................................... 24

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) .................................................................................... 24

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) .................................................................................. 24, 25

*Hotels.com, L.P. v. Pine Bluff Advert. & Promotion Comm'n,*
  2024 Ark. 86, 688 S.W.3d 399 ................................................................... 11

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .................................................................................... 15

*Johnson v. Arden,*
  614 F.3d 785 (8th Cir. 2010) ................................................................... 2, 9

*Labrador v. Poe,*
  144 S. Ct. 921 (2024) .................................................................................. 31

*Langford v. City of St. Louis,*
  3 F.4th 1054 (8th Cir. 2021) ...................................................................... 24

*Lemmon v. Snap, Inc.,*
  995 F.3d 1085 (9th Cir. 2021) .................................................... 8, 9, 10, 19

*Maryland v. King,*
  567 U.S. 1301 (2012) .................................................................................. 29

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ...................................................... 3, 12, 13, 14, 15, 19, 32

*Netchoice v. Skrmetti,*
  No. 3:24-CV-01191, 2025 WL 1710228 (M.D. Tenn. June 18, 2025) .................... 28

*NetChoice, LLC v. Bonta,*
  No. 25-146, 2025 WL 2600007 (9th Cir. Sept. 9, 2025) ........................... 15, 16, 33

*NetChoice, LLC v. Fitch,*
  No. 25A97, 2025 WL 2350189 (U.S. Aug. 14, 2025) ............................................ 30

iii

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................ 7, 29

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
    530 F.3d 724 (8th Cir. 2008) (en banc) ............................................... 7, 8

*Posters 'N' Things, Ltd. v. United States,*
    511 U.S. 513 (1994) ........................................................................................ 24

*Powell v. Noble,*
    798 F.3d 690 (8th Cir. 2015) ...................................................................... 26

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................................ 19, 21

*Rogers v. Scurr,*
    676 F.2d 1211 (8th Cir. 1982) .................................................................... 31

*Roth v. Jones,*
    No. 4:25-cv-733, 2025 WL 2414160 (E.D. Ark. Aug. 20, 2025) ........................ 8, 32

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,*
    637 F. Supp. 3d 1377 (U.S. Jud. Pan. Mult. Lit. 2022)......................................... 15

*Stone v. State,*
    498 S.W.2d 634 (Ark. 1973) ...................................................................... 24

*TikTok, Inc. v. Garland,*
    604 U.S. 56 (2025) ........................................................................................ 18

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025) ...................................................................... 29, 31

*Turner Broadcasting Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................ 14, 18, 20

*United States v. Hansen,*
    599 U.S. 762 (2023) .................................................................................. 3, 13

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................................ 24, 25

*Walls v. Sanders,*
    733 F. Supp. 3d 721 (E.D. Ark. 2024) .................................................... 33

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ............................................................................ 18, 24

iv

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ................................................................................ 13, 32

*Willson v. City of Bel-Nor,*
    924 F.3d 995 (8th Cir. 2019) ............................................................... 21

*S.J.W. ex. Rel. Wilson v. Lee's Summit R-7 Sch. Dist.,*
    696 F.3d 771 (8th Cir. 2012) ......................................................... 26, 27

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................... 7

**Statutes**

47 U.S.C. § 230.............................................................................. 7, 9, 21

Ark. Code Ann. § 4-88-1502............................2, 6, 11, 14, 17, 19, 22, 25, 28, 29, 31, 32

Ark. Code Ann. § 4-88-1503............................2, 6, 8, 10, 11, 14, 17, 18, 22, 25, 27, 28

## INTRODUCTION

Social media companies know that their platforms can be addictive. Indeed, some are designed to be. And social media companies know that addiction to their platforms has disastrous consequences for users' physical and mental health—including sleep deprivation, anxiety, and increased risk of self-harm from suicide to drug use to eating disorders. Social media companies, like cigarette companies before them, have studied their product and have unique information about the harms it causes. Yet they have buried that information and have made their platforms more addictive in pursuit of profit. After whistleblowers and news reports sounded the alarm about the dangerous practices of social media companies and the profound negative consequences to users, numerous States began taking action to protect their citizens from exploitative practices. And that is precisely what Arkansas has done with Act 901 of 2025.

Passed with overwhelming, bi-partisan support,[1] Act 901 creates civil penalties for social media companies that are knowingly using designs, algorithms, or features that will cause users to become addicted to their platform or to engage in self-harm behaviors. Under Act 901, bad actors will face consequences if they

---

[1] *See Senate Vote*, https://arkleg.state.ar.us/Bills/Votes?id=SB612&rcs=1319&chamber=Senate&ddBienniumSession=2025%2F2025R (Apr. 16, 2025) (showing Act 901 passed the Arkansas Senate by a vote of 32 to zero, with two senators not voting and one senator voting present); *House Vote*, https://arkleg.state.ar.us/Bills/Votes?id=SB612&rcs=1349&chamber=House&ddBienniumSession=2025%2F2025R (Apr. 15, 2025) (showing Act 901 passed the Arkansas House by a vote of 91 to two, with three house members not voting and four voting present).

1

intentionally "hijack[] the social reward systems of a user's brain" to cause addiction,[2] and have their engineers "invent new ways" to keep users' addicted to their platforms.[3]  And if social media companies know their design features are will cause self-harm behaviors, they can no longer "ignore the problems they created and bury evidence" without risking liability under Act 901.[4]  Act 901, however, was carefully crafted to refrain from penalizing protected speech.  It only penalizes knowing and intentional *conduct* of social media companies, Ark. Code Ann. §§ 4-88-1502(a), 4-88-1503(a), expressly does *not* impose liability based on the third-party content that is shared on their platforms, *id.* § 4-88-1503(d)(1), and explicitly does *not* impose liability for any expressive conduct that is protected by the First Amendment of the U.S. Constitution or the Arkansas Constitution, *id.* § 4-88-1503(d)(2).

Nevertheless, an internet trade association, NetChoice, seeks a preliminary injunction on behalf of its social media company members and argues that Act 901 is unconstitutional and preempted by § 230 of the Communications Decency Act.  But § 230 only bars States from holding social media companies "legally responsible for information that third parties created and developed," *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010), which is something Act 901 expressly does not do, *see* Ark. Code Ann. § 4-88-1503(d).  And NetChoice's First Amendment and Due Process

---

[2] Julian Morgans, *The Secret Ways Social Media is Built for Addiction* (May 17, 2017), attached as Ex. B-1.

[3] Von Tristan Harris, *The Slot Machine in Your Pocket*, (July 27, 2016), attached as Ex. B-2

[4] Lily Jamali, *Meta covered up potential child harms, whistleblowers claim* (September 9, 2025), attached as Ex. B-3.

2

Clause arguments fare no better. They too rely on a misreading of Act 901. Act 901 does not restrict protected speech and, even if it did, it can survive strict scrutiny because it is narrowly tailored to the State's compelling interests.

In any event, NetChoice has fallen far short of the "daunting, if not impossible, task" of showing it will likely succeed on its facial challenge involving "a broad swath of varied platforms" with different designs, features, and algorithms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 746 (2024) (Barrett, J., concurring). It has not shown that Act 901's "realistic" unconstitutional applications, as opposed to "fanciful" unconstitutional applications, are "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

To top it off, NetChoice cannot satisfy the other factors to show it is entitled to the extraordinary relief of preliminarily enjoining enforcement of a democratically enacted state law. And even if the Court believes that NetChoice has shown that some small aspect of Act 901 is unconstitutional as applied to certain members, it must tailor any injunction to remedy that precise harm. The Court lacks the power to enjoin the entirety of Act 901 as to each NetChoice member as NetChoice seeks.

The Court should therefore deny NetChoice's preliminary-injunction motion in its entirety or, in the alternative, issue a limited, tailored injunction that is consistent with its limited equitable powers.

3

## BACKGROUND

Social media companies hold a vast amount of power over Arkansans, and they have refused to exercise that power responsibly.[5]  Their platforms are designed to maximize user engagement, using features that exploit the human desire for social interaction and the neurophysiology of the brain's reward systems to keep users endlessly scrolling, posting, "liking," commenting, and counting the number of "likes" and comments to their own posts.[6]  And they have the biggest demand in the "attention economy" where "a person's attention" is a hotly traded "commodity."[7]  More than "59% of the global population totaling 4.76 billion people" uses social media.[8]  And "[t]he average daily time spent on these platforms is 2 h[ours] and 31 min[utes] as of January 2023."[9]  Of those users, a subgroup of Americans totaling between 5 and 10% "show addicted behaviours and use it obsessively."[10]  That "social media addiction is characterized by excessive concern about [social media], an insatiable urge to access

---

[5] *See* Justin Hendrix, *Transcript: US Senate Hearing on 'Examining Whistleblower Allegations that Meta Buried Child Safety Research*, (Sept. 10, 2025) https://www.techpolicy.press/transcript-us-senate-hearing-on-examining-whistle-blower-allegations-that-meta-buried-child-safety-research/ ("If I had one thing to say, I would just want to make it very clear that Meta is incapable of change without being forced by Congress, whether it's engagement or profits at any cost, they have frankly had unearned opportunities in order to correct their behavior and they have not.").

[6] *See* Julian Morgans, *The Secret Ways Social Media Is Built for Addiction* (May 17, 2017), attached as Ex. B-1.

[7] *Id.*

[8] Jahagirdar, et al., *Assessment of the impact of social media addiction on psychosocial behaviour like depression, stress, and anxiety in working professionals* 2 (2024), attached as Ex. B-4.

[9] *Id.*

[10] *Id.*

4

or use [social media], and a commitment of more time and energy to [social media] to the point that it interferes with other significant elements of life."[11]

This behavior is created in certain users because social media "triggers dopamine, the ultimate feel-good chemical, in order to take advantage of our brain's reward system."[12]   But while those releases feel good for a moment, there is "a significant association between [social media addiction] and psychosocial factors like depression, stress, and anxiety" among affected populations.[13]   Indeed, "[a]ddictive social media use will look much like any other substance use disorder," causing symptoms like "[w]ithdrawal" when an addict gets too much separation from social media and inspiring "[r]elapse" in those who try to break their addiction.[14]   Those affected populations keep "consuming things" on social media, "even when they aren't hungry anymore."[15]   That's because social media companies "design" their apps to "maximize 'time spent'" on the platform.[16]   They accomplish this through, among many other things, "engagement-based algorithms," that "can learn your most hidden interests and emotions, and drive users of any age deep into rabbit holes of content."[17]   And at social media companies know about the harmful side effects they create in their users. *See* Ex. B-7, Georgia Wells, et al., *Facebook Knows Instagram Is Toxic for Teen Girls*

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Dr. Ashish Bhatt, *Social Media Addiction* (July 28, 2025), attached as Ex. B-5.

[15] Von Tristan Harris, *The Slot Machine in Your Pocket*, (July 27, 2016), attached as Ex. B-2.

[16] *Id.*

[17] Rob Barry, et al., *How TikTok Serves Up Sex and Drug Videos to Minors* (Sept. 8, 2021), attached as Ex. B-6.

5

(Sept. 14, 2021) (Meta stated in a 2019 slideshow that summarized research about teen girls, "We make body image issues worse for one in three teen girls.").

Seeking to protect Arkansans, especially children, from social media companies' exploitative practices, the Arkansas Legislature took action. In 2023, it passed the Social Media Safety Act in 2023, and then in 2025, it amended that Act and passed an entirely new piece of social media legislation in 2025: Act 901.[18] Act 901 prohibits social media platforms from utilizing designs, algorithms, or features that it knows (or should know) will cause enumerated harms. Specifically, it provides:

> (a) A social media platform shall not use a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user to:
>
> > (1) Purchase a controlled substance;
> > (2) Develop an eating disorder;
> > (3) Commit or attempt to commit suicide; or
> > (4) Develop or sustain an addiction to the social media platform

Act 901 of 2025, § 1 (to be codified at Ark. Code Ann. § 4-88-1502(a)). The Act imposes liability for bad actors, making them liable for civil penalties and litigation costs if they "knowingly and willfully" violate Act 901, and expressly creates a right of action for parents whose children commit or attempt to commit suicide. *Id.* (to be codified at Ark. Code Ann. § 4-88-1503(a)–(c)).

Act 901 expressly does not impose liability on social media companies for merely displaying third-party content or for constitutionally protect conduct. *Id.* (to be codified at Ark. Code Ann. § 4-88-1503(d)). It specifies that:

---

[18] Act 901 of 2025 is attached as Ex. A.

(d) This section does not impose liability on a social media platform for:

>(1) Displaying content that is created and hosted entirely by a third party, including without limitation an advertisement managed by a third party and shared on the social media platform; or

>(2) Conduct that is protected by the:

>>(A) First Amendment of the United States Constitution; or
>>(B) Arkansas Constitution.

*Id.*

Despite Act 901's tailored scope, NetChoice filed this present motion for a preliminary injunction to prevent Act 901's enforcement in its entirety. That motion should be denied.

## LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Thus, a plaintiff must clearly establish that: "[1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of the equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 22. But when the government is the nonmoving party, "[t]he balance-of-harms and public-interest factors 'merge.'" *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"When seeking to enjoin the implementation of a state statute, the plaintiff must show 'more than just a "fair chance" that it will succeed on the merits.'" *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc)). Instead,

"[i]t must show that it 'is likely to prevail on the merits.'"  *Id.* (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)).  This is "a more rigorous standard," which "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."  *Rounds*, 530 F.3d at 732 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).  Therefore, courts "considering requests to preliminarily enjoin duly enacted state or federal laws . . . should proceed with the greatest caution, greatest humility, and greatest respect for the democratic process."  *Roth v. Jones*, No. 4:25-cv-733, 2025 WL 2414160, at *1 (E.D. Ark. Aug. 20, 2025) (citing *Rounds*, 530 F.3d at 732).

## ARGUMENT

## I.   NETCHOICE HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Because Act 901 does not impose liability for third-party content, NetChoice cannot show it will likely succeed on its preemption claim under §230.

Act 901 expressly does not impose liability on social media companies for third-party content, so § 230 of the Communications Decency Act ("CDA") does not preempt it.  NetChoice can argue otherwise only by ignoring one of the Act's provisions that it tellingly does not cite in its brief: Ark. Code Ann. § 4-88-1503(d)(1).  Accordingly, NetChoice has failed to show it will likely succeed on its preemption claim.

Concerned about promoting "the continued development of the Internet and other interactive computer services," Congress passed the CDA in 1996, which "provide[d] internet companies with immunity from certain claims"—not all claims.  *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021).  Section 230 of the CDA

8

provides that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And § 230 further specifies that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Courts, including the Eighth Circuit, have interpreted § 230 as barring States and local governments from holding online service providers "legally responsible for information that third parties created and developed." *Arden*, 614 F.3d at 791. But § 230 does not immunize online service providers from all liability. Indeed, subsection (e)(3) itself is clear that States may still enforce laws against such entities as long as those laws do not impose liability for third-party content. *See* 47 U.S.C. § 230(e)(3).

Online service providers thus can still be liable "for speech that is properly attributable to them," *Arden*, 614 F.3d at 791, such as when "they create or develop their own internet content" or contribute to the content creation of others, *Lemmon*, 995 F.3d at 1093. In other words, there is no CDA immunity if providers "are sued for their own expressive activity or content (i.e., first-party speech)." *Anderson v. TikTok, Inc.*, 116 F.4th 180, 183 (3d Cir. 2024). That means if social media companies "curate compilations of others' content via their expressive algorithms," that expressive algorithm is first-party speech for which the social media companies can be held liable. *Id.* at 184.[19] Accordingly, TikTok could not use CDA immunity to avoid a

---

[19] Other types of algorithms are not expressive speech, which would simply be a different reason to conclude that liability based on those algorithms are fall outside the scope of CDA immunity. *See id.* at 183 n.10.

9

lawsuit that alleged it used its expressive algorithm to recommend and promote a "Blackout Challenge" video to the plaintiff's deceased child, which "encourage[d]" the child "to record [herself] engaging in acts of self-asphyxiation." 116 F.4th at 181; *see id.* at 186 (Matey, J., concurring in judgment) (explaining that § 230 shields online service providers with "for hosting videos created and uploaded by third parties," but that "it does not shield more, and [the decedent's] estate may seek relief for TikTok's knowing distribution and targeted recommendation of videos it knew could be harmful").

CDA immunity is also no bar to liability based on a website or application's "architecture," features that encourage dangerous behavior, and "content-neutral tools." *Lemmon*, 995 F.3d at 1093–94. A social media company thus could not use CDA immunity as a shield against a design-defect claim for a dangerous "Speed Filter" and other "reward system" features that encouraged Snapchat users to drive at dangerous speeds. *See id.*

Because NetChoice has failed to show that Act 901 imposes liability on social media companies for third-party content as opposed to their own conduct (such as platform designs, features, and non-expressive algorithms) or their own speech, NetChoice is unlikely to succeed on its preemption claim. Indeed, Act 901 expressly does not "impose liability on a social media platform" for simply "[d]isplaying content that is created and hosted entirely by a third party, including without limitation an advertisement managed by a third party and shared on the social media platform." Ark. Code Ann. § 4-88-1503(d)(1). Act 901 is therefore plainly not preempted by § 230

10

of the CDA, and many of NetChoice's arguments about how Act 901 will apply are necessarily fanciful. For example, based on Act 901's plain text, a social media company will not "be liable for publishing advertisements for allergy medication." Pl.'s PI Br. 2.

NetChoice primarily bases its CDA preemption argument on Ark. Code Ann. § 4-88-1503(b)(1)'s use of the terms "hosted, promoted, shared, or otherwise facilitated the immediate connection" between the suicide victim and harmful content. But that provision must be read in context with subsection (d)(1), which makes it clear that social media companies cannot be held liable simply for displaying third-party content. *See Hotels.com, L.P. v. Pine Bluff Advert. & Promotion Comm'n*, 2024 Ark. 86, at 7, 688 S.W.3d 399, 405 ("[W]e reconcile statutory provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part."); *Gundy v. United States*, 588 U.S. 128, 141 (2019) (refusing to construe words "in a vacuum" and explaining that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989), and *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 666 (2007))). The same is also true of § 4-88-1502(a). It too must be read in light of subsection (d)(1), which makes it clear that Act 901 does not impose liability for mere display of third-party conduct. Instead, it holds social media companies accountable for their own—knowing and willful—actions. *See* Ark. Code Ann. § 4-88-1503(a) (imposing liability only for "knowingly and willingly" violating Act 901); *see id.* § 4-88-

11

1502(a) (making "knows" or "should have known" an element of the underlying violation).

In sum, where a social media company implements a particular design into its platform, it is engaging in its own conduct—whether that conduct is expressive or non-expressive. And because Act 901 only targets social media companies' own conduct, it does not run afoul of § 230's preemption provision. NetChoice thus cannot show that it will likely succeed on its preemption claim.

### B. Because NetChoice has not shown that Act 901 regulated protected speech or that Act 901 would fail any form of scrutiny, it cannot show that it will likely succeed on its First Amendment claim.

NetChoice has similarly failed to show that it is likely to succeed on its First Amendment claim. For starters, NetChoice does not even come close to carrying its burden of showing that its facial challenge is likely to succeed. And while it half-heartedly asserts Act 901 is unconstitutional as applied to its members, that single paragraph unsurprisingly fails to provide sufficient evidence regarding NetChoice's members' platforms, designs, features, and algorithms to make an as-applied showing either. *See* PI Br. 20–21. NetChoice's First Amendment claim also fails because Act 901 does not target speech and, even if it did, it survives any type of scrutiny.

#### 1. NetChoice has not satisfied the daunting standard for a facial challenge or shown it will likely succeed on its as-applied claim.

NetChoice has sought to prove likelihood of success on its facial challenge and, as it knows, that "decision comes at a cost." *NetChoice*, 603 U.S. at 723. Facial challenges are "hard to win" by design because they "'often rest on speculation' about the law's coverage and its future enforcement" and "'threaten to short circuit the

12

democratic process' by preventing duly enacted laws from being implemented in con-

stitutional ways." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*,

552 U.S. 442, 450–51 (2008)). "To justify facial invalidation, a law's unconstitutional

applications must be realistic, not fanciful, and their number must be substantially

disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. And if the

plaintiff cannot show this "lopsided ratio," its facial challenge fails. *Id.*

Rather than showing that Act 901's realistic unlawful applications outweigh

its lawful ones, NetChoice misinterprets Act 901 and then offers rhetorical questions

to suggest that Act 901 sweeps too broadly. PI Br. 12. That is not enough. NetChoice

seems to think it need not carry its burden because it has asserted that "*all* [of Act

901's] applications are unconstitutional," PI Br. 20, but that is false (as explained

more thoroughly below, *see* infra pp. 16–26). Act 901, for example, prohibits a social

media company from knowingly implementing a design feature, such as a particular

notification method, that its own researchers have found to be addictive. That appli-

cation would not violate the First Amendment, which demonstrates that Act 901 has

a lawful sweep that NetChoice failed to consider. And there are countless other fea-

tures that social media companies embed into their platforms that have no ties, or

attenuated ones at best, to speech or expressive conduct. But, again, whether those

features are lawfully or unlawfully regulated by Act 901 is NetChoice's burden to bear

in a facial challenge.[20]  That is why these sorts of challenges are "daunting, if not impossible, task[s]." *NetChoice*, 603 U.S. at 745 (Barrett, J., concurring).

NetChoice's suggestions, such as that Act 901 would require YouTube to take down clips of movies and music videos, PI Br. 12, are, at best, fanciful, unlawful applications of Act 901 that is insufficient to show it will likely succeed on a facial challenge.  Act 901 does not impose liability on social media companies for displaying third-party content, nor does it threaten liability based on social media companies' failure to remove content.  That is clear from § 4-88-1503(d)(1), which states that Act 901 "does not impose liability on a social media platform for" displaying third-party content, including advertisements.  And it is clear from § 4-88-1502(a), which prohibits "design[s], algorithm[s], or feature[s]" that platforms know will cause addiction or other harm, regardless of the particular content.  In short, NetChoice failed to show

---

[20] Does Snapchat use its editorial judgment in employing the "Streak" function? *See* Ex. B-8, Snapchat Support Page. What about when platforms use algorithms entirely operated by artificial intelligence to do the "curating" for them? *See See Moody*, 603 U.S. at 746 (Barrett, J., concurring) ("[T]echnology may attenuate the connection between content-moderation *actions* (*e.g.*, removing posts) and human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression consideration and adherence.'" (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (emphasis in original)); *see also* Ex. B-9, Cameron Schoppa, *How the 5 Biggest Social Media Sites Use AI* (Aug. 6, 2025). Do platforms express themselves through AI chatbots that pose harms to young users? *See* Ex. B-10, *Statement of the FTC* (Jan. 16, 2025). Does the infinite scrolling feature receive speech protection under the First Amendment? *See* Ex. B-11, Elizabeth Chuck, *Major Psychology Group says infinite scrolling, other social media features are 'particularly risky' to youth mental health* (Apr. 15, 2024). What about when Meta makes parental controls difficult to access for parents? *See* Ex. B-12, Am. Psych. Ass'n, *Potential risks of content, features, and functions* (Apr. 2024).

14

it will likely succeed on its facial challenge, so that claim cannot support a prelimi-nary injunction.

Nor will its as-applied claim. While NetChoice asserts an as-applied challenge in a single paragraph, NetChoice has "a standing problem" and cannot "pursue this claim on behalf of its members." *NetChoice, LLC v. Bonta*, No. 25-146, 2025 WL 2600007, at *6 (9th Cir. Sept. 9, 2025). To establish associational standing, NetChoice must show, among other things, that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). NetChoice has failed to make that showing here. That is because "[t]he First Amend-ment analysis is 'fact intensive' and will 'surely vary' from 'platform to platform,'" which "means, in turn, that the merits of 'the claim asserted' and the 'relief requested' requires the participation of individual NetChoice members, making associational standing inappropriate." *Bonta*, 2025 WL 2600007, at *6 (quoting *NetChoice*, 603 U.S. at 747 (Barrett, J., concurring), and *Hunt*, 432 U.S. at 343); *see In re Soc. Media Ado-lescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 637 F. Supp. 3d 1377, 1378 (U.S. Jud. Pan. Mult. Lit. 2022) ("In opposing centralization of the" products liability "actions naming them, defendants TikTok, Snap, and YouTube," two of which are NetChoice members, "argue that . . . defendants' various social media platforms operate—and plaintiffs interacted with them—in different ways and, therefore, individual factual issues will predominate. . . .").

.

15

Regardless, even if NetChoice had standing, it has failed to provide specific arguments or evidence about how Act 901 will apply to its members and cause the alleged harm. PI Br. 20–21. NetChoice generically asserts that Act 901 will apply to its members while they are "engaged in expressive activity such as curating" third-party speech, PI Br. 20; however, they fail to provide enough information for the Court to assess whether that is true. That is fatal. As NetChoice has "acknowledge[d]" in a different case, "each of its members" has "unique" algorithms. *Bonta*, 2025 WL 2600007, at *7. And "[t]hat matters because the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive." *Id.* The asserted as-applied challenge is thus simply a disguised facial challenge that purports to show that Act 901 is unconstitutional across the board. And, as explained above, NetChoice has failed to show that it is likely to succeed on that hard-to-win claim.

### 2. *Act 901 is not subject to strict scrutiny.*

Despite NetChoice's arguments, strict scrutiny does not apply to Act 901. NetChoice first argues that strict scrutiny applies to Act 901 because it "effectively mandate[s] the removal of protected speech." PI Br. 12. It next argues that strict scrutiny applies because Act 901 "imposes content-based restrictions on speech," PI Br. 13—overlooking that it conceded Act 901 is focused on the known consequences of the platforms' designs, features, and algorithms regardless of content on the previous page, *see* PI Br. 12 (arguing Act 901 "punish[es] websites for disseminating *any* content that the state (or a jury) happens to think the website 'should have known' may cause a user to purchase a controlled substance, develop an eating disorder,

16

commit suicide, or develop an addiction to its services, *even if that content does not promote or glorify any of that conduct*" (first emphasis in original, second emphasis added)).  And it then finishes by arguing that Act 901 is also subject to strict scrutiny because it "discriminates among speakers."  PI Br. 14.  Each argument fails.

***First***, Act 901 does not mandate the removal of protected speech, much less the broad swath of speech that NetChoice suggests.  All Act 901 does is prohibit social media companies from using "a design, algorithm, or feature," that it actually knows (or should know) based on its own research, user feedback, or widespread media reports is causing users to become addicted to their platforms or engage in self-harm behaviors.  *See* Ark. Code Ann. § 4-88-1502(a).  Act 901 is thus focused on platforms' use of features, designs, and algorithms that the platforms themselves know are harmful but use anyway to cause addiction, increase user-engagement, and drive up profits.[21]

Furthermore, § 4-88-1503(d) belies NetChoice's characterization of Act 901 as requiring social media companies to remove certain content from their platforms.  That provision is clear that Act 901 "does not impose liability on a social media

---

[21] *See* Ex. B-1, Morgans, *The Secret Ways Social Media Is Built for Addiction* ("[T]he social media business model, built around the needs of marketing agencies instead of lives, are already far too entrenched and profitable for self-governing."); *see also* Ex. B-2, Harris, *The Slot Machine in Your Pocket* (explaining how social media companies have become experts at maximizing screen time and hooking users by "sprinkle[ing] intermittent variable rewards all over their products"); *see also* Ex. B-13, Sydney Bradley, et al., *Instagram and Facebook are hardly social media apps anymore. Here's the proof.* (Apr. 14, 2025) ("Meta says just 7% of time spent on Instagram in 2025 is spent viewing content from friends," and "[t]hat's due in part to Meta's prioritization of short-form video" and how it promotes content to its users).

17

company" for displaying third-party content, including advertisements, or for "[c]onduct that is protected by the First Amendment of the United States Constitution" or the "Arkansas Constitution." Ark. Code Ann. § 4-88-1503(d).

*Second*, Act 901 is not a content-based restriction on speech. A law is content based if it either (1) "applies to particular speech because of the topic discussed or the idea or message expressed" or (2) is content neutral but "cannot be justified without reference to the content of the regulated speech or was adopted . . . because of disagreement with the message the speech conveys." *TikTok, Inc. v. Garland*, 604 U.S. 56, 70–71 (2025) (citation modified). "[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (internal citations omitted). "The principal inquiry in determining content neutrality, in speech cases generally . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The "controlling consideration" is "[t]he government's purpose" in passing the legislation. *Id.*

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* And "[g]overnment regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984))

18

(emphasis in original).  To be sure, as Plaintiff cites, "[w]hether laws define regulated speech by particular subject matter or by its function or purpose, they are subject to strict scrutiny."  *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015).  But Plaintiff conflates the "function or purpose" of speech, *id.*, with the "end result of speech," Pl.'s Br. 13.

In *Reed*, the content-based regulation split rules for posting signage into three different categories—temporary, political, and ideological—and depended entirely on the sign's communicative content.  576 U.S. at 156.  The same is not so with Act 901.  Act 901 largely regulates conduct,[22] and to the extent it regulates expressive conduct or speech, it does not do so based on content.  Instead, it regulates design features that social media companies know are causing negative consequences, such as addiction or self-harm behaviors.  It prohibits, for example, a platform from implementing a design feature that it knows will likely cause users to develop or sustain an addiction to the platform.  *See* Ark. Code Ann. § 4-88-1502(a)(4).  That has nothing at all to do with content.  The same is true of the other provisions.  If a social media platform knows based on its research and development that implementing a particular feature will cause users to develop an eating disorder or commit suicide, then it cannot implement that feature—regardless of whether the feature is simply a different type of

---

[22] Much of what Act 901 regulates is not speech.  After all, a platform's features and designs include things like how a platform is structured or its "architecture" and "reward system."  *See Lemmon*, 995 F.3d at 1093–94.  And while an "algorithm" can be an "exercise of editorial judgment" depending on the extent of human involvement and expressive choice, *NetChoice*, 603 U.S. 707, 745–46 (Barrett, J., concurring); some algorithms are not making expressive choices and are not speech, *see id.*; *Anderson*, 116 F.4th at 184 n.10.

19

"like" button, an AI-algorithm pushing certain types of content, or sending notifications after a certain time of night.  Act 901 is focused on the harmful consequences and social media companies' knowledge (or willful blindness) as to those consequences, not prohibiting social media companies from displaying any particular type of content.  NetChoice seems to concede this (but wrongly thinks Act 901 mandates removal of content as opposed to prohibiting design features that social media companies know are harmful). *See* PI Br. 12 (arguing Act 901 requires the removal of content that causes self-harm behaviors or addiction to a platform, "even if that content does not promote or glorify any of that conduct").

*Third*, Act 901 does not impermissibly distinguish between speakers. NetChoice's contrary argument is based on the assumption, rebutted above, that Act 901 is targeting social media companies' expression of certain content, rather than social media companies' conduct.  Regardless, "[i]t would be error to conclude . . . that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, 512 U.S. at 660.  For such heightened scrutiny to apply, the regulation must be "structured in a manner that raise[s] suspicions that their objective was, in fact, the suppression of certain ideas." *Id.*

NetChoice, here, complains that Act 901's regulations do not apply to "books, magazines, television, movies, and the spoken word." Pl.'s Br. 19.  True.  But these other forms of media do not have the same types of designs, algorithms, or features to regulate, so applying Act 901 to providers of those types of traditional media would

be nonsensical.  Act 901 regulates evenly across the board when it comes to social media platforms—it does not contain an impermissible speaker-based distinction.

### 3. *Whatever level of scrutiny applies, Act 901 satisfies it.*

Even if strict scrutiny applies, NetChoice has failed to show that Act 901 cannot survive it.  Because Act 901 can satisfy strict scrutiny (and necessarily the lower standards of scrutiny), NetChoice has failed to show it is likely to succeed on its First Amendment claim.

Here, Act 901 is "narrowly tailored to serve compelling state interests."  *Willson v. City of Bel-Nor*, 924 F.3d 995, 1000 (8th Cir. 2019) (quoting *Reed*, 576 U.S. at 163).  Arkansas has a compelling interest in protecting Arkansans from social media addiction and self-harm behaviors, such as drug use, eating disorders, and suicide.  Indeed, "internet addiction (particularly social media addiction) imposes serious harms on users." Ex. B-15, Vikram R. Bhargava, *Ethics of the Attention Economy* 331 (2020).  And there is ample evidence suggesting that social media platforms have decided to implement or retain certain designs, algorithms, and features despite knowing that those aspects of its platform have caused users to develop an addiction to their platform or engage in these harmful behaviors.[23]  Moreover, Act 901's scope

---

[23] *See* Ex. B-2, Harris, *The Slot Machine in Your Pocket*; Ex. B-1, Morgans, *The Secret Ways Social Media is Built for Addiction*; Ex. B-3, Jamali, *Meta covered up potential child harms, whistleblowers claim*; Ex. B-14, Allison Slater Tate, *Facebook whistle-blower Frances Haugen says parents make 1 big mistake with social media* (Feb. 7, 2022); Ex B-7, Georgia Wells, *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show* (Sept. 14, 2021); Ex. B-16, Taylor Hatmaker, *Facebook knows Instagram harms teens. Now, its plan to open the app to kids looks worse than ever* (Sept. 16, 2021); and Ex. B-17, The Wall Street Journal, *Teen Mental Health Deep Dive* (Sept 29, 2021).

is further narrowed by its provisions that remove any doubt that it does not impose liability on social media companies' for third-party conduct or their constitutionally protected conduct.  *See* Ark. Code Ann. § 4-88-1503(d).  Act 901 is thus narrowly tailored to address these harms and serve Arkansas's compelling interests.

NetChoice insists Act 901 is overbroad and not narrowly tailored because the Act provides its members "with no way of knowing which designs, algorithms, or features" will cause the harmful effects. PI Br. 15.  Nonsense.  Far from subjecting social media companies to strict liability for conduct they could not know would cause harm, the Arkansas Legislature put two levels of mens-rea requirements into the Act.  First, it only prohibits "use of a design, algorithm, or feature that the social media platform *knows, or should have known though the exercise of reasonable care*" will cause the enumerated detrimental consequences.  Ark. Code Ann. § 4-88-1502(a) (emphasis added).  Second, it only makes a social media company liable if it "*knowingly and willfully*" violates Act 901.  *Id.* § 4-88-1503(a).  Act 901 is thus keyed into imposing liability only on bad actors for their knowing and willful conduct and is narrowly tailored to Arkansas's compelling interest.

After arguing Act 901 is overinclusive, NetChoice pivots to arguing it is underinclusive.  But that argument fares no better.  Act 901 does not apply to content, it applies to designs, features, and algorithms, which do not have an "identical" parallel to other types of media.  PI Br. 19.  And there is not the same type of emerging

research and whistleblowers indicating that other types of media and entities are causing the same widespread harm that social media is causing.[24]

Finally, NetChoice insists that Arkansas could take other steps to accomplish the same goals. Not so. Social media companies have intentionally implemented or maintained features that they know are addictive, with great success. Evidence shows "[i]f you want to maximize addictiveness, all tech designers need to do is link a user's action (like pulling a lever) with a variable reward." Ex. B-2, Harris, *The Slot Machine in Your Pocket.* A media campaign will not change that. Prohibiting social media companies from knowingly designing their product to hurt Arkansans can.

NetChoice has therefore failed to carry its burden that it will likely succeed on its First Amendment claim, especially since it effectively brings only a facial challenge.

### C. Because NetChoice has not shown that Act 901 fails to provide fair notice of what is prohibited or is standardless, it has not shown that it is likely to succeed on its due process claim.

NetChoice has also failed to show that it will likely succeed on its due process claim. Indeed, most of its arguments that Act 901 is vague simply rehash its misinterpretation of the Act.

For a statute to be unconstitutionally vague, it must "[1] fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or [2] [be] so standardless that it authorizes or encourages seriously discriminatory enforcement."

---

[24] *See* Ex. B-14, Tate, *Facebook whistleblower Frances Haugen says parents make 1 big mistake with social media*; *see also* Ex. B-3, Jamali, *Meta covered up potential child harms, whistleblowers claim*.

*United States v. Williams*, 553 U.S. 285, 304 (2008).  The law need not give "perfect clarity and precise guidance," even if it "restrict[s] expressive activity."  *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).  It just needs to "provide minimal guidelines to govern law enforcement." *Langford v. City of St. Louis*, 3 F.4th 1054, 1059 (8th Cir. 2021).

"Close cases" do not make a statute vague, nor the "possibility that it will sometimes be difficult to determine whether the incriminating fact" has been proven.  *Williams*, 553 U.S. at 305–06.  Indeed, enforcement of a law "always" "requires the exercise of some degree of . . . judgment."  *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972); *see Langford*, 3 F.4th at 1059 ("That officers must employ some degree of judgment in determining whether a person has positioned herself in a manner that obstructs the reasonable flow of traffic does not render the ordinance unconstitutional.").  And "knowledge requirements" have been repeatedly "held" to "reduce[] any potential for vagueness."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 21 (2010) (citing *Hill v. Colorado,* 530 U.S. 703, 732 (2000), *Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 523, 526 (1994), and *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982)).

Here, NetChoice argues that Act 901 "leaves covered NetChoice members to choose between risking unpredictable and arbitrary enforcement (backed by serious penalties) or declining to engage in speech."  Pl.'s Br. 23.  But that ignores the language of Act 901, not to mention basic statutory interpretation principles—from rule of lenity to construing statutes to being constitutional.  *See, e.g., Stone v. State*, 498

24

S.W.2d 634, 635 (Ark. 1973) ("Another principle is that if it is possible for the courts to so construe an act that it will meet the test of constitutionality, they not only may, but should and will, do so."); *Williams*, 553 U.S. at 306 ("Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt."). "It is axiomatic that the meaning of certain words or phrases cannot be determined in isolation, but must be drawn from the context in which they are used." *Bush v. State,* 338 Ark. 772, 776, 2 S.W.3d 761, 763 (1999). Yet NetChoice takes Act 901's terms out of their "narrowing context," disregards the statutory definitions and settled meanings of terms, and ignores that "the statutory terms at issue here are quite different from the sorts of terms that [the Supreme Court] ha[s] previously declared to be vague." *Holder*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306).

Contrary to NetChoice's arguments, Act 901 cannot be interpreted as applying to its members' display of a video in response to targeted search, PI Br. 22, because it does not "impose liability on a social media platform" for "[d]isplaying" third-party content, Ark. Code Ann. § 4-88-1503(d)(1). And NetChoice similarly ignores that Act 901 contains knowledge requirements that further "reduce[] any potential for vagueness." *Holder*, 561 U.S. at 21. Act 901 does not require social media companies "to predict" which of its features will cause addiction or enumerated harmful behaviors, PI Br. 22, because it prohibits them only from using those features that they know or should know will cause that harm and only imposes liability if they "knowingly and willfully" do so, *see* Ark. Code Ann. §§ 4-88-1502(a), 4-88-1503(a). And even apart

from the knowledge requirements, Act 901 uses well-understood terms like addiction.[25]

NetChoice has thus failed to show that it is likely to succeed on its vagueness claim, just like its preemption and First Amendment Claims. Accordingly, it has not established that it is entitled to preliminary injunctive relief.

## II.   NETCHOICE HAS NOT SHOWN IRREPARABLE HARM IS LIKELY.

Not only has NetChoice failed to show a substantial likelihood that it will prevail on the merits, it has also failed to show it will likely suffer irreparable harm in the absence of a preliminary injunction.

To establish irreparable harm, plaintiffs "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *S.J.W. ex. Rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 78 (8th Cir. 2012)). And although "[i]t is well-established that '[t]he loss of First Amendment freedoms, for even

---

[25] *See* Ex. B-5, Ashish Bhatt, MD, et al., *What is Social Media Addiction?* ("Addictive social media use will look much like any other substance use disorder and may include: [m]ood modification (engagement in social media leads to a favorable change in emotional states)[,] [s]alience (behavioral, cognitive, and emotional preoccupation with social media)[,] [t]olerance (ever-increasing use of social media over time)[,] [w]ithdrawal symptoms (experiencing unpleasant physical and emotional symptoms when social media use is restricted or stopped)[,] [c]onflict (interpersonal problems ensue because of social media usage)[,] [and/or] [r]elapse (addicted individuals quickly revert back to their excessive social media usage after an abstinence period)") ("The phenomena of social media addiction can be largely attributed to the dopamine-inducing social environments that social networking sites provide. Social media platforms produce the same neural circuitry that is seen in those with a gambling addiction and recreational drug users. The goal is to keep consumers using their products as much as possible; this has resulted in an increase of people displaying symptoms of TikTok addiction, Instagram addiction, Snapchat addiction, Facebook addiction, and even YouTube addiction.").

minimal periods of time, unquestionably constitutes irreparable injury,'" a plaintiff who has failed to show it is likely "his First Amendment rights have been violated" has also failed to show "a threat of irreparable harm that warrants preliminary injunctive relief." *Id.* (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976))

Because Act 901 does not violate the First Amendment and NetChoice has not shown it is substantially likely to prove otherwise, it has necessarily not shown that it will suffer irreparable harm without injunctive relief. *See id.* At the very least, NetChoice has not shown that the alleged harms are imminent, clear, and present. A social media company is liable under Act 901 only if it "knowingly and willfully," violates it. Ark. Code Ann. § 4-88-1503(a). NetChoice does not allege, much less show that its members intend to knowingly and willfully violate it. As such, they have failed to show that any risk of enforcement is imminent absent an injunction and thus have failed to show that any purported chill on their speech is imminent. All NetChoice offers is "speculative harm," which is insufficient to "support a preliminary injunction." *S.J.W.*, 696 F.3d at 779.

NetChoice also alleges irreparable harm in the form of unrecoverable compliance costs; however, that assertion is based on a clear misreading of Act 901. Plaintiff argues that "[i]f forced to try to comply with Act 901, NetChoice members would have to spend large amounts of resources attempting to (1) figure out what Act 901 actually requires; (2) review their existing 'design[s],' 'algorithm[s],' and 'feature[s]' to determine whether any of them could run afoul of Act 901; and (3) either attempt to comply with Act 901 in Arkansas or cease operating in Arkansas altogether." Pl.'s Br. 26.

27

But "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *see Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."); *see also A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."). "[U]nrecoverable compliance costs may represent a harm—perhaps even a substantial one—but that does not mean that such harm is irreparable for purposes of the preliminary-injunction analysis." *Netchoice v. Skrmetti*, No. 3:24-CV-01191, 2025 WL 1710228, at *14 (M.D. Tenn. June 18, 2025).

Even if "compliance costs can constitute irreparable harm under particular circumstances," NetChoice "would need to show that such circumstances are present here." *Id.* But Netchoice "has not done so; it has done little to show that the compliance costs in this case are (even if unrecoverable) not mere 'ordinary compliance costs[, which] are typically insufficient to constitute irreparable harm.'" *Id.* (quoting *Freedom Holdings, Inc.*, 408 F.3d at 115). It does not allege that intends to "knowingly and willfully" violate Act 901. Ark. Code Ann. § 4-88-1503(a). And it has not shown that the safe harbor, allowing its members to avoid liability if they remedy the risk of harm within thirty days of discovering it, *see* Ark. Code Ann. § 4-88-1502(b), does not offer its members sufficient protection from unforeseeable and irretrievable

28

compliance costs.  As explained above, Plaintiff need only alter "design[s], algorithm[s], or feature[s]" that it "knows or should have known through the exercise of reasonable care" would pose a substantial risk of accomplishing one of the harms enumerated in Act 901.  Ark. Code Ann. § 4-88-1502(a).  Plaintiff is therefore unlikely to suffer imminent irreparable harm.

## III.    NETCHOICE HAS FAILED TO SHOW THE BALANCE OF THE EQUITIES FAVOR AN INJUNCTION.

NetChoice likewise has failed to show that the balance of equities weighs in favor of granting a preliminary injunction.  It not only discounts the public interest in having democratically enacted laws enforced, but it also overlooks the serious harms that Act 901 is aimed at reducing: addiction and self-harm.

When balancing the equities and public interest, courts consider the alleged "harm against the 'serious[] and irreparabl[e] harm' that an injunction would inflict on the State [and the public] by 'barring the State from'" implementing a validly enacted law.  *Eggers v. Evnen*, 48 F.4th 561, 567 (8th Cir. 2022) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 (2018)); *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that balance-of-the-equities and public-interest "factors merge when the Government is the opposing party").  "Any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people" the State "suffers a form of irreparable injury."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2652 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

Act 901 is a democratically enacted law, which was motivated to address undisputed evils: addiction and self-harm.  *See* Ark. Code Ann. § 4-88-1502(a).  A

29

preliminary injunction would override the democratic process and prevent Defendants from enforcing Act 901, which will cause serious and irreparable harm. *See Eggers*, 48 F.4th at 567. Not only is this harm serious, but it is also certain. This necessarily outweighs NetChoice's asserted irreparable harm, which is speculative at best. *See supra* Part II. And even if Netchoice had shown the law is unconstitutional, that would not end the analysis. It would still need to show the "balance of harms and equities favors it at this time," which it has not done. *See NetChoice, LLC v. Fitch*, No. 25A97, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J.) (concurring in "the denial of NetChoice's application for interim relief").

NetChoice asserts that "[m]aintaining the status quo" will cause little harm. PI Br. 25. Nothing could be further from the truth. If Defendants are enjoined from enforcing Act 901, social media platforms will not be disincentivized from continuing to intentionally "hijack[] the social reward systems of a user's brain" to cause addiction and have their engineers "invent new ways" to keep users' addicted to their platforms.[26] But if social media companies know their design features are likely to cause self-harm behaviors, they can no longer "ignore the problems they created and bury evidence" without risking liability under Act 901.[27]

Thus, NetChoice has failed to show even a single factor weighs in favor of a preliminary injunction, much less that the Court should exercise its discretion to grant this extraordinary relief here.

---

[26] Ex. B-2, Von Tristan Harris, *The Slot Machine in Your Pocket*, (July 27, 2016).
[27] Ex. B-3, Lily Jamali, *Meta covered up potential child harms, whistleblowers claim* (September 9, 2025).

30

**IV.    ALTERNATIVELY, EVEN IF NETCHOICE HAD SHOWN EXTRAORDINARY INJUNCTIVE RELIEF IS WARRANTED, THE SCOPE OF RELIEF MUST BE NARROWLY TAILORED.**

As explained above, NetChoice has fallen far short of establishing entitlement to a preliminary injunction.  But even if that were not so, any preliminary injunction that this Court issues must be narrow and tailored to the harm that NetChoice has substantiated (which Defendants maintain is none).

Under the Judiciary Act of 1789, federal courts have limited equitable power; though the power is "flexible," courts' "equitable authority is not freewheeling." *Trump*, 145 S. Ct. at 2551.  For one, the injunctive relief courts grant "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *accord Trump*, 145 S. Ct. at 2551.  Relatedly, "[a]n injunction must be tailored to remedy specific harm shown." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).  That means a court lacks the authority "to fashion equitable relief" that extends beyond "the inadequacy that produced the injury in fact that the plaintiff has established." *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in stay grant) (quoting *Gill v. Whitford*, 585 U.S. 48, 68 (2018)).

Accordingly, this Court cannot grant injunctive relief that extends beyond the parties. *See CASA*, 145 S. Ct. at 2557–58.  And it cannot grant relief that extends beyond any specific harm that NetChoice has shown. *See Rogers*, 676 F.2d at 1214; *Gill*, 585 U.S. at 68.  For example, if the Court concludes that the prohibition on "algorithm[s]" is likely unconstitutional but not the prohibitions on "design[s]" or "feature[s]," Ark. Code Ann. § 4-88-1502(a), then it should only enjoin Defendants from

31

enforcing Act 901 as to algorithms.  Or if it concludes that prohibitions on a social media company knowingly using a "design, algorithm, or feature" that it knows will cause a user to "[d]evelop or sustain an addiction to the social media platform" is likely constitutional, *id.* § 4-88-1502(a)(4), but that the prohibitions in (a)(1) to (a)(3) are likely content-based and are unlikely to satisfy heightened scrutiny, then it should issue an injunction only as enforcement of subsection (a)(1) to (a)(3)—not to subsection (a)(4).

Eschewing NetChoice's request for a broad injunction is not only necessary to comply with the limits on the Court's equitable powers, but it also gives due deference to the democratic process.  After all, one reason that facial challenges are disfavored is that they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways."  *NetChoice*, 603 U.S. at 723 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  But that threat may be mitigated slightly if injunctive relief is tailored so that the challenged law can be enforced in likely constitutional ways while the proceeding is pending.

"At the preliminary injunction stage, especially where a facial challenge is not likely to succeed, courts cannot be said to be striking or voiding portions of a statute." *Roth*, 2025 WL 2414160, at *18. "What courts are doing is temporarily preventing likely-unconstitutional applications of a statute against plaintiffs." *Id.*; *see id.* (enjoining enforcement of one portion of a statute regulating commercial speech that the court held was likely unconstitutional but letting enforcement of constitutional

32

provisions stand); *see NetChoice, LLC v. Bonta*, No. 25-146, 2025 WL 2600007, at *16 (9th Cir. Sept. 9, 2025) (concluding that, "[f]or the most part, the district court got it right" when it enjoined enforcement of some statutory provisions it found were likely unconstitutional and not those that "passed constitutional muster"); *see also Walls v. Sanders*, 733 F. Supp. 3d 721, 752 (E.D. Ark. 2024) (prohibiting enforcement of a provision in a particular way), *vacated*, 144 F.4th 995, 1000 (8th Cir. 2025) (vacating injunction because plaintiffs failed to show likelihood of success).

Even if NetChoice had shown extraordinary injunctive relief is warranted, which it has not, this Court should narrowly tailor the scope of injunctive relief it grants.

CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court deny Plaintiff's motion for a preliminary injunction, and they further request any and all just and proper relief to which they may be entitled.

Respectfully submitted,

TIM GRIFFIN
Attorney General

By:  Laura Purvis
Ark. Bar No. 2023239
Assistant Attorney General

Arkansas Attorney General's Office
101 West Capitol Avenue
Little Rock, AR 72201
(501) 320-3085
(501) 682-2591 fax
laura.purvis@arkansasag.gov

*Counsel for Defendants*

34