**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

|  |  |
|---|---|
| NETCHOICE,<br><br>   *Plaintiff*,<br><br>  v.<br><br>TIM GRIFFIN, in his official capacity as<br>Attorney General of Arkansas, et al.,<br><br>   *Defendants*. | Civil Action No. 5:25-cv-05140-TLB<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF<br>MOTION FOR PRELIMINARY<br>INJUNCTION** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.     NetChoice Has A High Likelihood Of Success On The Merits. ...................................... 3

        A.     NetChoice Is Likely to Succeed on Its First Amendment Claim........................... 3

            1.     Act 901 triggers strict scrutiny................................................................. 3

            2.     Act 901 cannot survive any level of heightened scrutiny. ....................... 10

            3.     Act 901 violates the First Amendment on its face and as applied to NetChoice members................................................................................. 14

        B.     NetChoice Is Likely to Succeed on Its Vagueness Claim.................................... 18

        C.     NetChoice Is Likely to Succeed on Its CDA §230 Preemption Claim. ................ 19

II.    NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief. ............ 21

CONCLUSION..................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*AFGE v. Trump*,
139 F.4th 1020 (9th Cir. 2025)..................................................................................... 6

*Anderson v. TikTok, Inc.*,
116 F.4th 180 (3d Cir. 2024)...................................................................................... 20

*Angelilli v. Activision Blizzard, Inc.*,
781 F.Supp.3d 691 (N.D. Ill. 2025) .......................................................................... 11

*Atl. Richfield Co. v. Christian*,
590 U.S. 1 (2020) ......................................................................................................... 6

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .................................................................................................... 18

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .............................................................................................. 10, 13

*Chamber of Com. v. Lierman*,
151 F.4th 530 (4th Cir. 2025)...................................................................................... 7

*CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*,
770 F.2d 468 (5th Cir. 1985)........................................................................................ 6

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F.Supp.3d 1011 (W.D. Tex. 2024)........................................................... 4, 8, 19

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
2025 WL 1570007 (N.D. Fla. June 3, 2025)............................................................ 12

*Doe (K.B.) v. Backpage.com, LLC*,
768 F.Supp.3d 1057 (N.D. Cal. 2025) ...................................................................... 21

*Doe v. WebGroup Czech Republic, a.s.*,
767 F.Supp.3d 1009 (C.D. Cal. 2025)....................................................................... 20

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019)................................................................................... 19

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019)......................................................................................... 19

*Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*,
813 F.3d 1124 (8th Cir. 2016).................................................................................... 17

ii

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    702 F.Supp.3d 809 (N.D. Cal. 2023) .................................................................... 19

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996)................................................................................. 22

*Little Rock Fam. Plan. Servs. v. Rutledge*,
    397 F.Supp.3d 1213 (E.D. Ark. 2019) .................................................................. 23

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
    540 F.3d 752 (8th Cir. 2008)................................................................................. 22

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025)................................................................................ 19

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ......................................................................................... *passim*

*NetChoice v. Bonta*,
    761 F.Supp.3d 1202 (N.D. Cal. 2024) .................................................................. 15

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024).............................................................................. 14

*NetChoice, LLC v. Bonta*,
    2025 WL 2600007 (9th Cir. Sept. 9, 2025)...................................................... 15, 17

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ................................................... *passim*

*NetChoice, LLC v. Yost*,
    778 F.Supp.3d 923 (S.D. Ohio 2025).................................................................. 7, 15

*Patterson v. Meta Platforms, Inc.*,
    239 N.Y.S.3d 726 (N.Y. App. Div. 2025).............................................................. 20

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................................... 6, 10

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................................................... 5, 10

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)................................................... 21

*TikTok, Inc. v. Garland*,
    604 U.S. 56 (2025) ................................................................................................ 10

iii

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) ............................................................................................... 9

*United States v. Williams,*
  553 U.S. 285 (2008) ............................................................................................. 19

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................................... 6

**Statutes**

47 U.S.C. §230(f)(2) ............................................................................................... 21

47 U.S.C. §230(f)(4) ............................................................................................... 21

Ark. Code §4-88-103 ............................................................................................... 12

Ark. Code §4-88-104 ............................................................................................... 12

Ark. Code §4-88-1401(a) ........................................................................................... 5

Ark. Code §4-88-1402(b)(2) ....................................................................................... 5

Ark. Code §4-88-1402(c)(2) ....................................................................................... 5

Ark. Code §4-88-1403(a)(1) ....................................................................................... 5

Ark. Code §4-88-1405(b) ........................................................................................... 5

Ark. Code §4-88-1501(a)(5) ............................................................................... *passim*

Ark. Code §4-88-1502(a) ................................................................................... *passim*

Ark. Code §4-88-1502(a)(4) ..................................................................................... 11

Ark. Code §4-88-1502(b) ...................................................................................... 5, 23

Ark. Code §4-88-1503(a) ......................................................................................... 12

Ark. Code §4-88-1503(b)(1) .............................................................................. 3, 18, 20

Ark. Code §4-88-1503(d) ......................................................................................... 18

Ark. Code §4-88-1503(d)(1) ........................................................................ 5, 15, 19, 20

Fla. Stat. §501.2041(1)(g) ....................................................................................... 14

**Other Authorities**

Kai Hibbard, *Why NOT to Watch The Biggest Loser Reboot*, Nat'l Eating Disorders Ass'n,
https://perma.cc/Y982-2YVS (last visited Oct. 9, 2025) .............................................................. 9

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and
Religion*, 75 Emory L.J. ___ (forthcoming 2026), https://perma.cc/LFX6-XMX4 .................. 11

Hannah Zwemer, *Does 'Euphoria' Encourage Teen Party Culture?*, Addiction Ctr.
(Mar. 17, 2025), https://perma.cc/U6XA-ZMK7 ......................................................................... 9

**INTRODUCTION**

Earlier this year, this Court held that Arkansas's sweeping effort to restrict access to "social media" websites via Act 689 of 2023 violated the First Amendment through and through. *See NetChoice, LLC v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025). Instead of heeding that admonition, Arkansas responded by enacting new legislation that is, if anything, even more blatantly unconstitutional than the original law. Arkansas Act 901 of 2025 prohibits "social media" websites from utilizing any "design, algorithm, or feature" that a jury determines (with the benefit of hindsight) the website "should have known" would "cause[] *a* user" (emphasis on singular) to "[p]urchase a controlled substance," "[d]evelop an eating disorder," "[c]ommit or attempt to commit suicide," or "[d]evelop or sustain an addiction" to the website. Ark. Code §4-88-1502(a). By its terms, Act 901 appears to make it unlawful for YouTube to recommend a music video of Afroman's "Because I Got High" so long as a jury concludes that it foreseeably could cause a single user to purchase marijuana, for Instagram to use algorithms to alert users of a new fitness video so long as a jury determines that it foreseeably could cause a single user to develop an eating disorder, and for Snapchat to use push notifications to alert users of entertaining messages from their friends so long as a jury determines that those notifications foreseeably could cause a user to become "addicted" (whatever that means) to Snapchat. It is hard to think of more obvious content-based restrictions on speech.

It is thus unsurprising that Arkansas concedes that prohibiting the *display* of these types of content would be an "unlawful application[] of Act 901." Opp.14. Arkansas instead tries to distinguish restrictions on "*displaying* third-party content" from restrictions on the use of certain "design, algorithms, or features" to "*push[]*" that content. Opp.14-15, 20 (emphasis added). That distinction is untenable; it is akin to saying that a publisher has a First Amendment right to publish a book, but no First Amendment right to promote it, or to make the book more engaging or

appealing to readers. Indeed, book publishers, movie directors, newspaper editors, and the like have used numerous literary devices over the years to make their products more engaging and appealing to the public. Perhaps it could be said that some of those literary devices and editorial choices have led to "addiction" or other "harmful consequences." Opp.20. But the state obviously could not prohibit, e.g., a television studio from utilizing cliffhangers to keep users coming back to the next episode, or a newspaper from breaking up a bombshell news story into a multi-part exposé to keep readers engaged for multiple days—let alone do so only when the exposé concerns controlled substances, body image, or self-harm. For the same reasons, the state may not prohibit websites from utilizing, e.g., "algorithms," "notification[s]," "infinite scrolling," "like button[s]," or "architecture," Opp.13, 14 n.20, 19-20 & n.22, to keep users engaged with the speech on their websites, even if a jury may (in hindsight) determine that the website "should have known" that those features may lead even just one viewer to develop what the state views as "addiction," Opp.19-20. And while the state insists that NetChoice failed to demonstrate that Act 901 is unconstitutional in *all* (or substantially all) of its applications, that argument depends on a blatant misreading of the carveout in §1503(d)(1), which restricts only liability under §1503, not §1502, and even then applies only when "a social media platform … *[d]isplay[s]* content that is created *and hosted entirely by a third party*." That limited carve-out thus does not change the fact that Act 901 imposes liability on websites for decisions about how to organize and disseminate all manner of speech on their services.

Nor does Arkansas have any answer to Act 901's vagueness or preemption problems. As for vagueness, the state does not seriously dispute that it is nearly impossible for a website to know *ex ante* whether a particular design, algorithm, or feature will cause a single user to purchase drugs, develop an eating disorder, attempt suicide, or develop an addiction. Nor does it dispute that the

2

Act leaves a key statutory term ("addiction") undefined. What does it mean for a user to be "addicted" to a website? Is it addiction to spend one hour a day on a particular service? What about two or three? Does addiction turn on what the user is doing on the website or on some aspect of their mental state vis-à-vis the website? The statute does not say. As for preemption, the state's principal response is, once again, to point to the savings clause in §1503(d)(1). But once again, that provision applies only to claims brought under §1503 and says nothing about liability for a website's decision about how to organize and disseminate third party content hosted on the websites themselves. Yet that is exactly what §230 prohibits. This Court should hold that Act 901 is likely unconstitutional and preliminarily enjoin Defendants from enforcing it.

ARGUMENT

## I.  NetChoice Has A High Likelihood Of Success On The Merits.

### A.  NetChoice Is Likely to Succeed on Its First Amendment Claim.

#### 1.  Act 901 triggers strict scrutiny.

Act 901 is plainly a content-based restriction on speech, as it imposes liability on online services based on the content of the speech they disseminate. It is impossible to determine whether some aspect of a "social media platform" may have "cause[d] a user to … [p]urchase a controlled substance," [d]evelop an eating disorder," "[c]ommit or attempt to commit suicide," or "[d]evelop or sustain an addiction to the social media platform," Ark. Code §4-88-1502(a); *see id.* §4-88-1503(b)(1), without considering what *content* he or she viewed on the platform. While it is not entirely clear what Act 901 prohibits, *see infra* pp.17-19, it would seemingly restrict a "social media platform" from utilizing any "design, algorithm, or feature" to disseminate content promoting prescription drugs, fitness videos idealizing thin body types, music videos that explore themes of depression and suicide, and entertaining video clips that cause users to come back for more, so long as the state (or a jury) determines that the website should have known that the speech

3

may lead a single user to purchase of a controlled substance, develop an eating disorder, attempt suicide, or develop an "addiction" (a term the statute does not define) to the website. Indeed, the Governor advocated for the bill as a means of protecting Arkansans' from "*toxic material*" online. Dkt.25-16 at 1 (emphasis added). Consequently, any attempt to comply with the statute would necessarily entail the suppression of *content* that could potentially be linked with the statutorily enumerated outcomes. As a court recently held with respect to similar provisions of Texas law, that is "as content based as it gets." *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1036 (W.D. Tex. 2024).

The state's efforts to avoid that conclusion fall flat. First, the state tries to evade First Amendment scrutiny altogether by asserting that Act 901 "only penalizes" the "*conduct* of social media companies" and "refrain[s] from penalizing protected speech." Opp.2; *see also, e.g.*, Opp.19 & n.22 ("Act 901 largely regulates conduct," "not speech."). Not so. The Supreme Court has held that "the First Amendment offers protection" to Facebook and YouTube when they "compil[e] and curat[e] others' speech," "organizing and presenting" third-party speech to create "a distinctive expressive product." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731-32 (2024); *see id.* at 737-40. Accordingly, the "conduct" Act 901 regulates—using "a design, algorithm, or feature" to "facilitate" certain types of "interaction, expression, or communication," Ark. Code §§4-88-1501(a)(5), 1502(a), which plainly includes curating and disseminating compilations of third-party speech—is itself protected speech, separate and apart from the underlying pieces of third-party content. Indeed, a website's choices about how to "organiz[e] and present[]" collections of "third-party speech" to its users are just as expressive as an author's decision to separate a long story into chapter books or to end episodes in cliffhangers. *See Moody*, 603 U.S. at 731-32. By Arkansas's logic, states could restrict access to an online newspaper because it

4

utilizes features like seamless pagination, push notifications, and recommendation algorithms without even triggering First Amendment scrutiny.[1]

The state never seriously grapples with the consequences of its position. It just tries to get around the First Amendment by invoking the savings clause of §1503(d). *See* Opp.17-18. According to the state, §1503(d)(1) makes "clear that Act 901 'does not impose liability on a social media company' for displaying third-party content, including advertisements." *Id.* But §1503(d)(1) expressly applies only to "[t]his section"—i.e., §1503, which creates a private right of action for only one subset of the content laid out in §1502—so it imposes no limitations on Defendants' authority to enforce §1502.[2] Moreover, that statutory carve-out is far more limited than the state suggests: It precludes liability for "*[d]isplaying* content that is created *and hosted entirely* by a third party." Ark. Code §4-88-1503(d)(1) (emphasis added). It is unclear what, if anything, this actually covers, as the bulk of the "user-to-user" and "user-to-public interaction, expression, [and] communication" burdened by Act 901 is presumably "hosted" by the regulated company. In all events, as the state acknowledges elsewhere in its brief, the carve-out does not apply to the use of design, algorithms, or features to "*push[]* certain types of content," Opp.20, which is plainly speech protected by the First Amendment. As for the part of the savings clause

---

[1] Act 901's imposition of broad, vague restrictions on "social media platforms" will also inevitably burden the First Amendment rights of the millions of Arkansans who use those platforms to view and engage in speech. The fact that the statute does not directly prohibit users' speech is immaterial: "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

[2] The state tries to portray §1503(d)(1) as a limitation on all aspects of Act 901. *See, e.g.*, Opp.2. But the plain text of §1503(d) makes clear that it applies only to one "section" of the Arkansas Code—§1503. Act 900 and Act 901 repeatedly use "this section" in that manner. *See* Ark. Code §§4-88-1502(b); 1402(b)(2), (c)(2); 1405(b). By contrast, when a provision applies to the entire Act, it speaks in terms of "this subchapter." *See id.* §§4-88-1401(a), 1403(a)(1), 1501(a). Accordingly, §1503(d) is no limitation on the content-based restrictions of §1502.

that exempts "[c]onduct that is protected by the … First Amendment" or the "Arkansas Constitution," it is well settled that appending such a clause does not magically cure constitutional defects in a statute's more specific provisions. *See, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 23 (2020) ("[W]e have long rejected interpretations of sweeping saving clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found."); *AFGE v. Trump*, 139 F.4th 1020, 1038 (9th Cir. 2025); *CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985).

Next, Arkansas insists that even if Act 901 restricts speech (and it does), its restrictions are not "content based." *See* Opp.18-20. That argument fails, too. Relying on decades-old caselaw, the state asserts that content neutrality turns on "'the government's purpose' in passing the legislation." Opp.18 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). That test does not help the state, as Act 901's avowed purpose (and inevitable effect) is to suppress types of content that the state deems "toxic." Dkt.25-16 at 1. In any event, more recent Supreme Court decisions expressly reject the state's reading of *Ward*, explaining that the decision "had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban." *Reed v. Town of Gilbert*, 576 U.S. 155, 166-67 (2015). There is simply "no need to consider the government's justifications or purposes" when, "[o]n its face, the [challenged law] is a content-based regulation of speech." *Id.* at 164-65. And a law is "content based" if it "applies to particular speech because of the topic discussed or the idea or message expressed"—which includes "defin[ing] regulated speech by its function or purpose." *Id.* at 163. Act 901 does precisely that: It restricts expressive activity that "causes a user to" take certain actions or leads to certain results. Ark. Code §4-88-1502(a); *see supra* pp.3-4; PI.Mot.13-14.

6

Arkansas's efforts to divorce the "design features" of "social media platforms" from the content that those features display, Opp.19-20, are unpersuasive. To take one of the state's own examples, Act 901 forbids regulated entities from using an "algorithm *pushing certain types of content*" if the algorithm "caus[es] negative consequences, such as addiction or self-harm behaviors." Opp.19-20 (emphasis added). That just underscores that Act 901 regulates speech based on its content. It is hard to see how a "social media" website would face liability under §1502(a)(1) unless it displays *content* related to controlled substances, self-harm, or body image issues. Using push notifications to alert users of sports scores, algorithms to recommend puppy videos, and infinite scroll to display otherwise anodyne content could hardly be said to "cause" users to purchase drugs, attempt suicide, or develop body image issues. What the Act punishes is the use of designs, features, and algorithms to disseminate certain kinds of *content* that may lead to those consequences. As another court recently held in striking down a similar Ohio law, "the features that the Act singles out are inextricable from the content produced by those features." *See NetChoice, LLC v. Yost*, 778 F.Supp.3d 923, 953 (S.D. Ohio 2025). Just so here. Indeed, most of the state's arguments have no bearing on the part of §1502(a)(1) restricting the use of design, algorithms, or features that may lead a user to purchase drugs, develop an eating disorder, or attempt suicide. For good reason, as those provisions are obviously content based. At the very least, the Court should enjoin the state from enforcing those provisions. *See Chamber of Com. v. Lierman*, 151 F.4th 530, 542 (4th Cir. 2025).

The state contends that, even if the provisions addressing drugs, body image issues, and suicide are content based, the provision addressing "develop[ing] or sustain[ing] an addiction to [a] platform … has nothing at all to do with content." Opp.19. But its "addiction" concerns are plainly focused on particular content. After all, Act 901 does not regulate *all* websites that employ

7

features, designs, and algorithms that could lead to addiction.  Act 901 singles out websites that are "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication," and "[e]mploy[] features that allow a user to connect, follow, or establish a relationship with other users."  Ark. Code §4-88-1501(a)(5).  In other words, the Act leaves speech by "institutional content creators" like Disney+ or Hulu completely unregulated, while targeting websites that principally facilitate "the speech of users of online services."  *Griffin*, 2025 WL 978607, at *9.  Arkansas thus takes issue with design, features, and algorithms that may lead to addiction only when they are connected to services that feature content it apparently does not trust—i.e., content generated by everyday people, rather than selected by a third-party provider. That "elevation" of "provider-generated content over user-generated content" triggers strict scrutiny.  *Paxton*, 747 F.Supp.3d at 1032; *see Griffin*, 2025 WL 978607, at *9-10.

On top of that, it is hard to see how a website's design, features, or algorithms could possibly lead to "addiction" without referencing the *content* on the website.  No user would develop an "addiction" to a website as a result of "infinite scroll" if the website just infinitely displays the text of the dictionary or random gobbledygook.  Likewise, "push notifications" would obviously not be "addictive" if the notifications alerted users to irrelevant or uninteresting content. Millions of users open the NYTimes app "every day" precisely because it "provid[es] *engaging* word and logic games" such as Wordle and Connections.  Dkt.25-1 at 6 (emphasis added).  And people use covered websites precisely because of the interesting and engaging *content* on those websites.  Under Act 901, a company will escape liability under §1502(a)(4) if its algorithm promotes anodyne content, but faces a serious risk of liability if the content it displays is entertaining or engaging enough to keep users coming back for more.  Simply put, Act 901 discriminates between websites based on the *content* they disseminate.

Again, Arkansas has no persuasive response.  After repeating its failed assertion that Act 901 regulates only "conduct," it invokes *Turner Broadcasting Systems, Inc. v. FCC*, 512 U.S. 622 (1994), which held that the First Amendment does not require "strict scrutiny" for a "speech regulation that applies to one medium (or a subset thereof) but not others," "when the differential treatment is 'justified by some special characteristic of the particular medium being regulated.'" *Id.* at 660-61.  But that is clearly not the case here.  The Supreme Court has expressly rejected the notion that internet is sufficiently different from all other forms of speech to justify lesser First Amendment protection.  *Moody*, 603 U.S. at 733.  And, at least at the level of generality that Act 901 seems to contemplate, books, magazines, television, movies, video games, and the spoken word are no less capable of "causing" recipients of speech to purchase a controlled substance, develop an eating disorder, or engage in self-harm.  For example, HBO Max's "Euphoria" has been criticized for "misguidedly glorify[ing] … high school drug use"—and it "is hardly the first TV show" to face similar criticisms.  Hannah Zwemer, *Does 'Euphoria' Encourage Teen Party Culture?*, Addiction Ctr. (Mar. 17, 2025), https://perma.cc/U6XA-ZMK7.  Similarly, "The Biggest Loser" has been criticized for "quite literally celebrat[ing]" "disordered eating and exercise habits"—"harm[ing]" participants and viewers alike.  Kai Hibbard, *Why NOT to Watch The Biggest Loser Reboot*, Nat'l Eating Disorders Ass'n, https://perma.cc/Y982-2YVS (last visited Oct. 9, 2025).  Moreover, unregulated video-streaming platforms like Disney+, Hulu, and HBO Max use some of the exact same features that the state decries as "addictive," including autoplay and content-recommendation algorithms that encourage users to "binge" episode after episode of a highly entertaining TV show.  Act 901's arbitrary "discriminat[ion] among media" thus "present[s] serious First Amendment concerns."  *Turner*, 512 U.S. at 659.

In sum, this Court's holding in NetChoice's first lawsuit against Arkansas applies with full force here: "Because the Act draws both content-based and speaker-based distinctions, the State bears the burden of demonstrating that it survives strict scrutiny." *Griffin*, 2025 WL 978607, at *10.

### 2.    Act 901 cannot survive any level of heightened scrutiny.

Because strict scrutiny applies, Arkansas bears the heavy burden of demonstrating that Act 901 is "narrowly tailored to serve [a] compelling state interest[]." *Reed*, 576 U.S. at 163.  And even if Act 901 were subject only to intermediate scrutiny, Arkansas would still have to show that "it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *TikTok, Inc. v. Garland*, 604 U.S. 56, 70 (2025).  The Act fails either standard.

To begin, while Arkansas certainly has a legitimate interest in discouraging "drug use, eating disorders, and suicide," Opp.21, it has no valid interest in preventing what it perceives as "addiction" to "social media" websites.  Arkansas is not seeking to prevent "addiction" to non-speech products like drugs or gambling.  The state's aim is to prevent addiction to websites for "interaction, expression, or communication," Ark. Code §4-88-1501(a)(5)(A)—i.e., addiction to *speech*.  But Arkansas has no legitimate interest in deciding how much speech its residents should be able to engage in.  It could not validly restrict Disney+ from streaming shows that "contain … catchy jingles," *Sorrell*, 564 U.S. at 578, out of fear of "addiction" to television any more than it could restrict books that end in cliffhangers out of fear of "addiction" to reading.  In *Brown v. Entertainment Merchants Association*, California did not even try to justify its law on the theory that it had an interest in preventing minors from addiction to video games.  564 U.S. 786, 799-804 (2011).  As the Supreme Court has repeatedly made clear, the fact that a "State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* at 578; *see*

*Angelilli v. Activision Blizzard, Inc.*, 781 F.Supp.3d 691, 701 (N.D. Ill. 2025) ("Plaintiffs label Roblox 'addictive,' but this [is] just … another way of saying that Roblox's interactive features make it engaging … First Amendment protections do not disappear simply because expression is impactful."). Burdening protected speech because people find it especially interesting is especially inconsistent with the First Amendment.[3]

In any event, Act 901 is not remotely tailored to Arkansas's asserted interests in curbing "drug use," "eating disorders," "self-harm," and "addiction." Imposing nebulous, front-end restrictions on online services' dissemination of protected speech to millions of recipients, based on what the speech may ultimately "cause[]" one or more of those recipients to do, is breathtakingly overbroad. *See* PI.Mot.15-20. Virtually any positive statement about a "controlled substance" could inspire some recipient to purchase it, so the only realistic way to comply with §1502(a)(1) is by broadly restricting that type of content (and viewpoint). Similarly, because it is next to impossible to know, *ex ante*, what types of statements, images, or videos could arguably be linked to an unknown recipient's eating disorder or suicide attempt, any attempt to comply with §§1502(a)(2)-(3) and 1503(b)(1) would likewise require broad suppression of protected content (and viewpoints)—ranging from images of thin body types and diet tips to songs containing themes about depression and self-harm. And Act 901's prohibition on presenting speech in a manner that "causes a user" to "[d]evelop or sustain an addiction to [a] social media platform," Ark. Code §4-88-1502(a)(4), is even more problematic. Act 901 effectively mandates that online services significantly alter or eliminate the methods for presenting and organizing speech that have made

---

[3] Indeed, if Arkansas were right that it may restrict speech that it deems "addictive," then there is no reason why it could not restrict religion on the same theory. *See* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. ___ (forthcoming 2026) (manuscript at 2-9), https://perma.cc/LFX6-XMX4.

their services so useful and popular.  In short, Act 901 dramatically restricts dissemination of speech to *all* Arkansans whenever there is a risk that a small subset of Arkansans (indeed, a single Arkansas user) will become "addicted" to it.  None of that is remotely tailored to the state's asserted interests.

Arkansas's response is cursory and unpersuasive.  Its claim that Act 901 imposes liability only for "knowing and willful conduct," Opp.22, misreads its own law.  Section 1503 establishes heightened penalties (beyond those available for any violation of the state's consumer protection laws, *see* Ark. Code §§4-88-103, -104) for "knowing[] and willful[]" violations of "*this section*," which addresses only certain claims relating to suicide attempts.  *Id.* §4-88-1503(a) (emphasis added).  Accordingly, those "*mens rea* requirements" do not apply to the *neighboring* section, i.e., §1502.  *Contra* Opp.22.  An entity may instead be held liable under §1502 whenever a jury determines, with the benefit of hindsight, that the company "should have known" that some user of its speech-facilitating product would end up buying a controlled substance, attempting suicide, or developing an eating disorder or "social media" addiction.  Ark. Code §4-88-1502(a); *see id.* §4-88-104.  The Act thus burdens any speech that could have an enumerated harmful effect on any single recipient ("a user"), even if the speech is not harmful to millions of other recipients.  Indeed, even taking at face value the state's dubious claim that "between 5 and 10%" of Americans "use [social media] obsessively," Opp.4, the Act needlessly restricts protected speech with respect to *90 to 95%* of Americans who find covered websites useful and engaging but do not "show addicted behaviours," *id.*; *see Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *15-19 (N.D. Fla. June 3, 2025).  That is a seriously overinclusive means of addressing the "harmful behaviors" that the Act supposedly targets, regardless of whether regulated entities "know[]" that some unidentified subset of their users may (unfortunately) engage in those behaviors, Opp.21.

12

While Act 901's overinclusiveness is fatal under any form of heightened scrutiny, the Act is also seriously underinclusive because it does not restrict other forms of speech that likewise would be said to "cause" individuals to purchase a controlled substance, develop an eating disorder, harm themselves, or become addicted. *See* PI.Mot.19. To give just a few examples, it does not apply to in-person ads for prescription drugs or spoken advocacy for the legalization of substances like marijuana; fashion magazines, TV commercials, or billboards that promote thin body types and diet culture; bullying via text message or video chat; algorithm-driven recommendations on streaming platforms Hulu, Disney+, and HBO Max; or potentially addictive video games and pornography websites—so long as they do not include *user-generated* content. *Id.* That underinclusiveness raises serious concerns that the law is really just aimed at muzzling disfavored speakers and suppressing disfavored content.

Again, Defendants offer barely any response. Citing no authority, the state avers that "social media" sites use "designs, features, and algorithms" that "do not have an 'identical' parallel to other types of media." Opp.22. That is both wrong and beside the point. As NetChoice pointed out in its opening brief, many online services that offer only provider-generated content (and thus are not subject to Act 901) employ content-recommendation algorithms and features like autoplay, push notifications, and infinite scroll. *See* PI.Mot.14, 19. In any case, underinclusiveness turns on whether "other media" produce the same "harmful effects" that the challenged statute ostensibly seeks to eliminate, regardless of whether their features are identical in all respects. *See Brown*, 564 U.S. at 800-02 (state restriction on violent video games was underinclusive because the state did not restrict "exposure to violence on television," "video games like Sonic the Hedgehog," or "distribution of pictures of guns"). Here, as in *Brown*, the state's decision to single out one

13

particular type of media for special restrictions is grossly underinclusive and underscores that the state is targeting particular content.

### 3. Act 901 violates the First Amendment on its face and as applied to NetChoice members

Because Act 901 burdens large amounts of constitutionally protected expression in ways that are not remotely tailored to any legitimate state interest, it is facially unconstitutional. Unlike the law in *Moody*, which the Supreme Court was concerned might regulate non-speech activities of websites like Uber and Venmo, Fla. Stat. §501.2041(1)(g) (defining "[s]ocial media platform" as "any information service, system, Internet search engine, or access software provider that … [p]rovides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site"), Act 901 applies *only* to websites that "facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication." Ark. Code §4-88-1501(a)(5)(A); *see* PI.Mot.12-13, 15. In other words, it applies only to websites in the business of facilitating *speech* when they are facilitating speech. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (9th Cir. 2024) (finding facial challenge proper because, "in every application to a covered business," the statute "raise[d] the same First Amendment issues"). Moreover, unlike the law in *Moody*, which seeks to force websites to disseminate or display speech in ways they otherwise would not, Act 901 seeks to *restrict* the dissemination of speech, thus burdening the First Amendment rights of users as well. And even if there were some conceivable applications of Act 901 that would *not* implicate the First Amendment (although the state has identified none), the burdens it imposes on broad swathes of protected speech—including any content that may cause *a single user* to purchase a controlled substance, develop body image issues, attempt self-harm, or develop an "addiction"—"substantially outweigh" any potential constitutional applications the state could dream up. *See Moody*, 603 U.S. at 723-24.

14

The state's counterarguments go nowhere. The state tries to minimize the Act's core, content-based (and blatantly unconstitutional) applications, but it can do so only by contorting the statutory text beyond recognition. Again, Act 901 does not broadly immunize companies from liability for "displaying third-party content," Opp.14 (citing Ark. Code §4-88-1503(d)(1)). As explained, §1503(d)(1) limits liability for "content promoting, or otherwise advancing, self-harm or suicide" only under *§1503*, and it is a far more limited (and potentially illusory) carve-out for "*[d]isplaying* content that is created *and hosted* entirely by a third party." *Supra* p.5 (quoting Ark. Code §4-88-1503(d)(1) (emphasis added)). Nor does §1502(a) restrict "designs" and "features" "regardless … of content." *Contra* Opp.14. As explained, it imposes burdens based on the "function or purpose" of speech, suppressing particular types of content (e.g., speech about controlled substances, body image, or suicide). *Supra* pp.6-8. Again, the Act's vague restrictions on "features … are inextricable from the content produced by those features." *Yost*, 778 F.Supp.3d at 953.

Arkansas's assertion that there are "countless … features that social media companies embed into their platforms that have no ties … to speech or expressive conduct," Opp.13, misses the point: What Act 901 regulates is speech. "[P]rohibit[ing]" a "particular notification method," *id.*, plainly implicates speech, as it directly prohibits the conveyance of speech. *See NetChoice v. Bonta*, 761 F.Supp.3d 1202, 1227 (N.D. Cal. 2024) (California's prohibition on sending "push notifications" to minors during certain hours likely violates First Amendment); *NetChoice, LLC v. Bonta*, 2025 WL 2600007, at *4 (9th Cir. Sept. 9, 2025) (noting that California "did not appeal" this issue). The same goes for other potential applications of Act 901 to speech between a platform and its users, such as the state's hypothetical regarding Snapchat's "Streak" function. Opp.14 n.20. "Social media companies" are clearly engaged in expressive activity when they use

15

algorithms (with or without the aid of artificial intelligence) to "decide which third-party content" their services "will display, or how the display will be ordered and organized." *Moody*, 603 U.S. at 740; *cf.* Opp.9, 14 n.20. Infinite scrolling and chatbots likewise reflect editorial choices about how to effectively present speech. *Cf.* Opp.14 n.20. And all of that plainly implicates the First Amendment rights of users who want to receive or engage in the speech that Act 901 restricts. But in all events, even if there were some hypothetical application of Act 901 to a "feature" of a speech-facilitating online service that implicates *neither* the company's own expressive activity *nor* third-party users' First Amendment rights—though, again, the state has not identified any—any such applications are far outweighed by the Act's many unconstitutional applications.

At the very least, Act 901 violates the First Amendment as applied to NetChoice members when they engage in their own speech or the undisputedly expressive activity of curating and disseminating speech. *See* Opp.9 (conceding that when "social media companies 'curate compilations of others' content,'" they are engaged in "expressive" activity). Act 901 plainly triggers and fails strict scrutiny if deployed, for example, to penalize Facebook for disseminating third-party content "[d]ebating or advocating for the legality or discussing scientific or medical merits of" illegal drugs," Dkt.25-3 at 4, or YouTube for offering a vast, searchable library of highly engaging videos. And, *contra* Opp.16, NetChoice's preliminary-injunction brief and the accompanying declarations are replete with arguments and evidence about how Act 901 could be enforced against its members to curtail their expressive activity. *See, e.g.*, PI.Mot.4-7, 12-20.

Lacking any persuasive response, Arkansas asserts that NetChoice lacks prudential standing to pursue an as-applied claim on behalf of its members. *See* Opp.15-16. The state is wrong again. Under Eighth Circuit law, "an association may have standing solely as the representative of its members" if it demonstrates that "(a) its members would otherwise have

16

standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016). Arkansas disputes only the third prong, relying almost exclusively on *NetChoice v. Bonta*, 2025 WL 2600007—where the Ninth Circuit recently called for a response to NetChoice's pending petition for rehearing en banc—which concluded that "more information" and "the participation of individual members" was needed to adjudicate a "fact intensive" as-applied claim that "require[d] review of *each* member's algorithm and how it functions." *Id.* at *6-7. But nothing of the sort is required here. Imposing content-based restrictions on the "facilitat[ion]" of "user-to-user, user-to-group, [and] user-to-public interaction, expression, or communication," Ark. Code §4-88-1501(a)(5)(A), obviously implicates the expressive activity of regulated NetChoice members and the millions of Arkansans who use their services, regardless of how any specific algorithm may operate. And NetChoice's as-applied claim asserts that Act 901 cannot constitutionally be applied to curb any of that protected activity. That is not "a disguised facial challenge," Opp.16; it is an as-applied challenge that takes off the table any potential application of Act 901 to non-speech conduct or non-NetChoice members. Simply put, the Court does not need any details about how particular NetChoice members engage in and facilitate speech to conclude that Arkansas cannot impose content-based restrictions on them when they do so. Indeed, in *Moody* itself, the Supreme Court squarely held that the challenged laws could not constitutionally be "applied to Facebook's News Feed and YouTube's homepage," even though neither Meta nor Google was a plaintiff in the suit. *See Moody*, 603 U.S. at 724, 733-38. There is no reason why the Court could not do the same here.

### B.  NetChoice Is Likely to Succeed on Its Vagueness Claim.

As discussed in NetChoice's preliminary injunction brief, Act 901 is unconstitutionally vague because it is entirely unclear what types of "design[s], algorithm[s], or feature[s]" could cause one or more unidentified users—including adults—to purchase a controlled substance, develop an eating disorder, attempt suicide, or become "addicted" to the platform.  *See* Ark. Code §§4-88-1502(a), 1503(b)(1); PI.Mot.3.  Of course, at a high level of generality, an algorithm that displays speech touting the alleged benefits of a controlled substance could lead someone to purchase that substance, and a website that features highly entertaining and engaging content could arguably lead someone to become "addicted" to it.  But it is extremely difficult to predict, *ex ante*, whether any specific aspect of a "social media platform" will cause one of its millions of Arkansas users to experience one of the statutorily enumerated harms—especially since each individual viewer may react differently to any given type of content.  In light of that uncertainty and §1502's "should have known" standard, companies attempting to comply with Act 901 would be forced to broadly suppress speech with respect to *all* Arkansans whenever the speech might harm some small subset of them.  That would inevitably force companies to stop disseminating content on certain subjects, and to make their curated compilations of third-party speech less appealing and engaging.  Accordingly, Act 901 is a textbook example of a vague law that "force[s] the entities regulated 'to "steer far wider of the unlawful zone" than [they would] if the boundaries of the forbidden areas were clearly marked.'"  *Griffin*, 2025 WL 978607, at *15 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

Arkansas's counterarguments misread the statutory text.  The state repeats its incorrect assertions that Act 901 "does not 'impose liability on a social media platform' for '[d]isplaying' third-party content" and "only imposes liability" on companies that "knowingly and willfully" cause harm.  Opp.25-26 (citing Ark. Code §4-88-1503(d)).  As explained, those carveouts

18

expressly apply only to "th[e] section" in which they are located (§1503), so they provide no protection against claims that a regulated company "should have known" that some aspect of its speech-facilitating service would "cause[] a user" to purchase a controlled substance, develop an eating disorder, attempt to commit suicide, or become "addicted" to the service, Ark. Code §4-88-1502(a).  Moreover, the former carve-out is expressly limited to "[d]isplaying content that is created *and hosted entirely* by a third-party," *id.* §4-88-1503(d)(1) (emphasis added)—a phrase that the state repeatedly omits from its descriptions of that subsection.  *See* Opp.2, 6, 14, 17-18, 22, 25.  And Arkansas's quotation of a lengthy and convoluted definition of "social media addiction" from "addictioncenter.com" hardly demonstrates that there is general agreement on the contours of that term.  *See* Opp.26 & n.25.  Regardless, the state simply has no answer for the reality that restricting dissemination of speech based on its potential effects on some unknown subset of recipients, under a "should have known" liability standard, creates a massive vagueness problem.  In short, a "person of ordinary intelligence" does not have "fair notice" of what Act 901 prohibits.  *United States v. Williams*, 553 U.S. 285, 304 (2008).

### C.    NetChoice Is Likely to Succeed on Its CDA §230 Preemption Claim.

Finally, Act 901 is preempted by §230 of the Communications Decency Act.  Section 230 bars states from imposing liability on websites for selecting, displaying, or recommending third-party content.  *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1095, 1098 (9th Cir. 2019) (§230 preempted claim that a website's "features and functions, including algorithms" "facilitated [an] illegal drug sale[]"); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019); *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025); *Paxton*, 747 F.Supp.3d at 1036, 1042-43 (§230 preempted state law requiring online services to filter content "that promotes, glorifies, or facilitates … suicide, self-harm, or eating disorders"); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.Supp.3d 809, 830-31 (N.D. Cal. 2023)

19

(§230 preempted claim that "social media" companies use "algorithms" to curate and disseminate third-party content "in a way that promotes addiction").  That is precisely what Act 901 seeks to do.

The state again tries to brush aside that reality by pointing to §1503(d)(1).  Opp.10-11.  But as explained, that carve-out by its terms apply only to "th[e] section" in which it is located (§1503), so it provides no protection against claims seeking to hold a regulated company liable for facilitating access to third-party speech that it "should have known" would "cause[] a user" to purchase a controlled substance, develop an eating disorder, attempt to commit suicide, or become "addicted" to the service, Ark. Code §4-88-1502(a).  It is also limited to "*[d]isplaying* content that is created *and hosted entirely* by a third-party," *id.* §4-88-1503(d)(1) (emphasis added), so it has nothing to say about "push[ing]" third-party content or the dissemination of third-party content hosted on "social media platforms" themselves.  *See also id.* §4-88-1503(b)(1) (permitting a parent or guardian of a minor who attempts suicide to sue a platform if it "hosted, promoted, shared, or otherwise facilitated" access to that content).

Citing *Anderson v. TikTok, Inc.*, 116 F.4th 180, 183-84 (3d Cir. 2024), Arkansas argues that providers may still be held liable for "push[ing]" or "recommending" third-party content because "if social media companies 'curate compilations of others' content via their expressive algorithms,' that expressive algorithm is first-party speech" not covered by §230.  Opp.9.  But *Anderson* is an outlier that was wrongly decided.  *See, e.g.*, *Doe v. WebGroup Czech Republic, a.s.*, 767 F.Supp.3d 1009, 1021 (C.D. Cal. 2025) (observing that *Anderson* is out of step with the "views of other circuits"); *Patterson v. Meta Platforms, Inc.*, 239 N.Y.S.3d 726, 732 (N.Y. App. Div. 2025) ("We do not find *Anderson* to be persuasive authority.").  Contrary to the Third Circuit's view, §230 does not allow states to impose liability on websites for their editorial choices

20

about how to organize and present third-party content. Holding as much would gut §230. Indeed, Congress enacted §230 to specifically overrule *Stratton Oakmont, Inc. v. Prodigy Services Co.*, which held that a website could be held liable for disseminating defamatory third-party content on the theory that it became a "publisher" of that content *because it exercised* "editorial control over the content of messages posted on its computer bulletin boards." 1995 WL 323710, at *2 (N.Y. Sup. Ct. May 24, 1995); *see* S. Rep. No. 104-230, at 194 (1996). If the Third Circuit were correct that websites lose §230 protection whenever they exercise "editorial" judgment over the third-party content on their services, then §230 would be a dead letter. *See Doe (K.B.) v. Backpage.com, LLC*, 768 F.Supp.3d 1057, 1063 (N.D. Cal. 2025) (adopting *Anderson*'s reasoning "would effectively render the core of Section 230 a nullity, contrary to Congress's intent and the plain language of the statute").

A website's decisions about how to organize third-party content are just as much of a core "publisher" function as its decision whether to disseminate third-party content at all. *Force*, 934 F.3d at 68. That is evident not just from a long line of cases, but from §230 itself. Section 230 defines an "interactive computer service" to include providers of "software" or "tools" that "filter," "pick, choose," "reorganize," "display," or "forward" content. 47 U.S.C. §230(f)(2), (4). Section 230 thus expressly contemplates that websites exercising editorial control may invoke its protection. Yet, under Arkansas's logic, the very features that make websites "interactive computer service[s]" covered by §230 at the same time would make them ineligible for protection under §230(c)(1). That reading would render §230 not just ineffectual but nonsensical.

## II.    NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief.

Finally, all other relevant factors favor granting NetChoice's motion for a preliminary injunction. Act 901's broad, vague restrictions on entities that "facilitate … interaction, expression, or communication," Ark. Code §4-88-1501(a)(5), are virtually certain to abridge the

21

First Amendment rights of NetChoice members and those who use their online services. *See supra* pp.3-13. As this Court recently held in the Act 689 case, "the loss of First Amendment freedoms … unquestionably constitutes irreparable injury." *Griffin*, 2025 WL 978607, at \*17 (quoting *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008)). On top of that, NetChoice members would suffer irreparable economic injuries in the form of unrecoverable compliance costs if Act 901 were to take effect, as they would need to expend large sums either attempting to comply or shutting down their operations in Arkansas altogether. *See* PI.Mot.26-27; *see also Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).

Unable to deny that a likely First Amendment violation constitutes *per se* irreparable harm, the state disputes whether "the alleged harms" are sufficiently "imminent, clear, and present" to justify injunctive relief. Opp.27. Of course they are. Just a few pages after disputing imminence, the state declares its intention to "enforc[e] Act 901" against "social media companies" whose speech-facilitating services the state deems "addict[ive]" or otherwise "harm[ful]." Opp.30. Given that representation, there can be no serious dispute that the impending loss of First Amendment rights (and imposition of unrecoverable compliance costs) is sufficiently imminent to justify preliminary injunctive relief.

Arkansas's attempts to downplay the costs of attempting to comply with Act 901 fare no better. *See* Opp.28. The state fails to identify a single case from within the Eighth Circuit that supports its stance that "ordinary compliance costs" are "typically insufficient to constitute irreparable harm." Opp.28. At any rate, the costs imposed by Act 901's nebulous restrictions on protected speech are anything but ordinary. Act 901 requires regulated companies to attempt to predict whether some aspect of their speech-facilitating services could lead to certain enumerated harms. Because those restrictions are so broad and vague, the costs of compliance would be very

22

high; indeed, "at least some NetChoice members would choose to cease operations in Arkansas altogether." Cleland.Decl.¶¶24-25. A law that imposes compliance costs so extreme that it runs businesses out of the state can hardly be considered ordinary. *See* Opp.28. And the 30-day safe harbor, *see* Ark. Code §4-88-1502(b), does nothing to reduce those enormous compliance costs.

As to the balance of equities, Arkansas "has no interest in enforcing laws that are unconstitutional." *Little Rock Fam. Plan. Servs. v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019). The state emphasizes that Act 901 was "democratically enacted," Opp.29, but that is true of all state statutes and is not a sufficient reason to allow an unconstitutional statute to remain in force. Simply put, the balance of the equities sharply favors NetChoice because "an injunction preventing the State from enforcing [an unconstitutional statute] does not irreparably harm the State." *Rutledge*, 397 F.Supp.3d at 1322.

Finally, Arkansas contends that "any preliminary injunction that this Court issues must be narrow and tailored to the harm that NetChoice has substantiated." Opp.31. This argument does not help the state, however, because NetChoice has demonstrated that all of Act 901's liability-creating provisions—namely, §1502(a) and 1503(b)(1)—are invalid several times over. There is no realistic path to concluding that "the prohibition on 'algorithms' is likely unconstitutional but not the prohibitions on 'designs' and 'features,'" as the state suggests. *See* Opp.31-32 (brackets omitted). Because no provision of Act 901 can be given effect—indeed, unlike Act 900, the statute does not even contain a severability clause, *cf.* Dkt.2-1 at 9—the Court should simply hold that Act 901 is likely unconstitutional and enjoin Defendants from enforcing it against any NetChoice member.

**CONCLUSION**

For these reasons, the Court should preliminarily enjoin Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing Act 901 against NetChoice or its members.

Respectfully submitted,

Marshall S. Ney
Katherine C. Campbell
FRIDAY, ELDREDGE & CLARK, LLP
3350 South Pinnacle Hills Pkwy., Suite 301
Rogers, AR 72758
(479) 695-6049

Paul D. Clement*
Erin E. Murphy*
James Y. Xi*
Joseph J. DeMott*
Barrett L. Anderson*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

 *admitted pro hac vice

*Counsel for Plaintiff*

October 10, 2025

24