**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

NETCHOICE,

        *Plaintiff,*

        v.

TIM GRIFFIN, in his official capacity as
Attorney General of Arkansas, et al.,

        *Defendants.*

Civil Action No. 5:25-cv-05140-TLB

**MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    Adults and Minors Both Use Social Media Services to Engage in Protected First Amendment Activity......................................................... 3

    B.    NetChoice Members Have Adopted Detailed Policies and Expended Significant Resources Prohibiting and Policing Harmful Content to Protect Their Users ....................................................................................... 5

    C.    Arkansas Enacts the "Social Media Safety Act" of 2023, and This Court Holds it Facially Unconstitutional ............................................................ 7

    D.    Arkansas Passes Acts 900 and 901 Seemingly to Evade This Court's Injunction ............................................................................................... 8

ARGUMENT ................................................................................................................ 12

I.    NetChoice Is Likely To Succeed On The Merits Of Its First Amendment Claim............................................................................................................... 12

    A.    The Provisions Addressing Addictive Practices (§§1402(d)(1) & (3)) Violate the First Amendment on Their Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services ............................................................................................. 13

        1.    The addictive practices provisions burden an overwhelming amount of First Amendment speech .......................................... 13

        2.    The addictive practices provisions are content based, triggering strict scrutiny............................................................................ 17

        3.    The addictive practices provisions flunk any level of heightened scrutiny............................................................................................. 19

        4.    Sections 1402(d)(1) and (d)(3) lack any legitimate sweep ...................... 22

    B.    The Default Notification and Privacy and Safety Setting Provisions (§§1402(d)(2)(A) & (B)) Violate the First Amendment on Their Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services ................................................................. 24

i

1.    Sections 1402(d)(2)(A) and (B) trigger strict First Amendment scrutiny..................................................................................... 24

2.    Sections 1402(d)(2)(A) and (B) flunk any level of heightened scrutiny..................................................................................... 27

C.    The Online Dashboard Provision (§1402(d)(4)) Violates the First Amendment on Its Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services ........................................ 31

1.    Section 1402(d)(4) triggers strict First Amendment scrutiny ................... 31

2.    Section 1402(d)(4) cannot survive any level of scrutiny, let alone strict scrutiny........................................................................................ 34

II.    NetChoice Is Likely To Succeed On Its Vagueness Claim ................................................ 35

III.    NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief ............. 40

CONCLUSION.................................................................................................................. 41

ii

# TABLE OF AUTHORITIES

**Cases**

*1-800-411-Pain Referral Serv., LLC v. Otto*,
   744 F.3d 1045 (8th Cir. 2014) ............................................................................ 33

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) ............................................................................................ 32

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ....................................................................................... 3, 36

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) .............................................................................................. 34

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ..................................................................................... *passim*

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ............................................................................................ 32

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ............................................................................................ 19

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
   747 F.Supp.3d 1011 (W.D. Tex. 2024) ............................................................... 18

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ......................................................................................... 15, 22

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................................ 40

*Entergy, Ark., Inc. v. Nebraska*,
   210 F.3d 887 (8th Cir. 2000) .............................................................................. 40

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) .............................................................................................. 7

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................................................ 35

*Hess v. Indiana*,
   414 U.S. 105 (1973) ............................................................................................ 22

*Hisp. Int. Coal. of Ala. v. Governor of Ala.*,
   691 F.3d 1236 (11th Cir. 2012) .......................................................................... 40

iii

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995)................................................................................. 14, 32, 33

*In re R.M.J.*,
455 U.S. 191 (1982)........................................................................................ 33

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
702 F.Supp.3d 809 (N.D. Cal. 2023) .................................................................. 24

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
329 F.3d 954 (8th Cir. 2003) ............................................................................. 27

*Iowa Utils. Bd. v. FCC*,
109 F.3d 418 (8th Cir. 1996) ............................................................................. 40

*Johnson v. Minneapolis Park & Recreation Bd.*,
729 F.3d 1094 (8th Cir. 2013) ........................................................................... 12

*Johnson v. United States*,
576 U.S. 591 (2015)........................................................................................ 36

*Little Rock Fam. Plan. Servs. v. Rutledge*,
397 F.Supp.3d 1213 (E.D. Ark. 2019) ................................................................ 40

*McCullen v. Coakley*,
573 U.S. 464 (2014)................................................................................... 19, 21

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
541 F.3d 785 (8th Cir. 2008)............................................................................. 33

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)........................................................................................ 33

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)................................................................................*passim*

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)........................................................................................ 22

*NAACP v. Button*,
371 U.S. 415 (1963)........................................................................................ 36

*NetChoice v. Bonta*,
692 F.Supp.3d 924 (N.D. Cal. 2023) .................................................................. 25

*NetChoice v. Bonta*,
761 F.Supp.3d 1202 (N.D. Cal. 2024) ...........................................................*passim*

*NetChoice v. Bonta*,
   152 F.4th 1002 (9th Cir. 2025) ............................................................... 14, 15, 30

*NetChoice v. Carr*,
   789 F.Supp.3d 1200 (N.D. Ga. 2025) ................................................................. 21

*NetChoice v. Griffin*,
   2025 WL 3634088 (W.D. Ark. Dec. 15, 2025) ............................................... *passim*

*NetChoice v. Murrill*,
   2025 WL 3634112 (M.D. La. Dec. 15, 2025) ................................................. 17, 21

*NetChoice v. Weiser*,
   2025 WL 3101019 (D. Colo. Nov. 6, 2025) ......................................................... 31

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ......................................................... 21, 24, 31, 33

*Netchoice, LLC v. Bonta*,
   770 F.Supp.3d 1164 (N.D. Cal. 2025) ................................................................ 25

*NetChoice, LLC v. Griffin*,
   2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ...................................................... 8

*NetChoice, LLC v. Griffin*,
   2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ................................................. *passim*

*NetChoice, LLC v. Reyes*,
   748 F.Supp.3d 1105 (D. Utah 2024) .............................................................. 17, 21

*NetChoice, LLC v. Yost*,
   778 F.Supp.3d 923 (S.D. Ohio 2025) ............................................................ 17, 21

*NIFLA v. Becerra*,
   585 U.S. 755 (2018) ..................................................................................... 28, 32

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ....................................................................................... *passim*

*Phelps-Roper v. Nixon*,
   509 F.3d 480 (8th Cir. 2007) ............................................................................ 40

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) .......................................................................................... 18

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988) .......................................................................................... 32

v

*SEAT v. Paxton*,
   765 F.Supp.3d 575 (W.D. Tex. 2025).................................................................... 17

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)............................................................................. 14, 20, 25

*TikTok, Inc. v. Garland*,
   604 U.S. 56 (2025).................................................................................... 19, 20

*United States v. Stevens*,
   559 U.S. 460 (2010)....................................................................... 13, 15, 23

*United States v. United Foods*,
   533 U.S. 405 (2001)............................................................................ 33, 34

*United States v. Williams*,
   553 U.S. 285 (2008)........................................................... 13, 15, 35, 40

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ........................................................... 31

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985)........................................................... 32, 34, 35

**Statutes**

Ark. Code §4-88-103 ..................................................................... 16

Ark. Code §4-88-104 ..................................................................... 16

Ark. Code §4-88-113(a)(3) ............................................................ 16

Ark. Code §4-88-1401(1).............................................................11, 39

Ark. Code §4-88-1401(2)....................................................................11

Ark. Code §4-88-1401(9)................................................................... 1

Ark. Code §4-88-1401(11)(A) ................................................... *passim*

Ark. Code §4-88-1401(12).............................................................11, 38

Ark. Code §4-88-1402(a)-(c) ..................................................... 8, 12, 39

Ark. Code §4-88-1402(d)(1)..................................................... *passim*

Ark. Code §4-88-1402(d)(2)..................................................... *passim*

Ark. Code §4-88-1402(d)(3).........................................................1, 11, 13

Ark. Code §4-88-1402(d)(4) ................................................................... 1, 12, 31

Ark. Code §4-88-1403(a) ............................................................................ 12

Ark. Code §4-88-1403(b)(1) ...................................................................... 16

Ark. Code §4-88-1403(b)(2) ............................................................. 15, 16, 37

Ark. Code §4-88-1403(b)-(c) ....................................................................... 8

Ark. Code §4-88-1403(d) ........................................................................... 10

Ark. Code §4-88-1403(d)(1)-(2) ................................................................ 18

Ark. Code §4-88-1502(a) ............................................................................. 9

Ark. Code §5-4-401(b)(1) ........................................................................... 16

Ark. Code §6-18-515 .................................................................................. 22

Cal. Health & Safety Code §27002(b)(5) .................................................. 30

**Other Authorities**

Sonny Albarado, *Bills Would Amend Arkansas Social Media Law, Create Right
for Parents to Sue Platforms*, Ark. Advoc. (Apr. 3, 2025),
https://perma.cc/7ZXU-2N7A ............................................................. 9, 23

Alyson Behr, *The Best Parental Control Apps in 2026, Tested by Our Editors*,
CNN Underscored (Jan. 1, 2026), https://perma.cc/38TM-5PJQ ............................ 6

Merriam-Webster Online Dictionary, https://perma.cc/W3KR-LKEN
(last visited Jan. 11, 2026) ................................................................... 15

Off. of Governor of Ark., *Governor Sanders Delivers State of the State Address*
(Jan. 14, 2025), https://perma.cc/7PS4-KSHG ........................................... 9

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech,
Press, and Religion*, 75 Emory L.J. __ (forthcoming 2026),
https://perma.cc/LFX6-XMX4 ................................................................ 20

YouTube Help, *Understand Your Choices As a Family*,
https://perma.cc/3B4D-ST5S (last visited Jan. 9, 2026) ............................. 7

YouTube Kids, *Parent Resources*, https://perma.cc/ZP34-F4ZH
(last visited Jan. 10, 2026) ................................................................... 5

YouTube, *Recommendations*, https://perma.cc/339A-5CQ8
(last visited Jan. 10, 2026) ................................................................... 5

**INTRODUCTION**

In March of 2025, this Court held that Arkansas's sweeping effort to restrict access to "social media" websites via Act 689 of 2023 violated the First Amendment and permanently enjoined the State from enforcing the Act. *See NetChoice, LLC v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025). Arkansas responded by enacting new legislation that is even more blatantly unconstitutional than its predecessor. Arkansas Act 900 of 2025 prohibits "social media" websites from engaging "in practices to evoke any addiction or compulsive behaviors" in Arkansas minors under the age of 16. Ark. Code §§4-88-1402(d)(1), 1401(9). To ensure that their practices do not violate §1402(d)(1), covered websites must conduct quarterly audits. *Id.* §1402(d)(3). They must also revert minors' default settings to (1) stop all notifications to minors between 10:00 p.m. and 6:00 a.m., which can only be altered by a parent, and (2) provide minors with "the most protective level of control for privacy and safety offered" by the website. *Id.* §1402(d)(2). And Act 900 requires social media websites to develop a "dashboard" that allows parents "to view and understand [their] child's use habits on the covered social media platform" and "provide[s] tools for a parent to restrict [their] child's access." *Id.* §1402(d)(4).

By its terms, Act 900 prohibits a host of protected speech on social media: Anything that might "evoke" a user to repetitively or "compulsive[ly]" do something. *Id.* §1402(d)(1). And it imposes this prohibition via content and speaker distinctions to boot. While Act 900 is not at all clear about what it prohibits, it appears to prohibit Facebook from recommending a video of Messi scoring a goal so long as a fact-finder concludes that it evoked "any addiction or compulsive behaviors" in a minor by causing him or her to obsessively practice soccer every day. *Id.* It would be unlawful for Instagram to use algorithms to alert users of a fitness video so long as a fact-finder determines that it caused a single minor user to compulsively use the gym. And Snapchat could be liable if it used push notifications to alert users of entertaining messages from their friends so

long as a fact-finder determines that those notifications caused a user to become "addicted" (whatever that undefined term means) to Snapchat. It is hard to think of broader or more obvious content-based restrictions on speech.

Act 900 flunks any form of heightened scrutiny, as its sweeping prohibitions are not tailored to any legitimate state interest. The Act is radically overinclusive: It burdens any speech that evokes "any addiction or compulsive behaviors," even if the speech is not harmful (and is even highly valuable) to other recipients. *Id.* And its sweeping and ill-defined effects-based prohibitions will force online services to broadly restrict anything that might lead to "addiction" or "compulsive behaviors." Could YouTube, for instance, be liable if a freshman in high school repeatedly practices basketball after watching daily highlight videos of the top 10 plays? Is an elementary school student who watches three episodes of Sesame Street in a row on Saturday morning on YouTube exhibiting "compulsive behaviors"? To guard against such risk, YouTube would have to significantly restrict content that kids and parents find both useful and entertaining.

At the same time, the Act is radically underinclusive, as it restricts only online services that disseminate user-generated speech but allows the exact same types of content in other settings. For example, Act 900 does not regulate purveyors of movies, television, or video games—even if they are disseminating the same exact content—so long as they offer only provider-generated content and do not "facilitate user … interaction, expression, or communication." *Id.* §1401(11)(A)(i). In other words, Act 900 leaves Hulu or HBO Max free to stream any content, even if its users "binge watch" certain shows, while seemingly prohibiting Instagram and YouTube from doing the same.

Act 900 is also hopelessly vague. A person of ordinary intelligence cannot know, *ex ante*, whether a particular "practice[]" will "evoke any addiction or compulsive behaviors." *Id.*

2

§1402(d)(1).  The Act provides no definition of these concepts, likely because there is no consistent definition of these terms, much less what can cause them, among medical professionals or even lay people.  Likewise, viewers' reactions to content will vary wildly based on factors a social media website cannot know.  Not only that, but Act 900's new definition of a covered "social media platform" extends far beyond websites that are traditionally considered "social media" to include virtually any website that allows users to post a comment.  *Id.* §1401(11)(A).  And Act 900 is unclear who it protects, as most of its restrictions seemingly extend to mere visitors to social media websites, not just account holders.  These glaring due-process problems amplify the First Amendment concerns, as the vagueness of Act 900's commands inevitably will force covered websites "to 'steer far wider of'" any universe of speech that it might be constitutional for Arkansas to restrict than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

Without an injunction, NetChoice's members and their users will suffer irreparable harm in the form of lost constitutional rights, and members will suffer irrecoverable compliance costs.  And all equitable factors cut strongly in favor of protecting constitutional rights.  NetChoice therefore respectfully asks this Court to hold that Act 900 is likely unconstitutional and preliminarily enjoin Defendants from enforcing it.

## BACKGROUND

A.    **Adults and Minors Both Use Social Media Services to Engage in Protected First Amendment Activity.**

NetChoice is a nonprofit trade association whose members operate many online services, including (among others) Facebook, Instagram, Nextdoor, YouTube, and Discord.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).  "On

3

Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.  Instagram allows users to share vacation pictures and informative videos with others.  Nextdoor permits users to build communities by sharing local information with their neighbors.  YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  And, on Discord, users can join communities dedicated to shared interests to connect, collaborate, and enjoy meaningful conversations together.

Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics.  Minors use these websites to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges.  Some use them to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression.  Others use them to raise awareness about social causes and participate in public discussions on salient topics of the day.  "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them." *Griffin*, 2025 WL 978607, at *13.  Still others use them to build communities and connect with those who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized, or are seeking support from others who understand their experiences.

These websites also engage in their own First Amendment activity.  For starters, they curate and disseminate third-party speech to their users, which is unquestionably protected First Amendment speech.  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024).  Facebook and Instagram, for example, curate and disseminate third-party content to their users based on their judgment about what is appropriate for users to see.  Murphy.Decl.¶¶10-13, 66.  YouTube likewise disseminates videos to users based on its judgment about what the user may find especially interesting.  YouTube, *Recommendations*, https://perma.cc/339A-5CQ8 (last visited Jan. 10,

4

2026); YouTube Kids, *Parent Resources*, https://perma.cc/ZP34-F4ZH (last visited Jan. 10, 2026).
Nextdoor curates content based on geographical location and the content it thinks users will enjoy.
Baird.Supp.Decl.¶¶27, 32. Websites also engage in speech when they disseminate their own
speech on the online service through notifications, recommendations, and other alerts.
Murphy.Decl.¶¶26, 65-66; Baird.Supp.Decl.¶32; Cleland.Supp.Decl.¶¶24-32, 40, 43.

> **B. NetChoice Members Have Adopted Detailed Policies and Expended Significant Resources Prohibiting and Policing Harmful Content to Protect Their Users.**

Just as people inevitably have different opinions about what books, television shows, and
video games are appropriate for minors, people inevitably have different views about whether and
to what degree online services like Facebook, Instagram, Nextdoor, YouTube, and Discord are
appropriate for minors. Concerns that new means of communication may be harmful to minors,
however, are hardly new. The same basic concerns have been raised repeatedly in the past about
other types of speech and mediums of expression, from "penny dreadfuls" to "motion pictures,"
"[r]adio dramas," "comic books," and more. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98
(2011).

While the government can certainly participate in those debates, the Supreme Court has
repeatedly rejected government efforts to try to resolve them by decreeing what speech minors
may access. After all, "[m]inors are entitled to a significant measure of First Amendment
protection, and only in relatively narrow and well-defined circumstances may government bar
public dissemination of protected materials to them." *Id*. at 794. And while states have an interest
in protecting minors from harm, that interest "does not include a free-floating power to restrict the
ideas to which [they] may be exposed." *Id.* In a Nation that values the First Amendment, the
preferred response is to let parents decide what constitutionally protected speech their children

may access, and how and when they may access it.

Parents have many tools at their disposal to control their children's access to protected speech on the Internet should they choose to do so.  Parents can decide whether and when to let their children use computers, tablets, and smartphones in the first place.  And those who choose to do so have many ways to control what their children see and do.  Device manufacturers (e.g., Apple and Google) offer settings that parents may use to limit the time that their children spend on applications and websites.  Cleland.Supp.Decl.¶7.  And many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2026, Tested by Our Editors*, CNN Underscored (Jan. 1, 2026), https://perma.cc/38TM-5PJQ.  Cell carriers and broadband providers (e.g., Verizon, AT&T, and Comcast Xfinity) provide parents with tools to block apps and websites from their children's devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours.  Cleland.Supp.Decl.¶8.  Most wireless routers (e.g., NetGear and TP-Link) contain parental control settings as well.  Cleland.Supp.Decl.¶8.  As do Internet browsers (e.g., Google Chrome and Mozilla Firefox).  Cleland.Supp.Decl.¶9.

On top of all that, NetChoice's members have devoted extensive resources to protect minors who use their services and provide their parents with tools to monitor what their children do and see on the Internet.  For starters, some prohibit minors under 13 from accessing their main services, while others offer separate experiences geared specifically toward minors.  *See* Cleland.Supp.Decl.¶10.  On Instagram, parents can review their teens' activity and limit their ability to send direct messages.  Murphy.Decl.¶43.  On Facebook, parents can see their teens' usage, privacy settings, content preferences, and the people and pages they have blocked.  *Id.*  And

6

on YouTube, parents can set up a YouTube Kids account or a "Supervised Experience" that gives them a host of tools to not only review what their minors are seeing, but also impose controls on content and use. YouTube Help, *Understand Your Choices As a Family*, https://perma.cc/3B4D-ST5S (last visited Jan. 9, 2026); Cleland.Supp.Decl.⁋11.c.

### C. Arkansas Enacts the "Social Media Safety Act" of 2023, and This Court Holds it Facially Unconstitutional.

"'Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet," including "social media" websites. *Id.* The Supreme Court has therefore held that the First Amendment limits the government's power to restrict what protected speech users may disseminate and view on those websites. *Id.* at 106-08. That rule applies with full force to efforts to restrict minors' access to speech on such websites. While "a State possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95. Courts thus routinely invalidate government efforts to protect minors from the purportedly harmful effects of constitutionally protected speech on new forms of media. *Id.* at 804-05; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217-18 (1975).

Notwithstanding the long line of cases striking down government restrictions on speech—including those that limit what protected speech minors may access—Arkansas enacted the Social Media Safety Act of 2023, which broadly restricts minors' access to some of the most popular online services. Among other things, that law prohibits minors from holding accounts on and accessing certain "social media platform[s]" without first obtaining parental consent, and requires

covered "social media compan[ies]" to verify the age of every individual who attempts to sign up to use their services. *See* Ark. Code §4-88-1402(a)-(c). The Act imposes both civil and criminal liability on companies that fail to comply with these restrictions. *See id.* §1403(b)-(c).

In June 2023, NetChoice sued to challenge the constitutionality of the Social Media Safety Act on behalf of its members. *See Griffin*, 2025 WL 978607, at *1-2, 6. This Court preliminarily enjoined enforcement of the Act shortly before its September 1, 2023, effective date, *id.* at *1, and ultimately awarded NetChoice a declaratory judgment and a permanent injunction against enforcement of the Act, *id.* at *17. This Court reasoned that the Social Media Safety Act imposes content- and speaker-based burdens that trigger strict First Amendment scrutiny, which the Act plainly fails because its age verification and parental consent requirements were "not narrowly tailored to address" the State's asserted interest in protecting minor children. *Id.* at *11; *see also NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *16-21 (W.D. Ark. Aug. 31, 2023) (conducting intermediate-scrutiny analysis at the preliminary-injunction stage). This Court also held that the Act is unconstitutionally vague, as it does not make clear which companies it covers or specify what it requires of them. *Griffin*, 2025 WL 978607, at *14-17. This vagueness "risk[s] chilling effects" by forcing arguably regulated entities "to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Id.* at *15. It also "invit[es] arbitrary enforcement" by giving the State *carte blanche* to bring actions against disfavored online services but not other similar services. *Id.* at *15-16.

### D. Arkansas Passes Acts 900 and 901 Seemingly to Evade This Court's Injunction.

While the Social Media Safety Act was preliminarily enjoined, Arkansas's Governor urged the state legislature to "update the Social Media Safety Act so that it's no longer held up in court and can begin to be enforced." Off. of Governor of Ark., *Governor Sanders Delivers State of the*

*State Address*, (Jan. 14, 2025), https://perma.cc/7PS4-KSHG.  On April 2, 2025—just two days after this Court granted NetChoice's motion for summary judgment and declared the "Social Media Safety Act" "unconstitutional in all conceivable applications," *Griffin*, 2025 WL 978607, at *14— the Governor announced the introduction of two new pieces of legislation, now known as Acts 900 and 901.  Sonny Albarado, *Bills Would Amend Arkansas Social Media Law, Create Right for Parents to Sue Platforms*, Ark. Advoc. (Apr. 3, 2025), https://perma.cc/7ZXU-2N7A.   The Governor asserted that these two acts (then known as S.B. 611 and 612) would "protect kids" from being "subjected to toxic material" on covered online services.  *Id.* (noting that S.B. 612 "would create a right for parents to sue social media platforms … because of [the] content the child was exposed to").  This new legislation passed through the House of Representatives and the Senate in just two weeks, and, on April 21, 2025, the Governor signed both acts into law.

Act 901's principal provision prohibits a "social media platform" from using "a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user to (1) Purchase a controlled substance; (2) Develop an eating disorder; (3) Commit or attempt to commit suicide; or (4) Develop or sustain an addiction to the social media platform." Ark. Code §4-88-1502(a).  Because Act 901 was slated to take effect on August 3, 2025, NetChoice promptly sued and sought a preliminary injunction prohibiting the State from enforcing the law.  This Court granted an injunction, concluding that Act 901 likely violates the First Amendment and is unconstitutionally vague.  *See NetChoice v. Griffin*, 2025 WL 3634088, *12-13 (W.D. Ark. Dec. 15, 2025).  As for the First Amendment, the Court concluded that Act 901 is likely unconstitutional on its face.  The Court explained that the prohibitions on designs, algorithms, and features that cause a user to purchase a controlled substance, develop an eating disorder, or commit or attempt to commit suicide are plainly content-based restrictions on

"platforms' editorial discretion and on users' speech." *Id.* at \*6-8. And even assuming that the provision addressing "social media addiction" is content neutral, it is not narrowly tailored to further any legitimate state interest. *Id.* at \*11-12. Finally, this Court held that §1502 is also likely unconstitutionally vague because it provides no standards of conduct to which social media websites can conform. Whether a particular design, feature, or algorithm violates the law "entirely depends upon the sensitivities of some unspecified user and a judge or jury's determination about what the platform 'should have known' about those sensitivities." *Id.* at \*13.

Act 900's key amendment to the Social Media Safety Act is set to take effect in April 2026. *See* Ex.A, Act 900, §8. Act 900 has several provisions relevant to this challenge. First, Act 900 abandoned the exception-riddled definition of a "social media platform" established by Act 689 and instead defines a covered service as a website or application that is "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication" and that provides a "unique identifier … that is associated with a specific user account." Ark. Code §4-88-1401(11)(A). Act 900 did not, however, abandon Act 689's core distinction between websites that primarily consist of user-generated content and websites that primarily consist of provider-generated content, which this Court has already determined to be content and speaker based. *Griffin*, 2025 WL 978607, at \*9-10. Nor does it abandon the Social Media Safety Act's exemption for "news," *see* Ark. Code §4-88-1403(d), despite this Court's conclusion that "news" is a type of content. *Griffin*, 2025 WL 978607, at \*9. Covered entities must also provide "mechanisms for a user to create an online profile comprised of personally identifiable information or professional information"; allow users "to connect, follow, or establish a relationship with other users and create[] a network"; "[g]enerate[] revenue primarily through user engagement, including without limitation through advertising, user data monetization, or premium content"; and … [be] accessed

10

by Arkansas users." Ark. Code §4-88-1401(11)(A). The Act distinguishes "Arkansas user[s]" and "user[s]"—who are both defined as mere visitors to a website, *see id.* §§1401(2), (12)—from "account holder[s]" who create and manage accounts on a social media website. *Id.* §1401(1).

Second, Act 900 added a new provision to §1402 that requires each "platform" to "ensure that [it] does not engage in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human." *Id.* §1402(d)(1). Covered websites must do so "[c]onsistent with contemporary understanding of addiction, compulsory behavior, and child cognitive development." *Id.* Websites must also perform a quarterly audit to review their practices and ensure that they comply with (d)(1)'s prohibitions—i.e., that they are not causing "addiction" or "compulsive" behaviors. *Id.* §1402(d)(3).

Third, every "social media platform" must "[e]nsure that, by default," "[n]otifications to an Arkansas user who is a minor, other than safety or privacy-related alerts, are ceased between the hours of 10:00 p.m. … and 6:00 a.m. … and allow a parent or guardian to modify this setting." *Id.* §1402(d)(2). Social media websites must also default minor users to the "most protective level of control for privacy and safety offered by the covered social media platform[.]" *Id.* §1402(d)(2)(B).

Finally, every "social media platform" must "[d]evelop an easily accessible online dashboard to allow a parent of a minor user to view and understand his or her child's use habits on the covered social media platform" and "provide tools for a parent to restrict his or her minor

child's access to the covered social media platform, or logical portions of the covered social media platform." *Id.* §1402(d)(4). The remaining provisions in Act 900 are not at issue in this case.[1]

## ARGUMENT

To obtain a preliminary injunction, NetChoice must show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief is in the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013). NetChoice readily satisfies each factor.

## I.    NetChoice Is Likely To Succeed On The Merits Of Its First Amendment Claim.

Act 900 is unconstitutional both on its face and as applied to NetChoice members when they curate and disseminate third-party content posted on their services.

---

[1] Most of Act 900 is inoperable because it depends on the enforceability of permanently enjoined provisions in Act 689. In *Griffin*, this Court correctly held that the Social Media Safety Act's age-verification and parental-consent requirements are "unconstitutional in all conceivable applications" and enjoined the State from enforcing them. *See* 2025 WL 978607, at *14, 17. Notably, Act 900 does not repeal or amend in any way the substantive provisions requiring "social media companies" to perform age verification and obtain parental consent before letting minors access their websites. *Compare* Act 900, *with* Ark. Code §§4-88-1402(a)-(c), 1403(a). Accordingly, the State is still enjoined from enforcing those provisions, and NetChoice need not challenge them anew in this lawsuit. To the extent Arkansas wishes to argue that Act 900 fixes the constitutional problems with the Social Media Safety Act's age-verification and parental-consent requirements (which Act 900 plainly does not), the onus is on the State to persuade this Court (or the Eighth Circuit) to lift or modify the injunction. Unless and until that happens, the State cannot enforce parts of Act 900 against NetChoice members. For example, §1403(c)'s new additions are unenforceable because they merely heighten the penalties for a violation of §1402's enjoined age verification requirements. Section 1405 is also unenforceable because it requires social media websites to protect against circumvention of the enjoined age-verification requirements in §1402(a)-(c).

A.    **The Provisions Addressing Addictive Practices (§§1402(d)(1) & (3)) Violate the First Amendment on Their Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services.**

1.    **The addictive practices provisions burden an overwhelming amount of First Amendment speech.**

The "first step" in a First Amendment facial challenge "is to construe the challenged statute," since "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010); *see also Moody*, 603 U.S. at 724-25. Under any plausible reading, §§1402(d)(1) and (d)(3) burden "a substantial amount of protected expressive activity." *United States v. Williams*, 553 U.S. 285, 297 (2008). Indeed, they are prohibitions of "alarming breadth." *Stevens*, 559 U.S. at 474. Section 1402(d)(3) requires a "social media platform" to "[c]onduct an audit" once per quarter "to ensure that the social media platform's software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior." Ark. Code §4-88-1402(d)(3). Section 1402(d)(1), in turn, prohibits such websites from engaging "in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor." *Id.* §1402(d)(1).

As an initial matter, it is not clear how a "social media platform" is supposed to know what "practices" the statute prohibits. Indeed, §§1402(d)(1) and (d)(3) are just as vague (if not vaguer) than the recently-enjoined §1502(a). *See Griffin*, 2025 WL 3634088, at *13, 15-16 (holding the prohibition on use of "a design, algorithm, or feature" that could cause "addiction" unconstitutionally vague). The statute does not define what "addiction" or "compulsive behaviors" means (let alone the term "evoke"). That is a fundamental and incurable problem. Among other things, what is "addictive" to some users may not be "addictive" to others. Likewise, what constitutes "compulsive behavior" will vary widely, even within the medical community. And, worse yet, the covered website need only "evoke" these indefinite results—a term which itself is

13

undefined. As a result, how can a covered website know what conduct is permissible and what conduct is not permissible? Does allowing teens to share photos with each other violate the statute? What about sharing videos? What if the videos disappear after a set amount of time? If a minor goes to the gym three times a week after seeing workout videos on YouTube, would YouTube be in violation of the statute? What if the minor goes to the gym seven days a week? The Act does not say.

But whatever §§1402(d)(1) and (d)(3) ultimately prohibit, there is no question that they apply to all manner of constitutionally protected *speech* in the vast majority (if not all) of their applications. Section 1402(d)(1) provides examples of "practices" that (according to the State) "evoke … addiction or compulsive behaviors" in minors, including "notifications, recommended content, artificial sense of accomplishment," and "engagement with online bots that appear human." Ark. Code §4-88-1402(d)(1). Each of those examples is protected First Amendment activity. A "notification[]" is the website's way of informing users about activity on the website, such as new content uploaded by other users, reactions and comments to content on the user's own account, and announcements from the website itself. *See NetChoice v. Bonta*, 761 F.Supp.3d 1202, 1224 (N.D. Cal. 2024), *rev'd in part on other grounds*, 152 F.4th 1002 (9th Cir. 2025). The dissemination of "recommended content" is speech as well, as the "dissemination of information" is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also Moody*, 603 U.S. at 734-37. That is so regardless of whether the website "generate[s]" the content as "an original matter," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569-70 (1995), or "curates" speech "originally created by others," *Moody*, 603 U.S. at 728. And while it is not at all clear what the statute means by "artificial sense of accomplishment," to the extent it prohibits YouTube or Instagram from offering, e.g., "likes,"

14

"view counts," or "rewards," that is a direct restriction on a website's First Amendment right to communicate with its users, as well as on the rights of users to receive that communication and utilize those features to communicate with one another. *See NetChoice v. Bonta*, 152 F.4th 1002, 1016-17 (9th Cir. 2025) (holding provision restricting display of "like counts" likely unconstitutional).

Other aspects of §1402(d) underscore that it reaches an "alarming" amount of constitutionally protected speech. *Stevens*, 559 U.S. at 474. Sections 1402(d)(1) and (d)(3) are not limited to activities that cause "addiction" to the "social media platform." They reach activities that "evoke *any* addiction or compulsive behaviors." Ark. Code §4-88-1402(d)(1) (emphasis added). The statute also imposes liability so long as the website engages in activity that could "evoke" (which presumably means something other than cause)[2] *a single Arkansas minor* to develop "any addiction or compulsive behaviors." *See id.* (prohibiting "practices" that "evoke any addiction or compulsive behaviors in *an* Arkansas user who is a minor" (emphasis added)). Worse still, §§1402(d)(1) and (d)(3) do not include a "scienter requirement," *Williams*, 553 U.S. at 294, which is itself a serious First Amendment problem, *see Counterman v. Colorado*, 600 U.S. 66, 76 (2023). To the contrary, the statute makes clear that a "violation of this subchapter *is a strict liability* civil offense." Ark. Code §4-88-1403(b)(2)(C) (emphasis added). In other words, a "social media platform" is strictly liable under the Act so long as a fact-finder determines (with the benefit of hindsight) that one of its practices "evoke[s] any addiction or compulsive behaviors"

---

[2] "Evoke" means "to call forth or up: such as … to bring to mind or recollection." *Evoke*, Merriam-Webster Online Dictionary, https://perma.cc/W3KR-LKEN (last visited Jan. 11, 2026). Cause, meanwhile, means "something that brings about an effect or result." *Cause*, Merriam-Webster Online Dictionary, https://perma.cc/PZB9-R99G (last visited Jan. 11, 2026). "Evoke" is thus seemingly much broader than "cause" and could even extend to reminding a reformed alcoholic of their prior addiction.

*in even a single Arkansas minor*—regardless of whether the "social media platform" had any reason to suspect that the practice may cause that (or any other) minor to develop that "addiction" or "compulsive behavior[]." *Id.* §1402(d)(1). If Facebook utilizes a recommendation algorithm to disseminate soccer highlights, Facebook could be liable for its recommendation system under §§1402(d)(1) and (3) if a fact-finder determines that those videos caused a single Arkansas minor to develop an "addiction" to playing or watching soccer. If YouTube utilizes notifications to alert users about engaging science videos, YouTube could be liable under §§1402(d)(1) and (d)(3) if a fact-finder determines that the posts caused a single minor in Arkansas to compulsively want to learn about science. And if Instagram utilizes autoplay to disseminate video clips of *Stranger Things*, Instagram could be liable under §§1402(d)(1) and (d)(3) if a fact-finder determines that those video clips caused a single Arkansas minor to binge watch the show (even on another website, such as HBO Max).

Violating the vague provisions of §§1402(d)(1) and (d)(3) not only exposes "social media platform[s]" to draconian civil penalties ($10,000 per violation). Ark. Code §§4-88-1403(b)(2); *id.* §4-88-104; *id.* §4-88-113(a)(3). It also exposes "social media plaform[s]" to potential criminal sanctions as well, *see* Ark. Code §4-88-1403(b)(1) (providing that "a prosecutor may initiate an enforcement action" under §4-88-103 "against a social media company that allegedly violates §4-88-1402"); *id.* §4-88-103 (explaining that a person who "knowingly and willfully commits an unlawful practice under this chapter shall be guilty of a class A misdemeanor"); *id.* §5-4-401(b)(1) (providing a maximum one year sentence for class A misdemeanors).

In short, §§1402(d)(1) and (d)(3) restrict a breathtaking amount of First Amendment activity.

### 2. The addictive practices provisions are content based, triggering strict scrutiny.

Sections 1402(d)(1) and (d)(3) not only restrict a breathtaking amount of First Amendment activity; they do so on the basis of content and speaker, triggering strict scrutiny. Indeed, those provisions are content and speaker based multiple times over.

For starters, the statute is content based on its face because it defines a "[s]ocial media platform" as a website that is "designed" to "facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication" and "[e]mploys features that allow a user to connect, follow, or establish a relationship with other users." Ark. Code §4-88-1401(11)(A). In other words, the statute targets websites "based on the 'social' subject matter 'of the material [they] disseminate,'" *NetChoice, LLC v. Reyes*, 748 F.Supp.3d 1105, 1122-23 (D. Utah 2024), while leaving websites that carry provider-generated content (e.g., Hulu, Disney+, or HBO Max) uncovered. As this court (and others) have held, "privileg[ing]" speech by "institutional content creators—movie and TV studios, mainstream media outlets, and [other] traditional journalists"— over speech by "the Soundcloud artist, the TikTok chef, and the citizen journalist" triggers strict scrutiny. *Griffin*, 2025 WL 978607, at *9; *see also SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025) ("The elevation of … provider-generated content over user-generated content is a content-based regulation."); *NetChoice v. Murrill*, 2025 WL 3634112, at *31 (M.D. La. Dec. 15, 2025) (similar); *Reyes*, 748 F.Supp.3d at 1122-23 (similar); *NetChoice, LLC v. Yost*, 778 F.Supp.3d 923, 953 (S.D. Ohio 2025) (similar).

The statute is content and speaker based in other ways as well. In fact, Act 900 is infected with many of the same content and speaker distinctions that doomed the original Social Media Safety Act. As this Court previously explained, "news" is a "certain type[] of content." *Griffin*, 2025 WL 978607, at *9. Yet Act 900 does not repeal parts of the original Social Media Safety Act

that discriminate in favor of "news." It expressly exempts "news-gathering organization[s]" and any "news or public interest broadcast, website video, report, or event" from its coverage. *See* Ark. Code §4-88-1403(d)(1)-(2). So if YouTube utilizes recommendation algorithms to disseminate workout videos to a minor, it may be covered by the law if the minor begins to compulsively attend the gym three times a week after watching the videos. But if YouTube utilizes the same recommendation algorithms to disseminate political news to a minor, it may not be covered if the content causes the minor to become a "news junkie." That is as content based as it gets.

The statute's focus on "addiction" and "compulsive behaviors" is also content based. Any such assessment could not be done "without reference to the content" of the speech on the website. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Whether a minor develops an "addiction" or "compulsive behaviors" (whatever those terms may mean) will inevitably depend, in whole or in part, on the *content* of the speech that the minor views on the "social media platform." No minor, after all, would be deemed to exhibit "addiction" or "compulsive behaviors" if the website simply displayed irrelevant or uninteresting content, such as the text of a dictionary, random gobbledygook, or C-SPAN clips. But a minor may well develop a strong and intense passion for science if a "social media platform" recommends interesting physics videos to the minor. Likewise, a minor may well binge watch *Stranger Things* if a "social media platform" recommends video clips of that show. Any attempt to comply with §§1402(d)(1) and (d)(3) would necessarily entail the suppression of content that could potentially be linked with "addiction or compulsive behaviors." Ark. Code §4-88-1402(d)(1). That is content based as well. *See Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F.Supp.3d 1011, 1036 (W.D. Tex. 2024) (considering similar provisions of Texas law).

18

### 3. The addictive practices provisions flunk any level of heightened scrutiny.

Because the government cannot suppress constitutionally protected speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them," *Brown*, 564 U.S. at 795, states bold enough to attempt such regulation must overcome strict scrutiny, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Sections 1402(d)(1) and (d)(3) cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Arkansas to demonstrate that its law is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires it to demonstrate that its law is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free expression," *TikTok, Inc. v. Garland*, 604 U.S. 56, 73 (2025). Sections 1402(d)(1) and (d)(3) cannot survive any level of scrutiny, let alone strict scrutiny.

First, to the extent Arkansas seeks to justify §§1402(d)(1) and (d)(3) on the theory that it has a compelling interest in preventing "*any* addiction or compulsive behaviors," that is so overbroad and vague that it cannot constitute a legitimate (let alone compelling) interest. Ark. Code §4-88-1402(d)(1) (emphasis added). While a clinical addiction to something may sometimes harm minors, §§1402(d)(1) and (d)(3) go way beyond that and target any repeated behavior, including those that many may view as beneficial—such as learning, sports, or listening to music. *See supra* p.16. The State has no valid interest in stopping minors from compulsively learning about science, obsessively practicing their basketball moves, or listening to music or podcasts for large chunks of time.

To the extent the State seeks to justify the statute on the ground that it has a compelling interest in preventing "addiction" to "social media platforms" in particular, that is not a valid

interest either, as it is plainly not "unrelated to the suppression of free expression." *TikTok*, 604 U.S. at 73. Act 900 defines "social media platform" as a website that is "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication," Ark. Code §4-88-1401(11)(A)(i)—in other words, websites that facilitate *protected speech*. Arkansas has no legitimate interest in preventing "addiction" to protected speech. The State could not, for example, restrict access to Disney+ because it offers too many shows that "contain … catchy jingles," *Sorrell*, 564 U.S. at 578, any more than it could restrict access to books that contain especially compelling stories. In *Brown*, California did not even try to justify its law on the theory that it had an interest in preventing minors from addiction to video games. 564 U.S. at 799-804. For good reason: As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576. Burdening access to protected speech citizens find especially interesting is especially inconsistent with the First Amendment. *Id.* Indeed, if Arkansas were right that it may restrict access to speech it deems "addictive," then there is no reason why it could not restrict access to religion on the same theory. *See* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. __ (forthcoming 2026) (manuscript at 2-9), https://perma.cc/LFX6-XMX4.

To the extent Arkansas seeks to justify §§1402(d)(1) and (d)(3) on the ground that it has a compelling interest in preventing "addiction" to *harmful* non-speech activities, §§1402(d)(1) and (d)(3) are not even remotely tailored to that interest. As explained above, §§1402(d)(1) and (d)(3) do not just target "addiction" to *harmful* activities like drugs or gambling. Making matters worse, Act 900 forces covered websites to restrict as to *all* users (minors or adults) any "practice" that could cause a *single Arkansas minor* to develop "any addiction or compulsive behaviors." *See Griffin*, 2025 WL 3634088, at *11-12 (holding that Act 901 was not narrowly tailored because it

20

denies "all users access to 'a distinctive expressive product' they wish to receive because of the threat of addiction in any subset of users, no matter how small"). And it does so even if the website has no way of knowing beforehand that the particular "practice" will have that forbidden effect. If a single Arkansas minor becomes obsessed with soccer after watching soccer highlights on YouTube, §§1402(d)(1) and (d)(3) would require YouTube to remove those videos for *all* users. Similarly, if a single Arkansas minor becomes deeply involved in local politics after seeing a clip of a rousing political speech on Instagram, Instagram would have to remove that clip for *all* users. That is breathtakingly overinclusive measured against any interest the State could assert.

"On the other side," Act 900 is "substantially underinclusive because [it] do[es] not restrict identical [practices]" of "other media." *Griffin*, 2025 WL 3634088, at *9. Act 900 would seemingly prohibit YouTube from recommending the popular cooking show MasterChef Junior if it causes a minor to binge watch. But Hulu would not face any liability for recommending the same exact show. "Act 90[0] is therefore concerningly underinclusive." *See id.*

Act 900 flunks narrow tailoring in other ways as well. Arkansas has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490; *see Packingham*, 582 U.S. at 107. To survive intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have ample tools at their disposal to protect minors on the Internet and social media websites from "addictive" content should they choose to do so. *See, e.g.*, *Murrill*, 2025 WL 3634112, at *34; *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1230 (N.D. Ga. 2025); *Griffin*, 2025 WL 978607, at *3-5; *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 748 F.Supp.3d 1126-30; *Yost*, 716 F.Supp.3d at 560. In fact, Arkansas already uses such tools itself.

21

In 2025 it passed the "Bell to Bell, No Cell Act" which prohibits the use of cell phones in school. *See* Ark. Code §6-18-515.  The State has not explained why parents could not adopt a similar approach.  To be sure, parents may not always choose to utilize those tools how Arkansas wishes they would.  But to the extent Arkansas's true goal is to impose "what the State thinks parents *ought* to want," that is not a permissible reason for the government to interfere with First Amendment rights.  *Brown*, 564 U.S. at 804.

Finally, §§1402(d)(1) and (d)(3) are unconstitutional for the additional and independent reason that they impose *strict liability* for disseminating speech.  Even when it comes to *unprotected speech* (such as true threats, obscenity, defamation or incitement), "the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce" an unlawful result.  *Counterman*, 600 U.S. at 76 (requiring recklessness for true threats); *Hess v. Indiana*, 414 U.S. 105, 109 (1973) (per curiam) (requiring intent to produce imminent disorder for incitement); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (requiring public figures to prove "actual malice" for defamation).  Indeed, "[a] strong intent requirement" is "a way to ensure" that laws regulating unprotected speech "would not bleed over, either directly or through a chilling effect, to … speech at the First Amendment's core." *Counterman*, 600 U.S. at 81.  If the First Amendment precludes strict liability for *unprotected* speech, it likewise precludes strict liability for *protected* speech a fortiorari.  Because §§1402(d)(1) and (d)(3) do not impose any scienter requirement at all, it is unconstitutional through and through.

### 4.    Sections 1402(d)(1) and (d)(3) lack any legitimate sweep.

Sections 1402(d)(1) and (d)(3) are facially invalid because *all* of their applications are unconstitutional.   But at a minimum, "a substantial number of [their] applications are unconstitutional, judged in relation to [their] plainly legitimate sweep." *Moody*, 603 U.S. at 723.

22

Indeed, it is difficult to see how the provisions can have *any* legitimate sweep, as §§1402(d)(1) and (d)(3) restrict protected First Amendment activities in every single one of their applications. There are few, if any, "practices" on a social media website that will "evoke any addiction or compulsive behaviors" separate and apart from the content of the underlying speech being disseminated via those "practices." Ark. Code §4-88-1402(d)(1). A push notification would not, on its own, evoke "any addiction or compulsive behaviors" if it recited only passages from the dictionary. That is probably why, when signing the law, Governor Sanders explained that Act 900 is meant to "protect kids" from being "subjected to *toxic material*" on social media websites, and to hold websites liable "*because of [the] content* the child was exposed to." Albarado, *supra* p.9 (emphasis added). When this Court asked the State's attorney at the preliminary injunction hearing for Act 901 to identify just "two or three examples" of "addictive" "features that social media companies embed into their platforms that have no ties, or attenuated ones at best, to speech or expressive conduct," she struggled to identify a single one. *See* Dkt.45 at 63:17-66:1. And while the Court hypothesized a few of its own, *Griffin*, 2025 WL 3634088, at *6, the "impermissible applications" of §§1402(d)(1) and (d)(3) "far outnumber any permissible ones." *Stevens*, 559 U.S. at 481-82.

At a minimum, §§1402(d)(1) and (d)(3) are unconstitutional as applied to NetChoice members when they engage in the protected First Amendment activity of curating or disseminating speech. Many NetChoice members curate collections of third-party speech, send push notifications to users, and dedicate themselves to disseminating speech that their users (including minors) enjoy both engaging in and consuming. Murphy.Decl.¶¶10-13, 26, 64-66; Baird.Supp.Decl.¶¶27, 32; Cleland.Supp.Decl.¶43. Those practices fall within the heartland of the First Amendment. So even if the State could identify enough *other* applications to save

23

§§1402(d)(1) and (d)(3) from facial invalidation (it cannot), those provisions still could not be applied to NetChoice members when they are engaged in expressive activity such as curating or disseminating speech on their services. *See Moody*, 603 U.S. at 740. While the Court should hold §§1402(d)(1) and (d)(3) unconstitutional on their face, it at the very least should enjoin Defendants from enforcing those provisions against NetChoice members when those members are engaged in that constitutionally protected activity.

**B. The Default Notification and Privacy and Safety Setting Provisions (§§1402(d)(2)(A) & (B)) Violate the First Amendment on Their Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services.**

**1. Sections 1402(d)(2)(A) and (B) trigger strict First Amendment scrutiny.**

1. Sections 1402(d)(2)(A) and (B) burden First Amendment rights in every single one of their applications. Section 1402(d)(2)(A) requires a "social media platform" to "[e]nsure that, by default," "[n]otifications to an Arkansas user who is a minor, other than safety or privacy-related alerts, are ceased between the hours of 10:00 p.m. central standard time (CST) and 6:00 a.m. central standard time (CST) and allow a parent or guardian to modify this setting." Ark. Code §4-88-1402(d)(2)(A). That is a direct restriction on speech. As explained, notifications are the means by which websites inform users about activity on the website, such as new content uploaded by other users, reactions and comments to the user's content, and announcements from the website itself. That is speech protected by the First Amendment. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.Supp.3d 809, 837 (N.D. Cal. 2023) ("There is no dispute that the content of the notifications themselves … are speech."); *Bonta*, 761 F.Supp.3d at 1227 (discussing a similar nighttime notification prohibition as "restrict[ing] significant amounts of speech").

24

Section 1402(d)(2)(B) also burdens First Amendment rights in every single one of its applications. That provision requires a "social media platform" to "[e]nsure that, by default," "[p]rivacy and safety settings for an Arkansas user who is a minor on a covered social media platform provide[s] the most protective level of control for privacy and safety offered by the covered social media platform." Ark. Code §4-88-1402(d)(2)(B). Because the definition of "social media platform" is limited to websites that "facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication," *id.* §1401(11)(A)(i), the practical effect of the provision is to "alter[]" the mix of speech that users can see and engage with on the website. *Moody*, 603 U.S. at 732. That burdens not just the First Amendment rights of websites to curate and disseminate content to their users, but also the First Amendment rights of users to receive that content and communicate with other users on the website. *See* Murphy.Decl.¶¶43, 67; Cleland.Supp.Decl.¶57; Baird.Supp.Decl.¶32. As another court put it, requiring websites to adopt default "privacy provisions … impede[s] the 'availability and use' of information and accordingly … regulate[s] speech." *See NetChoice, LLC v. Bonta*, 692 F.Supp.3d 924, 945-46, 952-53 (N.D. Cal. 2023) (quoting *Sorrell*, 564 U.S. at 570-71) (considering a California statute that, like Act 900, required covered "platforms" to default minors' privacy settings to a high level of privacy "unless the business can demonstrate a compelling reason that a different setting is in the best interests of the children"), *vacated on other grounds*, 113 F.4th 1101 (9th Cir. 2024); *see also Netchoice, LLC v. Bonta*, 770 F.Supp.3d 1164, 1202-03 (N.D. Cal. 2025) (coming to the same conclusion on remand), *appeal pending*, No. 25-2366 (9th Cir.).

To the extent the State thinks that §§1402(d)(2)(A) and (B) do not implicate the First Amendment because they give parents the authority to override the default settings, that argument is a non-starter. The Supreme Court has squarely held that "persons under 18 have [a]

25

constitutional right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the government perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the State has the power to prevent children from hearing or saying anything without their parents' prior consent." *Id.* Otherwise, the government could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"—or "to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to [speak to] young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

2. Sections 1402(d)(2)(A) and (B) trigger strict scrutiny for many of the same reasons that §§1402(d)(1) and (d)(3) trigger strict scrutiny. Like the addictive practices provisions, §§1402(d)(2)(A) and (B) apply only to "social media platform[s]," and Act 900's definition of "social media platform" is hopelessly content and speaker based. *See supra* Part I.A.2. And just as Act 900's content- and speaker-based carveouts for "news or public interest broadcast[s]" and "news-gathering organizations" apply to the addictive practices provisions, they apply to §§1402(d)(2)(A) and (B) as well. Section 1402(d)(2)(A) is also content based for the independent reason that it expressly exempts "safety or privacy-related alerts" from the default ban on notifications sent to minors between 10 p.m. and 6 a.m. So while websites are free to send

26

notifications to minors about breaking news stories and safety-related alerts, it cannot alert the same users about the latest soccer highlights or comments on their social media posts. That is about as content based as it gets. *See Bonta*, 761 F.Supp.3d at 1227.

### 2. Sections 1402(d)(2)(A) and (B) flunk any level of heightened scrutiny.

Sections 1402(d)(2)(A) and (B) flunk any level of heightened scrutiny. To the extent Arkansas seeks to justify §§1402(d)(2)(A) and (B) on the theory that it has an interest in helping parents control their children, Supreme Court and Eighth Circuit precedent foreclose that argument. In *Brown*, the Supreme Court expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." 564 U.S. at 802. "Accepting that position would largely vitiate the rule that only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to minors." *Id.* And in *Interactive Digital Software Association v. St. Louis County*, the Eighth Circuit rejected the County's argument that its interest in "assisting parents to be the guardians of their children's well-being" justified an ordinance prohibiting the sale of violent video games to minors without a parent's consent. 329 F.3d 954, 959 (8th Cir. 2003). The Eighth Circuit explained that "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Id.* at 960. "To accept the County's broadly-drawn interest as a compelling one would be to invite legislatures to undermine the [F]irst [A]mendment rights of minors willy-nilly under the guise of promoting parental authority." *Id.*

Moreover, strict scrutiny demands "an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799. In *Brown*, the Supreme Court explained that the video-game industry's voluntary rating system "does much to ensure that minors cannot purchase seriously violent games on their

own," and concluded that "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id*. at 803. "Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id*. at 803 n.9. So too here. Just as in *Brown*, Arkansas "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to" notifications or content on social media "but cannot do so," *id*. at 803, because parents already have many tools at their disposal to help them. They may refuse to give their children smartphones, tablets, or computers in the first place. Cell service providers, broadband internet providers, and routers provide network-level controls that parents can use to block their kids from specific websites and apps—including Facebook, Twitter, Instagram, and the like. Cleland.Supp.Decl.¶8. Virtually all smartphones, tablets, and computers provide parents with tools to control which websites they can visit, what apps they can access, and what notifications they can receive (and when). Cleland.Supp.Decl.¶7. Parental controls on Internet browsers like Apple Safari, Google Chrome, and Microsoft Edge provide another layer of protection. Cleland.Supp.Decl.¶9. And the "social media platforms" covered by Act 900 offer many features that empower parents to regulate and monitor their minors' activities on those services, including by turning off notifications and by setting default safety and privacy settings. Cleland.Supp.Decl.¶¶10-14. Because parents already have many ways to protect their minors on "social media" websites, "[f]illing the remaining modest gap" in their control is hardly a sufficient interest to justify §1402(d)(2)'s sweeping burdens on protected speech. *Brown*, 564 U.S. at 803.

Making matters worse, §1402(d)(2) is both wildly over- and under-inclusive, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than

28

disfavoring a particular speaker or viewpoint." *NIFLA v. Becerra*, 585 U.S. 755, 774-75 (2018). It is overinclusive because it applies even if a covered service already voluntarily makes it possible for minors to turn off notifications entirely or at set times (as many NetChoice members do). It is also overinclusive because it restricts minors from accessing wide swaths of protected speech even if the content is entirely innocuous. As the Supreme Court has recognized, online services like Facebook and X "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. Teens may wish to receive notifications after 10 p.m. and access certain types of content and communicate with particular users for many legitimate and productive purposes that lie at the First Amendment's core. For example, a teen may want to know the final score of a World Series game that goes late into the night because of extra innings. Or she may want to review a message notification from a friend asking for a ride to school the next morning. A teen may also want accounts that do not follow her to be able to share content she creates to amplify her message. Section 1402(d)(2) dramatically impinges upon those activities by imposing default restrictions unless a parent agrees to override them.

Conversely, §1402(d)(2) is wildly underinclusive when judged against any purported justification. To the extent the State's concern is that late-night notifications will interrupt a minor's sleep, then there is no justification for prohibiting notifications from only "social media platforms." Why can Amazon, Walmart, CNN, or ESPN send notifications to a minor at all hours of the day, but Facebook and YouTube cannot? And why can "social media platforms" send notifications related to news, safety, or privacy, but not notifications about other things? By allowing some notifications but not others, Act 900 undermines its own goal. *See Bonta*, 761 F.Supp.3d at 1227. And just as the law in *Brown* was "seriously underinclusive" because

29

California was "perfectly willing" to allow minors to play violent video games "so long as one parent … says it's OK," §1402(d)(2) is seriously underinclusive because Arkansas is willing to let minors receive notifications at all hours of the day and deviate from default settings so long as one parent says it is okay.  564 U.S. at 802.  "That is not how one addresses a serious social problem." *Id.*

The Ninth Circuit's decision in *Bonta* is both wrong and distinguishable.  There, the Ninth Circuit held that NetChoice was not entitled to a preliminary injunction as to a California law that requires social media websites to (among other things) "[s]et their child's account to private mode, in a manner in which only users to whom the child is connected on the addictive internet-based service or application may view or respond to content posted by the child" as a default.  *Bonta*, 152 F.4th at 1017 (quoting Cal. Health & Safety Code §27002(b)(5)).  The court said that NetChoice had not "explain[ed] how the private-mode default is a backdoor means of controlling content" so it subjected the provision to only intermediate scrutiny, which it concluded the law likely survived.  *Id.*  Here, by contrast, §1402(d)(2)(B) is plainly content based, as Act 900's definition of "social media platform" imposes both content- and speaker-based distinctions.  Moreover, §1402(d)(2)(B) sweeps much more broadly than the California law.  It requires covered websites to default minors to the website's "most protective level of control for privacy and safety offered."  Ark. Code §4-88-1402(d)(2)(B).  That could include restrictions on what content a minor can view, who they can interact with, and what speech they can engage in.  Murphy.Decl.¶¶43, 67; Cleland.Supp.Decl.¶¶56-57.  California's law, by contrast, only requires websites to default minors to private mode.  So the Ninth Circuit's conclusion that California's much narrower requirement survives intermediate scrutiny, while wrong in its own right, says little about whether §1402(d)(2)(B) survives heightened scrutiny.

30

     **C.**       **The Online Dashboard Provision (§1402(d)(4)) Violates the First Amendment on Its Face and As Applied to NetChoice Members When They Curate or Disseminate Speech on Their Services.**

           **1.**      **Section 1402(d)(4) triggers strict First Amendment scrutiny.**

1. Section 1402(d)(4) also burdens the First Amendment rights of NetChoice members in all its applications. This provision requires covered "platforms" to develop a "dashboard" for parents to "view and understand" their child's "use habits on the covered social media platform" and "provide tools for a parent to restrict his or her minor child's access." Ark. Code §4-88-1402(d)(4).

It is hard to see how a social media website could even perform that task for every minor that visits the website (as explained above, the Act's definition of "user" includes everyone who visits the website, regardless of whether he or she has an account). But setting that aside, requiring social media websites to provide parents with such information is a form of compelled speech. Several courts have recently determined as much, holding similar provisions facially unconstitutional. In *NetChoice v. Weiser*, 2025 WL 3101019 (D. Colo. Nov. 6, 2025), for example, the court held that a requirement that social media websites provide minors with certain warnings about the impact of their products on child development compelled speech in all its applications. *Id.* at *6-7; *see also Bonta*, 113 F.4th at 1116 ("the DPIA report requirement, in every application to a covered business, raises the same First Amendment [compelled speech] issues"); *X Corp. v. Bonta*, 116 F.4th 888, 898-99 (9th Cir. 2024) (same); *Bonta*, 761 F.Supp.3d at 1228–30 (explaining that certain disclosures were subject to, and failed, strict scrutiny because they required "report[s on] how users behave," and "sa[id] nothing about the quality of features … that might be relevant to consumers deciding between different platforms"). Because Act 900 compels *all* covered services to communicate to parents the same message via the requisite "dashboard," it implicates the First Amendment in all its applications. As this Court explained, acts that "impose[] a platform-wide

31

burden on users' right to engage in … speech" do not "differ between the platforms regulated." *Griffin*, 2025 WL 978607, at \*7.

2. Just as the disclosure requirements in those cases triggered strict scrutiny, the disclosure requirements here trigger strict scrutiny as well. The "constitutional equivalence of compelled speech and compelled silence in the context of fully protected expression" is well "established." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988). It is also well established that the protection against compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. Thus, just as laws compelling speech bearing a particular message are subject to traditional heightened scrutiny, so too are laws compelling statements of fact. *See, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607-08 (2021); *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010); *Riley*, 487 U.S. at 797-98.

While laws compelling disclosures are generally treated no differently from any other law compelling speech, *see, e.g.*, *NIFLA*, 585 U.S. at 776-77, the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* provides a narrow exception to that rule, permitting compelled disclosures of non-controversial, purely factual information in the commercial advertising context. 471 U.S. 626, 651 (1985). There, the Court upheld a requirement that attorneys who advertise their willingness to represent clients for a contingency fee must disclose whether the client would have to pay court costs in the event of a loss. *Id.* at 639-53. The Court declined to apply traditional heightened scrutiny, reasoning that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," an advertiser has only "minimal" interest in withholding "purely factual" information necessary to avoid misleading consumers. *Id.* at 651.

32

Neither the Supreme Court nor the Eighth Circuit has ever applied *Zauderer* to uphold a speech mandate outside the context of correcting misleading advertising in the commercial speech context. To the contrary, the Supreme Court has consistently and repeatedly described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); *see also, e.g.*, *Hurley*, 515 U.S. at 573 (describing *Zauderer* as permitting the government only to "requir[e] the dissemination of 'purely factual and uncontroversial information'" in the context of "commercial advertising"); *United States v. United Foods*, 533 U.S. 405, 416 (2001) (declining to apply *Zauderer* where compelled subsidy was not "necessary to make voluntary advertisements nonmisleading for consumers"); *In re R.M.J.*, 455 U.S. 191, 205 (1982) (invalidating commercial-speech mandate where advertising "ha[d] not been shown to be misleading"); *see also 1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1061 (8th Cir. 2014) (emphasizing that *Zauderer* applies to cases concerning misleading advertising); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 541 F.3d 785, 796 (8th Cir. 2008) (emphasizing that *Zauderer* applies to misleading advertising), *aff'd in part on appeal*, 559 U.S. 229 (2010).

The Ninth Circuit's decision in *Bonta* illustrates the point. There, the Ninth Circuit confronted a similar disclosure requirement. The California law at issue required social media companies to compile a public report discussing how designs or algorithms may harm minors in a host of different ways. California argued that the disclosure requirement should be analyzed under *Zauderer*, but the Ninth Circuit disagreed. *Bonta*, 113 F.4th at 1119. The court explained that the disclosure requirement "regulates far more than mere commercial speech," as it required social media companies to do "more than propose a commercial transaction." *Id.*; *see also Bonta*, 761

33

F.Supp.3d at 1229 (explaining that "[t]he disclosures about minor users are plainly not advertisements … rather, the disclosures report how users behave," which was not commercial speech or subject to *Zauderer*).  So too here.  Section 1402(d)(4) does not seek to "make voluntary advertisements nonmisleading for consumers."  *United Foods*, 533 U.S. at 416.  Indeed, it does not involve a "commercial transaction" at all.  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).  It is thus subject to the traditional remedy for compelled speech:  strict scrutiny.

**2.    Section 1402(d)(4) cannot survive any level of scrutiny, let alone strict scrutiny.**

Section 1402(d)(4) cannot survive any level of heightened scrutiny.  Strict scrutiny demands "an 'actual problem' in need of solving."  *Brown*, 564 U.S. at 799.  Just as in *Brown*, Arkansas "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to [social media websites] but cannot do so," *id*. at 803, because parents already have many tools at their disposal to help them.  *See supra* p.28.

But even setting that aside, the Act's dashboard requirement is far more burdensome than necessary to achieve any legitimate interest the State could have.  In fact, the dashboard requirement is so burdensome that it flunks even *Zauderer* scrutiny.  471 U.S. at 651 (explaining that "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech").  Section 1402(d)(4) requires covered services to track the online behavior of every single minor that visits their website, regardless of whether the minor has an account with the website.  And it requires covered services to build a dashboard to provide that information to minors' parents.  That would require websites to 1) build a system to verify the age of every single person that visits the website, with or without an account; 2) identify which visitors are minors; 3) track the minor's "use habits" on the website even though some minors do not have accounts on the website; 4) post information about the minor's use habits on a dashboard;

5) identify who the minor's parents are; 6) provide that information to the parents; and 7) give those parents tools to restrict their children's access to the website.  Those disclosures look nothing like the "purely factual and uncontroversial information" that *Zauderer* sanctioned, 471 U.S. at 651, and it would be virtually impossible for covered websites to comply with this dashboard requirement, given the millions of users that visit some of the largest "social media" websites each day.  For a "social media" website to avoid the strict liability that Act 900 imposes, it would have to restrict minors from visiting its website and the speech it contains without first creating an account or undergoing some type of age verification process—a requirement this Court has already found unconstitutional.  *See Griffin*, 2025 WL 978607, at *3-5.  Requiring "social media platforms" to track the online behavior of every single website visitor and report that on a parent dashboard or effectively stop allowing minors to access a website is thus an "unduly burdensome" way of achieving the State's interests.  *Zauderer*, 471 U.S. at 651.

## II.    NetChoice Is Likely To Succeed On Its Vagueness Claim.

NetChoice is also likely to succeed on its claim that Act 900 is unconstitutionally vague.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.  Courts "must meet" a particularly "stringent vagueness test" when a statute "contains criminal penalties … and interferes with the right of free speech" as Act 900 does here.  *Griffin*, 2025 WL 978607, at *15.  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling

would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372. For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Act 900's different provisions fail this basic requirement.

1. Act 900 is unclear about what "practices" it prohibits. Sections 1402(d)(1) and (d)(3) provide no definition of "addiction" or "compulsive behavior." Nor do they provide any "standard of conduct to which platforms can conform." *Griffin*, 2025 WL 3634088, at *13. Like Act 901, Act 900 utilizes amorphous terms that will vary wildly from user to user and be impossible to predict *ex ante*. The Act's only guidance is to reference "contemporary understanding[s]," but "[e]ven if the Court agreed that [this] is an acceptable 'qualitative standard,' the Act does not identify whose" understandings of these topics "courts, juries, and regulators should look to." *Griffin*, 2025 WL 978607, at *16 (quoting *Johnson v. United States*, 576 U.S. 591, 604 (2015)).

For starters, no consensus exists on what constitutes "addiction" in the context of Internet "social media platform" use. Is this a scientific term that requires a diagnosed clinical disorder recognized by the authoritative diagnostic manual for mental health disorders (the DSM-V)? Can this term be stretched to cover behavioral "addictions" not recognized by that diagnostic manual or even a consensus of the scientific community? If so, would checking your phone once every hour rise to the level of "addiction"? Every twenty minutes? And what if there are conflicting professional opinions on what constitutes "addiction"? Which professional gets to define it? Also, what is "compulsive behavior"? Is that a lesser version of "addiction," such that it could cover any behavior that gets repeated? How might "addiction" or "compulsive behaviors" be "evoked"? And how does something cause an "artificial sense of accomplishment"? Act 900 provides zero

36

guidance on these fundamental questions, the answer to which decides a social media website's strict liability for enormous civil fines. This is unconstitutional.

Even if there was a consensus view of what constitutes "addiction" or "compulsive behaviors," §1402(d)(1) seemingly prohibits social media companies from using designs and features that would lead to repetitive behaviors toward *anything*. So social media websites will be strictly liable for features that lead a single user to engage in *any* repetitive behavior claimed to be "addictive" or "compulsive" regardless of whether or not that was foreseeable. *See* Ark. Code §4-88-1403(b)(2)(A)(C) (making a violation "of this subchapter" a "strict liability civil offense"). That provides social media companies with no notice of what conduct is prohibited and flings the doors wide for selective prosecution and arbitrary enforcement.

Likewise, penalties can be imposed on social media companies for "evok[ing]" addictive or compulsive behavior, yet the term "evoke" is not defined at all. *Id.* §1402(d)(1). The use of this exceedingly broad and vague term creates yet another layer of unconstitutionality. The statute offers no guidance on the requisite nexus between the website activity and the vague effects it purports to regulate. It is impossible to know whether the website activities actually have to cause "addiction" or "compulsive behaviors," or whether they merely need to create the potential for such effects. Or whether the term "evoke" covers something else entirely, penalizing website content that brings to the user's mind "addictive" or "compulsive behaviors." This indeterminate language offers no standard for social media companies to understand what is prohibited and only serves to encourage discriminatory enforcement.

Also, how are social media websites supposed to know if a minor engages in "addictive" or "compulsive behaviors"? Section 1402(d)(1) makes websites liable if their practices evoke "*any* addiction or compulsive behaviors" which includes offline behavior. *Id.* §1402(d)(1) (emphasis

added).  Are social media websites supposed to monitor minors' behavior offline to determine whether their practices are causing "addiction" or "compulsive" acts?  Or are they required to sit around and wait to be sued under a strict liability regime to receive notice that certain practices caused an "addiction" or "compulsive behaviors"?  Act 900 is unfathomably vague on what it prohibits and would leave an enormous number of websites wholly at the mercy of prosecutors under a strict liability regime.

2.  Nor does Act 900 provide websites with adequate notice of who is subject to its requirements.  Act 900 defines a "social media platform" as an entity that is "designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication" that allows users to create accounts, "employs features that allow users to connect … with others," and "generates revenue primarily through user engagement, … advertising, user data, … or premium content."  Ark. Code §4-88-1401(11)(A).  And §1401(12) defines a "[u]ser" as "a person who has access to view all or some of the posts and content on a social media platform but is not an account holder."  *Id.* §1401(12).  So Act 900 seemingly covers any website where any visitor—regardless of whether she has an account—can converse with others, a group, or the public, and that connects individuals and generates revenue through engagement, advertising, or premium content.  It arguably covers any ad-based website that has a comment box visitors can use.  Does that include Chess.com?  What about ESPN.com?  Yahoo Sports?  After all, these websites (1) "facilitate user-to-user" and "user-to-public interaction, expression, or communication"; (2) allow users to "create an online profile" with a unique "username" or "profile name"; (3) allow users to "connect … with other users"—e.g., by letting users comment on and/or "like" content such as articles and videos; and (4) "[g]enerate[] revenue primarily … through advertising" and "premium content" available only to users who pay a subscription fee.  *Id.* §1401(11)(A).  By its plain text, Act 900 seemingly

sweeps in countless websites that are not traditionally considered "social media platforms" and likely do not consider themselves such.

3. It is also unclear if Act 900 prohibits practices that evoke "any addiction or compulsive behaviors" in minors who have accounts or just those that are visiting the website. *Id.* §1402(d)(1). Section 1402(d)(1) applies to "an Arkansas user who is a minor." And §§1401(2) and (12) define an "Arkansas user" and a "user" as someone who merely visits a website. *Id.* §§1401(2), (12). Contrast this with Act 900's definition of an "account holder": "an individual who primarily uses, manages, or otherwise controls an account or a profile to use a social media platform." *Id.* §1401(1).

By its plain text, Act 900 appears to prohibit social media websites from using a practice that evokes any "addiction" or "compulsive behaviors" in a single minor that *visits* its website, but *not* those who have an account. *See id.* §1402(d)(1). Act 900 imposes no obligations on "account holders." And the Social Media Safety Act only discusses "account holders" in the permanently enjoined portions of §1402 dealing with age verification. *See id.* §1402(a)-(c). But applying many of Act 900's obligations only to visitors, but not account holders, makes no sense. To begin, it becomes even more impossible for a social media company to know if a practice allegedly caused a *visitor* to develop an "addiction" or engage in "compulsive behaviors" if that visitor does not even have a regular account with the website. *See id.* §1402(d)(1). Also, the requirement that social media websites provide the "most protective level of control for privacy and safety" for minors makes little sense when applied to visitors because privacy settings are generally reserved for account holders. *See id.* §1402(d)(2)(B); Cleland.Supp.Decl.¶¶56-57; Murphy.Decl.¶¶34-42, 67. And how are social media companies supposed to develop dashboards that allow parents to

39

view the online activities of a minor who just visits the website instead of creating an account? *See id.* §1402(d)(4).

In short, Act 900 is so riddled with ambiguities that it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, [and] is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.  It makes no sense as written and leaves covered websites with a confusing morass of conflicting requirements.

**III.    NetChoice Satisfies All Other Requirements For Preliminary Injunctive Relief.**

Finally, all other factors favor granting NetChoice's Motion for Preliminary Injunction. Likelihood of success, which NetChoice has established, is generally "the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007).  But all the other preliminary injunction factors also favor NetChoice.

Act 900 will irreparably harm NetChoice members and its members' users in two ways. First, it will result in the loss of First Amendment freedoms for both NetChoice members and their users, which qualifies as irreparable harm.  *See Griffin*, 2025 WL 978607, at *17; *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Second, Act 900 will force NetChoice members to spend large amounts of resources on irrecoverable compliance costs, which also qualifies as an irreparable harm.  *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).

As to the balance of equities, the public interest "favors the constitutionally-protected freedom of expression." *Nixon*, 509 F.3d at 485.  And the "State has no interest in enforcing laws that are unconstitutional ... [so] an injunction preventing the State from enforcing [a challenged statute] does not irreparably harm the State." *Little Rock Fam. Plan. Servs. v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark. 2019) (citing *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691

40

F.3d 1236, 1249 (11th Cir. 2012)).  Maintaining the status quo until Act 900's glaring constitutional problems can be fully adjudicated will cause little if any harm to the State.

## CONCLUSION

For these reasons, the Court should declare that Act 900 is likely unconstitutional on its face or, alternatively, as applied to NetChoice's members that are covered websites under the Act, and preliminarily enjoin Defendants from enforcing Act 900 against NetChoice's members.  And the Court should grant that relief before the law takes effect on April 21, 2026.

Respectfully submitted,

/s/ Erin E. Murphy

Marshall S. Ney
Katherine C. Campbell
FRIDAY, ELDREDGE & CLARK, LLP
3350 South Pinnacle Hills Pkwy., Suite 301
Rogers, AR 72758
(479) 695-6049

Paul D. Clement*
Erin E. Murphy*
James Y. Xi*
Barrett L. Anderson*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*admitted pro hac vice

*Counsel for Plaintiff*

January 12, 2026

41