**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**NETCHOICE**                                                                          **PLAINTIFF**

**V.**                                        **CASE NO. 5:25-CV-5140**

**TIM GRIFFIN, in his Official Capacity
as Attorney General of Arkansas** *et al.*                        **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

NetChoice, an Internet trade association, asks the Court to preliminarily enjoin Defendants from enforcing Arkansas Act 900 of 2025, which is set to go into effect April 21, 2026. NetChoice argues that Act 900 violates the First Amendment and is void for vagueness. For the reasons that follow, NetChoice's Motion for Preliminary Injunction (Doc. 51) is **GRANTED**.

### I.  BACKGROUND

In 2023, Arkansas enacted Act 689 of 2023, the Social Media Safety Act. Act 689 required certain social media platforms to verify the age of account holders in Arkansas and required parental consent for account creation by those under 18 years of age. This Court permanently enjoined enforcement of Act 689 on First Amendment and due process vagueness grounds. *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. March 31, 2025).

The Court previously concluded that Act 689's definitions of "social media platform" and "social media company" were content based, so the Act's operative provisions were subject to strict scrutiny, which they did not survive. *Id.* at *7–14.   The Court also concluded Act 689 was void for vagueness because it failed to adequately define which online services it regulated. *Id.* at *14–17. The Court therefore permanently enjoined

1

enforcement of Act 689. *Id.* The State's appeal of the Court's permanent injunction is pending before the Eighth Circuit. *NetChoice, LLC v. Griffin*, Case No. 25-1889 (8th Cir.).

The law at issue here, Act 900 of 2025, modifies and supplements Act 689. The General Assembly has enacted a new definition of "social media platform" that avoids many of the content-based pitfalls of the previous definition. Act 900 imposes new restrictions on platforms and was enacted alongside Act 901 of 2025 which prohibits platforms from using any "design, algorithm, or feature" that causes certain undesirable outcomes. NetChoice also challenges Act 901 in this case, and on December 15, 2025 the Court preliminarily enjoined its enforcement. *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025). The State has taken an interlocutory appeal of that preliminary injunction. *NetChoice v. Griffin*, Case No. 26-1096 (8th Cir.).

NetChoice now asks the Court to preliminarily enjoin enforcement of Act 900. The challenged provisions of Act 900 apply to a "social media platform," which the Act defines as "a business entity or organization that operates an online platform, application, or service that:

(i)    Is designed to facilitate user-to-user, user-to-group, or user-to-public interaction, expression, or communication;

(ii)    Assigns, utilizes, or relies on a unique identifier, username, profile name, or image that is associated with a specific user account;

(iii)    Provides mechanisms for a user to create an online profile comprised of personally identifiable information or professional information, including without limitation a user's name, username, address, date of birth, educational pedigree, professional details, interests, activities, or connections;

(iv)    Employs features that allow a user to connect, follow, or establish a relationship with other users and creates a network of interactions either in real time or asynchronously, including without limitation virtual likes and dislikes;

2

> (v)    Generates revenue primarily through user engagement, including without limitation through advertising, user data monetization, or premium content; and
>
> (vi)    Is accessed by Arkansas users.

Act 900, sec. 1, § 4-88-1401(11)(A).

Act 900 also lowers the applicable age of majority from 18 to 16. *Id.* § 1401(9) ("'Minor' means an individual under sixteen (16) years of age who is in the State of Arkansas."). Act 900's newly enacted § 1402(d) imposes obligations on platforms beyond the age-verification and parental-consent requirements of Act 689. Section 1402(d) prohibits platforms from engaging in "addictive" practices, requires certain default settings for minors, and directs platforms to create an online dashboard for parental supervision.

**Addictive practices provision:**

> A social media platform shall . . .  [c]onsistent with contemporary understanding of addiction, compulsory behavior, and child cognitive development, ensure that the social media platform does not engage in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human.

Act 900, sec. 2, § 4-88-1402(d)(1). To aid compliance with this provision, a social media platform shall also "[c]onduct an audit at least one (1) time per quarter to ensure that the social media platform's software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior." *Id.* § 1402(d)(3).

**Default provisions:** Act 900 also requires social media platforms to set certain defaults for "an Arkansas user who is a minor": (1) Notifications, "other than safety or privacy-related alerts" must be "ceased between the hours of 10:00 p.m. central standard time (CST) and 6:00 a.m. central standard time," although a parent or guardian is allowed

"to modify this setting"; and (2) "Privacy and safety settings" must "provide[ ] the most protective level of control for privacy and safety offered" by the platform. *Id.* § 1402(d)(2).

**Dashboard provision:** Finally, Act 900 requires platforms to "[d]evelop an easily accessible online dashboard to allow a parent of a minor user to view and understand his or her child's use habits" and to include on this dashboard "tools for a parent to restrict his or her minor child's access" to the platform or "logical portions" of it. *Id.* § 1402(d)(4).

Act 900 has one particularly noteworthy problem: "users." Act 900 has three different definitions for relationships a person can have with a platform. First, an "account holder" is "an individual who primarily uses, manages, or otherwise controls an account or a profile to use a social media platform." *Id.* sec. 1, § 4-88-1401(1). "Account holder" is not used in any of the Act's operative provisions. Second, a "user" is "a person who has access to view all or some of the posts and content on a social media platform but is not an account holder." *Id.* § 1401(12). Third, an "Arkansas user" is "an individual who is a resident of the State of Arkansas and who accesses or attempts to access a social media platform while present in this state." *Id.* § 1401(2). "Arkansas users" include both "account holders" and "users," but "users" are definitionally not "account holders." The addictive practices provision and the default provisions therefore apply to all Arkansas minors, whether they have a social media account or are merely a website visitor. Worse, the dashboard provision applies only to minor "users," not account holders.

The State's prosecuting attorneys and the Attorney General can bring enforcement actions against platforms that violate § 1402. Ark. Code. Ann. § 4-88-1403(b). "A violation of this subchapter is a strict liability civil offense." *Id.* § 1403(b)(2)(C). And liability under § 1403 for a violation of § 1402 "does not [a]pply to a news or public interest broadcast,

4

website video, report, or event." *Id.* § 1403(d)(1). Act 900 increases the statutory penalty for violations from $2,500 per violation to $10,000 per violation and specifies that "[e]ach day that a covered social media platform permits a minor to access the covered social media platform in violation of this section constitutes a separate violation." Act 900, sec. 4, § 4-88-1403(c).

Defendants say social media platforms exploit children for monetary gain. (Doc. 56, p. 2). And while NetChoice's members do not agree with that assessment, it would be hard to deny the potential for problems associated with children's usage of social media in general. As whistleblower reporting has made known, companies like Meta know that young people want to spend less time online but "lack the willpower to control the time spent themselves." *Teen Mental Health Deep Dive*, Wall St. J. (Sept. 29, 2021) (Doc. 57-1, p. 54).[1] Rather than provide minors with tools to control their social media use, platforms are designed to maximize "engagement," or time spent online. Children and teens are especially susceptible to these designs: they are hypersensitive to social feedback, do not have a fully developed impulse-control system, and are more distractible than adults. *Potential Risks of Content, Features, and Functions: The Science of How Social Media Affects Youth*, Am. Psych. Ass'n (Apr. 2024) (Doc. 37-12).[2]

Too much time on social media has adverse effects on young people. It "displaces real world activities including sleep, physical activity, and real-world interactions." (Doc.

---

[1] https://s.wsj.net/public/resources/documents/teen-mental-health-deep-dive.pdf [https://perma.cc/448B-LHYW].

[2] https://www.apa.org/topics/social-media-internet/youth-social-media-2024 [https://perma.cc/A7GV-QRTL].

57-8, ¶ 24 (Kaliebe Dec.)).[3] "[M]ore time online is associated with lower child and teen wellbeing such as poorer sleep, more sedentary behaviors, more parent-child relationship difficulties, and more behavior problems." (Doc. 57-10, ¶ 55 (Radesky Dec.)).[4] The negative effects of social media use on sleep quality and duration are especially concerning for minors because sufficient sleep "is crucial to child health to support neurological development, bone growth, and [a] regulated endocrine system." *Id.* ¶ 37; *see* Jessica C. Levenson *et al.*, *The Association Between Social Media Use and Sleep Disturbance Among Young Adults*, 85 Preventive Med. 36 (2016) (Doc. 57-14).

Minors on social media face risks not just from the platforms themselves, but also from other people online. Children are vulnerable to online sexual exploitation. According to one source: *Over 300 Million Children a Year Are Victims of Technology-Facilitated Sexual Exploitation and Abuse*, Childlight (Dec. 4, 2024) (Doc. 57-18).[5] "[S]ocial media can be a component or the primary mechanism of contact or exploitation," and perpetrators "can scour the young people's social media for data that signals

---

[3] Dr. Kristopher Kaliebe is a professor and supervising physician at the University of South Florida. He is board certified in child and adolescent and forensic psychiatry. He was retained by the Attorney General of Georgia to provide an expert opinion on the effects of social media on young people in litigation concerning Georgia's age-verification law. *Id.* ¶ 1–10.

[4] Dr. Jenny Radesky is a professor of pediatrics at the University of Michigan Medical School. She is board certified in developmental behavioral pediatrics and serves as Director of the Division of Developmental Behavioral Pediatrics. She was retained by the Attorney General of California to provide an expert opinion on California's Protect Our Kids from Social Media Addiction Act. *Id.* ¶ 2–3, 24.

[5] https://www.childlight.org/newsroom/over-300-million-children-a-year-are-victims-of-online-sexual-exploitation-and-abuse [https://perma.cc/J2B8-HBCF].

vulnerabilities to exploitation, and can create false online accounts to shield their true identity." (Doc. 57-8, ¶¶ 94, 101 (Kaliebe Dec.)).

NetChoice says its member platforms work hard to protect minors on their platforms. Meta, for example, now offers Instagram Teen Accounts. Instagram account holders who self-identify as teens are automatically placed into Teen Accounts, which include restrictions like "default private accounts"; "Meta's strictest messaging restrictions"; various content restrictions directed at sensitive topics like suicide, offensive words associated with bullying, and nudity; "time limit reminders";[6] and "sleep mode, which mutes notifications overnight."  (Doc. 52-2, ¶ 35 (Murphy Dec.)).[7] "Teens under 16 need a parent's permission to change any of these settings to be less strict." *Id.* ¶ 36. Meta uses similar restrictions for Teen Accounts on Facebook. *Id.* ¶ 41. Meta also offers parental control and supervision tools for Teen Accounts, which allow parents to, among other things, set time limits, see how long their teen has spent on the platform over the last week, and modify their teen's content settings. *Id.* ¶ 43.

But some platforms, NetChoice says, pose few risks to minors and are nonetheless subject to the Act's restrictions. Nextdoor, for example, is designed to let people connect with others in their neighborhood. Nextdoor "require[s] individuals to register with and use their real names and addresses on the platform." (Doc. 52-3, ¶ 6 (Baird Dec.)).[8] "Nextdoor

---

[6] Defendants' evidence indicates that time limit reminders have "no effect on reducing smartphone screentime or checking behavior." (Doc. 57-10, ¶ 49 n.119 (Alter Dec.)). Adam Alter holds a Ph.D. in social and cognitive psychology and is a professor of marketing and psychology at New York University. *Id.* ¶ 1. He was retained by the Attorney General of Florida to provide an expert opinion on the addictiveness of social media generally and of certain features in particular. *Id.* ¶ 9.

[7] Elizabeth Murphy is Meta's Head of Youth Policy, Safety Policy Team. *Id.* ¶ 1.

[8] David Baird is Nextdoor's Lead of Support Operations. *Id.* ¶ 2.

estimates that approximately 99% of its users are legal adults. Further, only approximately 1% of its users are between the ages of 13 and 17, and less than 10% are under 25 years of age." *Id.* ¶ 16. Nextdoor says complying with Act 900 would be prohibitively expensive, so, given the small number of minors on its platform, it "would be forced to completely stop allowing minors under the age of 16 to access its website in Arkansas, as it was forced to do when similar laws in Texas, Mississippi, and Tennessee went into effect regarding those under the age of 18." *Id.* ¶¶ 28, 37.

## II.  LEGAL STANDARD

In determining whether to grant a motion for preliminary injunction, the Court must weigh the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). When a plaintiff seeks to "enjoin the implementation of a duly enacted state statute," they must meet a more rigorous standard on the second prong by showing that they are "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. 8 Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citation and quotation omitted). In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam), *vacated on reh'g on other grounds*, 705 F.3d 845 (8th Cir. 2012).

8

### III.  DISCUSSION

### A.  Standing

Defendants argue that NetChoice lacks associational standing to assert claims on behalf of its members and lacks third-party standing to assert claims on behalf of its members' users. Defendants previously raised these same arguments in the Act 689 litigation, and the Court concluded that NetChoice had both associational standing to sue on behalf of its members and third-party standing to assert the rights of its members' users. *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9–12 (W.D. Ark. Aug. 31, 2023). When asked why the Court should depart from its previous conclusion, Defendants' counsel offered no justification. The Court therefore concludes, as before, that NetChoice has associational standing to bring its facial challenge to Act 900, and third-party standing to assert First Amendment claims on behalf of its members' users. The Court will briefly restate the reasons for this conclusion. For a more fulsome discussion, see *id*.

To establish associational standing, an association must show: (1) its members would have standing to sue in their own right; (2) the suit seeks to protect interests germane to the association's purpose; and (3) neither the claim asserted nor the relief requested requires the individual members of the association to participate in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants challenge only the third requirement, arguing that individual member participation is required for the Court to resolve the First Amendment challenge because the First Amendment implications of the Act will vary from platform to platform and by function within each platform. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 725–26 ("Curating a feed and transmitting direct messages, one might think, involve different levels of editorial choice, so that the one creates an expressive product and the other does not. If so,

regulation of those diverse activities could well fall on different sides of the constitutional line.").

But under the facial challenge standard as articulated in *Moody*, the Court must consider "the full range of activities the law[ ] cover[s]." *Id.* at 724. Thus, regardless of whether NetChoice or an individual platform is the plaintiff, the Court must consider the law's applications to parties not before the Court. Requiring members to litigate individually would be more likely to hinder, rather than aid, the Court's resolution of NetChoice's facial challenge. The requirements for associational standing are met.

Defendants also argue that NetChoice cannot assert First Amendment claims on behalf of its members' users or account holders. As an initial matter, NetChoice's claims do not rely solely on the First Amendment rights of social media users—platforms also disseminate their own speech and engage in protected editorial discretion online, *see id.* at 731, and NetChoice contends that Act 900 restricts their ability to do so.

To the extent that NetChoice does assert the rights of platforms' users, litigants are normally barred "from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975). However, this rule has exceptions. *Craig v. Boren* provides a prototypical example. 429 U.S. 190 (1976). There, a licensed vendor of beer and her underage male customer challenged the constitutionality of gender-based distinctions in Oklahoma's liquor laws. *Id.* at 192. During the pendency of the lawsuit, the customer, Craig, attained the age of majority, so his claim became moot. *Id.* Nevertheless, the Supreme Court held that the vendor had standing to assert constitutional equal protection claims on behalf of Craig and other underage male customers. *Id.* at 196. Here, platforms have an analogous relationship with their users,

10

and an age-based restriction similarly threatens mootness should minor users seek to bring claims in their own behalf. NetChoice has third-party standing to assert the First Amendment rights of its members' users.

## B. Likelihood of Success on the Merits

NetChoice asserts both First Amendment and Fourteenth Amendment due process challenges to the operative provisions of Act 900.

"The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). "'Content-based laws . . . are presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny. That standard requires that a law be 'the least restrictive means of achieving a compelling state interest.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (first quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); and then quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Laws "[m]andating speech that a speaker would not otherwise make necessarily alter[ ] the content of the speech" and are therefore treated as content based. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). Speaker-based laws are also subject to strict scrutiny "when the legislature's speaker preference reflects a content preference." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994).

By contrast, content-neutral laws that regulate or have incidental effects on speech are subject to a less searching "intermediate" scrutiny, which they survive "if [they] advance[ ] important governmental interests unrelated to the suppression of free speech and do[ ] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). And "[e]xpression, whether

11

oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). "[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* Finally, while compelled speech is generally subject to strict scrutiny, certain mandated disclosures related to commercial speech are constitutional as long as they "are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).

The Fourteenth Amendment's Due Process Clause requires that state enactments "clearly define[ ]" what is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws that fail to do so are "void for vagueness." *Id.* Laws must therefore "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them" so that "arbitrary and discriminatory enforcement" may be prevented. *Id.* at 108–09.

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499.

12

NetChoice argues that the new definition of "social media platform" is content and speaker based, so all the Act's operative provisions are subject to strict scrutiny under the First Amendment. While the Court agrees that the new definition is speaker based, Act 900's definition avoids many of the obviously content-based pitfalls of the prior definition and presents a more difficult question. Because resolving that question is not necessary for the Court to find that NetChoice is likely to succeed on the merits, the Court declines to consider it at this time. NetChoice has shown that it is likely to succeed on its vagueness challenge to the addictive practices provision and that it is likely to succeed on its First Amendment challenges to the other provisions even under intermediate scrutiny.

### 1. Addictive Practices Provision

The addictive practices provision of Act 900 requires platforms to "ensure" that they "do[ ] not engage in practices to evoke any addiction or compulsive behaviors in an Arkansas user who is a minor, including without limitation through notifications, recommended content, artificial sense of accomplishment, or engagement with online bots that appear human." Act 900, sec. 2, § 4-88-1402(d)(1). NetChoice asserts that this provision is vague because it fails to specify what "practices" are prohibited. In preliminarily enjoining Act 901, the Court concluded that its prohibition on any "design, algorithm, or feature" that the platforms "knows, or should have known through the exercise of reasonable care, causes a user to . . . [d]evelop or sustain an addiction to the social media platform" was likely void for vagueness. Like that provision, this provision "fails to specify a standard of conduct to which platforms must conform[,] and its violation entirely depends upon the sensitivities of some unspecified user." *NetChoice v. Griffin*, 812 F.Supp.3d at 928.

13

But liability under Act 900 is even more uncertain than under Act 901 in two respects. First, Act 900 is not limited to addiction to the platform itself. *Compare* Act 900, sec. 3, § 4-88-1402(d)(1) ("to evoke *any* addiction or compulsive behaviors in an Arkansas user who is a minor" (emphasis added)) *with* Act 901, § 4-88-1502(a)(4) ("causes a user to . . . [d]evelop or sustain an addiction *to the social media platform*" (emphasis added)). A platform may thus be liable if its practices "evoke" "addiction" to even off-platform activities.[9]

Second, Act 900 imposes liability on a strict liability basis, while Act 901 imposes liability on a negligence basis. *Compare* Act 900, sec. 3, § 4-88-1403(b)(2)(C) ("A violation of this subchapter is a strict liability civil offense.") *with* Act 901, § 4-88-1502(a) ("A social media platform shall not use a design, algorithm, or feature that the social media platform knows, or should have known through the exercise of reasonable care, causes a user to . . . ."). Instead of defending the statute the General Assembly enacted, Defendants ask the Court to rewrite it by ignoring the strict liability provision altogether and inserting a specific intent requirement that appears nowhere in the text. The Court cannot do so.

"[T]he prohibition's use of the singular '[Arkansas user]' . . . suggests that it is actionable based on a single child's response to an online interface, meaning that a business designing a product accessed by millions of child users could face liability whenever any one of them experiences" addiction or compulsive behavior. *NetChoice, LLC v. Bonta*, 2026 WL 694471, at *16 (9th Cir. Mar. 12, 2026). Not only does Act 900

---

[9] Defendants resist this interpretation, but Act 900 and Act 901 were enacted in the same legislative session, and "[w]ithout evidence of a drafting omission, this court will not read into legislation what is not there." *Cave City Nursing Home, Inc. v. Ark. Dep't of Hum. Servs.*, 351 Ark. 13, 23 (2002).

impose liability based on a single child's response to the platform, it does so on a strict liability basis—a platform is liable for a practice the evokes addiction in a single child even if it could not have known through the exercise of reasonable care that the practice would have such an effect.  "Businesses of ordinary intelligence cannot reliably determine what compliance requires." *Id.*

The related audit requirement, which directs platforms to conduct quarterly audits "to ensure that the social media platform's software, application, or other products are not causing minors to engage in compulsory or addiction-driven behavior," is similarly defective. Act 900, sec. 2, § 4–88–1402(d)(3). This requirement is even more expansive with respect to what platforms must audit for—not just full-fledged "addiction," but "addiction-driven behavior" caused by the platform—again, whether that behavior is on- or off-platform. The addictive practices provision is likely void for vagueness.

### 2. Default Provisions

Under Act 900, social media platforms must also "[e]nsure that, by default:" (1) "[n]otifications to an Arkansas user who is a minor, other than safety or privacy-related alerts, are ceased between the hours of 10:00 p.m. central standard time (CST) and 6:00 a.m. central standard time (CST) and allow a parent or guardian to modify this setting"; and (2) "[p]rivacy and safety settings for an Arkansas user who is a minor on a covered social media platform provides the most protective level of control for privacy and safety offered by the covered social media platform." *Id.* § 1402(d)(2). The Court assumes that the content-based exception to the notifications default for "safety or privacy-related alerts" is severable, so strict scrutiny does not apply to the remainder.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for*

15

*Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Under the test for time, place, and manner restrictions, the Court agrees with Defendants that the notifications provision is justified without reference to the content of the regulated speech and that it leaves open ample alternative channels for communication. The Supreme Court has recognized that the government has an interest in "the protection of the householders from annoyance, including intrusion upon the hours of rest." *Martin v. City of Struthers*, 319 U.S. 141, 144 (1943). The State has a significant interest in ensuring minors get enough sleep, and this interest is unrelated to the suppression of free expression.

Here, the problems arise at the tailoring prong. Even reasonable time, place, and manner restrictions must be "narrowly tailored to serve a significant governmental interest." *Clark*, 468 U.S. at 293. The notifications default applies to "Arkansas users"— account holders and platform visitors alike. It seems to the Court that platforms would therefore have to silence notifications between 10 p.m. and 6:00 a.m. for everyone in Arkansas unless they have become an age-verified adult account holder.

In addition, the requirement of a parental override option in the nighttime notification context makes this provision so underinclusive as to be functionally useless. While Defendants justify the notification default as an aid to parental authority, they ignore their own evidence that parents are part of the problem. If parents wanted to prevent their children's sleep from being disrupted by late-night notifications, they have a readily available, free, no-tech solution already at their disposal: taking devices away at night. Yet "86% of adolescents sleep with their phone in the bedroom." Heather Cleland Woods & Holly Scott, *#Sleepyteens: Social Media Use in Adolescence is Associated with Poor Sleep Quality, Anxiety, Depression and Low Self-Esteem*, 51 J. Adolescence 41, 42

16

(2016) (Doc. 60). The State has provided no evidence that parents lack the tools to assert their authority in this domain, so it appears unlikely that the State's deferential approach to restricting nighttime notifications will actually serve its stated interest in ensuring minors get enough sleep.[10] This "is not how one addresses a serious social problem." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

While, as Defendants argue, the burden imposed on users and account holders by this provision is slight, that is exactly the problem—it burdens platforms' speech by silencing them for a third of the day without any indication that the burden will reduce nighttime social media use or otherwise serve the State's asserted interest at all.

The privacy default does not fit the mold of a time, place, and manner restriction, but, like the notifications default, it implicates platforms' speech. Safety and privacy settings typically restrict who can see an account holder's posts and whose posts an account holder can see.[11] Some platforms also incorporate restrictions on displaying content they identify as sensitive or potentially harmful. And some platforms allow people to protect their privacy from the platform itself, limiting the platform's collection or use of

---

[10] The General Assembly has already recognized the failure of deferential half-measures in the context of school cell-phone use. *See* Bell to Bell, No Cell Act, 2025 Ark. Laws Act 122.

[11] How this provision would apply to users, as opposed to account holders, is not entirely clear to the Court. But it is clear from Defendants' briefing that the State anticipates application beyond account holders. (Doc. 59, p. 41 n.11 ("[P]arents cannot prevent their children from creating or accessing social-media accounts given the ubiquity of smartphones and other devices that they can access, including school computers and friends' devices . . . ."). Mere visitors to a platform cannot establish profiles and relationship with other people online the way account holders can. Defendants' evidence (and the Court's experience) indicate that this relational aspect is a critical tool for online sexual predators, and it is absent from the website visitor experience. Accordingly, this provision, as applied to "users," is even less likely to advance the State's asserted interest.

their data. Defendants urge the Court not to decide NetChoice's facial challenge because "[t]here is no way to know the practical effect of this provision without the individual participation of the platforms themselves." (Doc. 56, p. 37). But while the particular mix of settings varies by platform, the First Amendment implications do not change from platform to platform within the general categories of settings laid out above.

While these types of settings may vary in their scope and effect, they all restrict platforms' ability to disseminate minors' speech and to disseminate speech to minors and therefore implicate the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[D]issemination of information [is] speech within the meaning of the First Amendment."). Assuming this restriction is content neutral, it is still subject to intermediate scrutiny, which requires that the law be "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017) (citation omitted). To be narrowly tailored, "the law must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*

Defendants assert that existing parental controls "are largely ineffective." (Doc. 56, p. 41). Controlling a child's privacy and safety settings does present more of a challenge to the tech-unsavvy parent than do nighttime notifications. But in contrast to the notifications default, the privacy default says nothing about who can change these settings, leaving the Court to conclude that, because the Act imposes a mere "default," anyone—parent or child—can opt for less restrictive settings. *See Default*, Merriam-Webster.com ("a selection automatically used by a program in the absence of a choice made by the user"); *Default*, Dictionary.Cambridge.com, ("the way that something will happen or appear automatically, especially on a computer, if you do not make any

18

different choices").[12] As such, the privacy default can hardly be called a "parental" control at all.

In addition to aiding parental authority, which this provision seems unlikely to do, Defendants argue that the privacy default serves the State's interest in protecting minors from exploitation and abuse. The Court does not doubt the importance of this interest, and the Court agrees that existing protections are insufficient and prophylactic measures are much needed. "But the assertion of a valid governmental interest 'cannot, in every context, be insulated from all constitutional protections.'" *Packingham*, 582 U.S. at 106 (quoting *Stanley v. Georgia*, 394 U.S. 557, 563 (1969)).

"It is well established that, as a general rule, the government 'may not suppress lawful speech as the means to suppress unlawful speech.'" *Id.* at 109 (quoting *Ashcroft*, 535 U.S. at 255). That is precisely what this provision does. In *Packingham*, the Supreme Court held unconstitutional a law "making it a felony for a registered sex offender to gain access to a number of websites, including commonplace social media websites like Facebook and Twitter." *Id.* at 101. While not as broad as that law, Act 900 has a broad definition of "social media platform" that sweeps in websites like Nextdoor and Pinterest which are unlikely to be the site of sexual exploitation, burdening minors' ability to speak and be spoken to on those platforms and burdening platforms' ability to disseminate minors' speech.

On the other hand, because the default can be changed by the minor, this provision is also wildly underinclusive. Defendants say children need this law to protect them from

---

[12] https://www.merriam-webster.com/dictionary/default [https://perma.cc/HN7R-LDDE]; https://dictionary.cambridge.org/dictionary/english/default [https://perma.cc/7R79-MMWC].

sexual exploitation online. But the law, in effect, allows children to decide whether they need protection from sexual exploitation online because they are free to depart from the protective default. As Defendants' evidence shows, teenagers' developing brains make them less likely than adults to appreciate the risks associated with, for example, making their profiles public. *See* Doc. 57-10, ¶ 51 (Radesky Dec.) ("Because of the general sense of invulnerability teens experience, they often do not pay attention to the risks or future consequences of their immediate behavior, such as spending money or sending a sexually intimate image." (footnote omitted)). Like the notification default, while the burdens imposed by the privacy default may be slight, they do not appear likely to serve the State's asserted interest at all. Imposing small burdens on vast quantities of speech for no appreciable benefit is not consistent with the First Amendment. Arkansas cannot sentence speech on the internet to death by a thousand cuts. The default provisions likely violate the First Amendment.

### 3. Dashboard Provision

Finally, NetChoice contends that the dashboard provision compels its members' speech. Defendants assert that the dashboard provision is a permissible disclosure requirement under *Zauderer*.

The Supreme Court recognizes two levels of scrutiny governing commercial speech. *Central Hudson* provides the more burdensome test for "commercial speech restrictions [that] are content- or speaker-based." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)). Under *Central Hudson*, the Court asks "(1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation

20

directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest." *Id.*

The less burdensome test from *Zauderer* applies to regulations mandating disclosure of "purely factual and uncontroversial information." 471 U.S. at 651. Such a regulation is permissible if the disclosure is reasonably related to a substantial government interest and is not unjustified or unduly burdensome. *Id.* Defendants ask the Court to apply the lower standard from *Zauderer*. NetChoice disputes that *Zauderer* applies, but argues that even if it does, this provision is so unduly burdensome that it fails even this less stringent standard. The Court agrees.

Act 900 requires platforms to "[d]evelop an easily accessible online dashboard to allow a parent of a minor *user* to view and understand his or her child's use habits." Act 900, sec. 2, § 4-88-1402(d)(4)(A) (emphasis added). This dashboard "shall also provide tools for a parent to restrict his or her minor child's access to the covered social media platform, or logical portions of the covered social media platform." *Id.* § 1402(d)(4)(B). Under Act 900, a "user" is definitionally distinct from an "account holder." So the dashboard provision applies only to website visitors, which would seem to require that platforms: (1) collect age information from everyone who visits a covered platform to identify minors; and (2) collect and store identity information for every minor who visits a platform to track their "use habits," connect them with their parents, and effectuate "tools for a parent to restrict his or her minor child's access." *Id.* § 1402(d)(4).

The Court questions whether this was the General Assembly's intended result. But "in construing an act, the courts are bound by specific definitions of a word by the legislature in that act, regardless of the usual and ordinary meaning of that word; unless

21

the definition is arbitrary, creates obvious incongruities in the statute, defeats a major purpose of the legislation or is so discordant to common usage as to generate confusion." *Bird v. Pan W. Corp.*, 261 Ark. 56, 60 (1977).[13]

Here, the definition of "user" is not arbitrary, and while its use in this provision may strike the Court as odd, it is not so obviously incongruous, self-defeating, or confusing that the Court can simply disregard the word and definition chosen by the General Assembly. Indeed, with respect to the privacy default, Defendants' briefing contemplates that parents need tools to exert control over their children's social media use beyond the devices parents themselves provide. *See* Doc. 56, p. 42 ("Even if a parent refuses to give their children an internet-capable device, their children could easily borrow a friend's. What's more, some children likely need to access the internet to complete school assignments."). Considered in conjunction with the enjoined but extant parental-consent requirement for minor "account holders," it is possible that the legislature concluded parents needed additional social media supervision tools for minor "users" in particular, since they are not subject to the parental-consent requirement.

The burdens imposed by the dashboard provision are a lot heavier than those imposed by the fine print required in *Zauderer*. This requirement would force platforms to compile scores of data about minor visitors to their websites, "somehow identify each minor's parents" to provide dashboard access to them, and follow minors across devices to enforce parental restrictions. (Doc. 64, p. 28). Such a requirement is unduly burdensome and seems likely to chill platforms' dissemination of speech to or from

---

[13] "Interpreting state statutes, this court applies that state's rules of statutory construction." *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).

anyone who is not an account holder. The dashboard provision is unlikely to survive even under the lenient standard Defendants ask the Court to apply.

### C.  Irreparable Injury

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted). "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The addictive practices provision, because of its "objectionable vagueness" likewise threatens "delicate and vulnerable" First Amendment freedoms with its "susceptib[ility] of sweeping and improper application." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963). NetChoice has shown that it is likely to suffer irreparable injury if Act 900 goes into effect.

### D.  Balance of the Equities and the Public Interest

"[I]t is always in the public interest to protect constitutional rights" and "[t]he balance of equities, too, generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc). While enjoining enforcement of a duly enacted statute does, in some sense, harm the State, any such harm "cannot be held sufficient to overcome the public's interest in protecting freedom of expression under the First Amendment." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

## IV.  CONCLUSION

For these reasons, NetChoice's Motion for Preliminary Injunction (Doc. 51) is **GRANTED**. Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, are hereby **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a) from enforcing the provisions of Act 900 against NetChoice's members, pending final disposition of the issues on the merits.

**IT IS SO ORDERED** on this 20th day of April, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE